1

2

3

THE HONORABLE RICHARD A. JONES

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

10

11

BRIAN REEF,

12

        Plaintiff,

13

           v.

14

TARGET CORPORATION, a foreign
corporation, registered to conduct business in
the State of Washington,

15

16

        Defendant.

17

No. 2:18-cv-00203-RAJ

**DECLARATION OF ANNE
VANKIRK IN SUPPORT OF
PLAINTIFF'S MOTION IN LIMINE
TO EXCLUDE DEFENSE EXPERT
BRADLEY PROBST**

18

     I, Anne Vankirk, am over the age of 18 years, and I am competent to testify to the

19

following based upon my personal knowledge.

20

21

    1.  I am the attorney of record for the Plaintiff in the above entitled case.

22

    2.    Attached hereto are true and correct copies of the following attachments:

23

24

25

26

| EXHIBIT | Description |
|---|---|
| 1 | Declaration of Dr. Massoudi, dated June 9, 2018 |
| 2 | Report of Dr. Klein, dated October 31. 2018 |
| 3 | Photos: Still captures of the Target incident, dated April 11, 2015 |
| 4 | Report of Bradley Probst |

DECLARATION OF ANNE VANKIRK - 1

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

| 5 | | 117 Reports authored by Bradley Probst between April 29, 2003 and October 5, 2018 and Index |
|---|---|---|
| 6 | | Curriculum Vitae of Bradley Probst |
| 7 | | Deposition of Bradley Probst in LaCroix v. Healy, King County Superior Court, Cause No. 17-2-04131-9 SEA, dated September 18, 2018. |
| 8 | | Declaration of Donald P. Gaver, dated February 16, 2013 |
| 9 | | Correspondence with Dr. Gaver, dated December 17, 2018 |
| 10 | | Combined relevant scholarly articles related to Probst's opinions, including: |
| | 1 | Lack of Relationship Between Vehicle Damage and Occupancy Injury |
| | 2 | Abstract: Rear-end Impacts: Vehicle and occupant response |
| | 3 | SAE: Human Tolerance to Impact Conditions as Related to Motor Vehicle Design |
| | 4 | Clinical Response of Human Subjects to Rear-End Automobile Collisions |
| | 5 | Chronic Whiplash and Whiplash -Associated Disorders: An Evidence-Based Approach |
| | 6 | Understanding and Managing the Impact of Vehicles Crashes: Reconstructing the "Accident" |
| | 7 | The Response of Human Volunteers to Rear-End Impacts: The Effect of Head Restraint Properties |
| | 8 | Parametric Analysis of Vehicle Design Influence on the Four Phases of Whiplash Motion |
| | 9 | BioRID II manikin and human seating position in relation to car head restraint |
| | 10 | Influence of Gender, Height, Weight, Age, Seated Position and Collision Site related to Neck Pain Syndrome in Rear End Impacts |
| | 11 | The Anatomy and Biomechanics of Acute and Chronic Whiplash Injury |
| | 12 | Whiplash Mechanics in Low Speed Rear-End Automobile Collisions |
| | 13 | Change of Velocity and Pulse Characteristics in Rear Impacts: Real World and Vehicle Tests Data |
| | 14 | SAE: Evaluating the Uncertainty in Various Measurement Tasks Common to Accident Reconstruction |

DECLARATION OF ANNE VANKIRK - 2

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

| | | |
|---|---|---|
| | 15 | SAE: Analysis of Human Test Subject Kinematic Responses to Low Velocity Rear End Impacts |
| | 16 | Advances in the Understanding of Rear Impact Collision - Updating Physics, Biomechanics and Statistics |
| | 17 | CV of John J. Smith |
| | 18 | The Problem with Probability |
| | 19 | Applications and limitation of Forensic Biomechanics: A Bayesian perspective |
| | 20 | Influence of Crash Severity on Various Whiplash Injury Symptoms: A Study Based on Real-Life Rear-End Crashes with Recorded Crash Pulses |

| 11 | Orders excluding Probst, including: |
|---|---|

| Date | Plaintiff | Judge | County |
|---|---|---|---|
| 05/02/2006 | Burkett-Wood | Calvin L. Scott Jr. | New Castle (Delaware) |
| 07/14/2009 | Abshir | John P. Erlick | King |
| 11/16/2009 | Stern | Theresa Doyle | King |
| 02/29/2012 | Corner | Jay V. White | King |
| 06/20/2012 | Shim | Barbara Linde | King |
| 09/06/2012 | Arnold | Patrick Oishi | King |
| 09/14/2012 | Guzek | Garold E. Johnson | Pierce |
| 11/07/2012 | An | Hollis Hill | King |
| 12/21/2012 | Williams | Palmer Robinson | King |
| 02/19/2013 | Brumfeld | Jim Rogers | King |
| 02/26/2013 | Ehringer | Mary Roberts | King |
| 10/02/2013 | Galvan | Kimberly Prochnau | King |
| 02/24/2014 | Todd | Schubert | King |
| 05/20/2016 | Dworsky | Bryan Chushcoff | Pierce |
| 08/20/2018 | Chalal | Alicea Galvan | King |

| 12 | Relevant portions of the deposition transcript of Bradley Probst from the case *Wolf v. Stevens*, King County # 12-2-11026-3 SEA |
|---|---|

DECLARATION OF ANNE VANKIRK - 3

**GLP ATTORNEYS, P.S., INC.**
**ATTORNEYS AT LAW**
**2601 Fourth Avenue, Floor 6**
**Seattle, WASHINGTON 98121**
**(206) 448-1992**
**FACSIMILE (206) 448-4640**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## UNDERSTANDING PROBST REPORTS

## PART 1 – "INJURY" AND "BIOMECHANICAL FAILURE" MEAN THE SAME THING

3.      Attached are 117 reports authored by Bradley Probst. In reviewing these reports several things stand out:

3a.     <u>Discussion of injury</u>: Mr. Probst discusses "injury" in all of his reports up until September 20, 2012. He never uses the term "biomechanical failure" a single time in any of his reports before September 20, 2012.

3b.     <u>Probst was repeatedly excluded for discussing injury</u>: Probst's tactic of directly discussing injuries was an easily recognizable problem for the Courts because Mr. Probst has no health care credentials in any state. He was repeatedly being excluded because he was discussing "injuries." In the most egregious instances, he was not only discussing injuries, but also appropriate treatment plans. *See* Nock Report at REPORTS0001, wherein he states, "While minor transient neck pain can certainly occur in a rear-end collision, it is unlikely that it would have required any medical attention and would have resolved itself in a relatively short period of time." (Nock at p. 6). Following exclusions for his use of this tactic in at least four cases in 2012, Mr. Probst coins the term "biomechanical failure" and introduces it for the first time in his report dated September 20, 2012. *See* Allegue Report at REPORTS0374.

DECLARATION OF ANNE VANKIRK - 4

**GLP ATTORNEYS, P.S., INC.**
**ATTORNEYS AT LAW**
**2601 Fourth Avenue, Floor 6**
**Seattle, WASHINGTON 98121**
**(206) 448-1992**
**FACSIMILE (206) 448-4640**

3c. <u>Probst uses "biomechanical failure" as an exact substitute for "injury"</u>: It is useful to compare a report that Probst wrote on September 11, 2012 (Brumfeld Report, REPORTS0362) with one that he wrote on September 20, 2012 (Allegue Report, REPORTS0374). These reports are identical except: (1) he changed the names of the parties), (2) he changed the names of the vehicles involved, and (3) he replaced 37 instances of the word "injury" with "biomechanical failure." There are literally no other changes. This find and replace method to avoid exclusion is easily identifiable because many of the references to "injury" in the Brumfeld report are actually citations to scholarly articles – and he still changed the references to "biomechanical failure." So, the citations that he makes with regard to "biomechanical failures" are in fact just articles about injuries.

3d. <u>Probst is talking about injury when he uses the term biomechanical failure</u>: Probst actually missed a reference to injury in the Allegue report – he accidentally left the reference to "Injury Summary" as a heading on page 3. He continued to use "Injury Summary" until November 29, 2012, when he finally changed it to "Biomechanical Failure Summary" in the Wu report. *See* REPORTS0456. In the Wu report, he does not use the word "injury" a single time other than footnotes to articles that include the word "injury" in their title. He had completely scrubbed all reference to injury. But in comparing reports pre- and post- his "find and replace" job to remove all reference to injury and replace it with "biomechanical failure," it is clear than none of his analysis or conclusions changed.

**GLP ATTORNEYS, P.S., INC.**
**ATTORNEYS AT LAW**
**2601 Fourth Avenue, Floor 6**
**Seattle, WASHINGTON 98121**
**(206) 448-1992**
**FACSIMILE (206) 448-4640**

He continues to talk about injury, as always, – he just coined to new term "biomechanical failure" to try to avoid being excluded.

        3e.      <u>Probst denies that he uses the terms interchangeably even though he directly interchanged them</u>: Mr. Samuel Elder, unfamiliar with the term "biomechanical failure" asked Mr. Probst to define what he meant. Unfortunately, even Probst could not differentiate the two phrases:

> Q You use a term in your report, biomechanical failure. What do you mean by that?
> A Basically it's a mechanical failure that's biologic in nature.
> Q Do you mean the same thing as injury?
> A No. I mean specifically mechanical failure that's biologic in nature.
> Q What's the difference between biomechanical failure and injury?
> A I would have to ask you to define injury.
> Q Do you use the term injury?
> A Certainly at times I use, from a medical point of view, that they say somebody has been injured.
> Q Sometimes you use the term biomechanical failure, sometimes you use the term injury; isn't that fair?
> A Well, it depends on what context. Sometimes it's a quote that somebody claims they were injured or something from another report, but certainly it's possible we use the term injury.
> Q What's the difference in the way that you use the terms biomechanical failure and injury when you use those terms?
> A Again, it would depend upon the context in which they were used to begin with.
> Q Do you use those terms interchangeably?
> A I try not to because specifically, again, trying to allow the readers of the report to understand exactly what we're doing, I attempt to say biomechanical failure just so there's no confusion as to what I'm actually doing or what I'm analyzing or what my opinions are.
> Q Do you believe that it would be improper to use them interchangeably?
> A Again, it depends on the context. It's possible they could be. It depends upon your definition of injury.

DECLARATION OF ANNE VANKIRK - 6

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

Q Let me ask you this. You've authored a number of different reports over the years. Have you used the terms biomechanical failure and injury interchangeably?

A I don't know about interchangeably, but as I said, I think I've tried to use biomechanical failure much more so now because there appears to be some confusion as to what biomechanics is and what a biomechanical failure is. So again, just to be precise and specific I attempt to say biomechanical failure.

Exhibit 10, Wolf dep., p. 15: 23 to p. 17: 14.

Mr. Probst also testified that he believed the Plaintiff in that case had claimed "biomechanical failures:"

Q Has Laura Wolf ever claimed any biomechanical failures?

A Certainly, yes.

Q What biomechanical failures has she claimed?

A They are well documented in my report starting on page three. Well, simply just on the bottom of page three.

Q And so what you're talking about is cervical spine strain/sprain, thoracic and lumbar spine sprain/strain, and right shoulder rotator cuff tear?

A Correct.

Q Aren't those the injuries that she's claiming?

A These are biomechanical failures, as I note.

Q I don't think she's ever called them biomechanical failures. I've never called them biomechanical failures. She said that she was injured and these are her injuries, her doctors have said that these are her injuries, but I haven't heard anyone call it biomechanical failures but you. Did you see any reference to anyone calling this a biomechanical failure other than you?

MR. NYE: Object to the form.

A Again, as it states here, according to the documents this is what's reported in her records that these are the biomechanical failures. Again, I'm looking at it from a biomechanical point of view. That is what's in those documents.

Q In any document do you see anyone ever call this a biomechanical failure?

A I don't recall. I have hundreds and hundreds of pages of documents. I don't recall honestly.

Q Is that a term that doctors typically use?

A I don't know if I've seen it quite often. Generally not. It might just be noted as sprain or strain or something like that.

Exhibit 10, Wolf dep., p. 19: 6 to p. 20: 12.

DECLARATION OF ANNE VANKIRK - 7

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

Based on this answer, I can only conclude that "biomechanical failure" is synonymous with injury. It appears that Mr. Probst uses the terms "injury" and "injury mechanism" interchangeably with "biomechanical failure" and "biomechanical failure mechanism." It appears that Mr. Probst started using the term "biomechanical failure" because he is not a doctor or health care provider of any kind, so he was being excluded for discussing "injuries." So he invented a kind of "double-speak" to get to avoid being excluded – but he is still just discussing injuries and causation of injuries when he has no license to do so. In fact, in the Fox case, he goes so far as to state, "While minor transient neck pain can certainly occur in a rear-end collision, it is unlikely that it would have required any medical attention and would have resolved itself in a relatively short period of time. An injury mechanism for the claimed cervical injury was not present in the subject incident." Mr. Probst apparently feels comfortable expressing opinions on specific diagnosis of injuries and whether treatment is appropriate or not even though he is not a medical doctor or health care provider of any kind.

4f.     Throughout this declaration, just like in Probst's reports, you can read "injury" and "biomechanical failure" interchangeably. You can find the quoted language both ways. Indeed, it is not possible to separate the two terms when discussing Probst's reports, because they represent the same impermissible medical opinion.

//

//

DECLARATION OF ANNE VANKIRK - 8

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

## PART II – PROBST'S CONCLUSIONS AND PROBLEMS ASSOCIATED WITH THEM

4.      Probst's conclusions are consistent across the 117 reports. Each report has a conclusion section where these same conclusions can be found nearly every time. I generally discuss each of his eight categories of conclusions, but because the science simply does not apply here at all, I have limited my discussion. Each conclusion I discuss begins with an example of the conclusory paragraph and is followed by subparts. The first paragraph (6a, 7a, 8a, 9a) contains the category, example, and four citations for easy reference (although many of these conclusions are found in nearly all 117 attached reports).

5a.      <u>Injury status and need for treatment</u>: Example: "While minor transient neck pain can certainly occur in a rear-end collision, it is unlikely that it would have required any medical attention and would have resolved itself in a relatively short time." Four examples: REPORTS 0006, 0038, 0052, 0102.

5b.      Probst holds no health care credentials in any state. He is not a licensed engineer or professional engineer. He obtained a masters in Biomechanical Engineering from Tulane. Probst is totally unqualified to diagnose injury. Probst is completely utterly out of his element when he starts issuing opinions related to whether a particular person needed to see health care and the prognosis for how soon they will recover. Yet Probst does not allow his total lack of qualifications stop him from rendering opinions.

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

5c.     Probst offers unqualified medical opinions disguised as the manner in which someone can be injured in the first place. In an attempt to circumvent exclusion due to discussing specific injury without proper qualification to do so, Probst offers opinions generally about injury and the root causes thereof. For example: In the Stark report (REPORTS0518), Probst opines that plantar fasciitis is a degenerative condition and "occurs due to prolonged standing and running." This conclusion is deceptive because describes degenerative plantar fasciitis and ignores acute plantar fasciitis, which can occur due to sudden injury. Probst then goes on to conclude that there is no "biomechanical failure mechanism" present to account for Ms. Stark's plantar fasciitis, without ever raising, discussing, or even acknowledging the injury mechanism of acute (accident related) plantar fasciitis. *Id.* at 0519. It is unclear as to whether this misleading conclusion is due to a deliberate attempt to deceive, or if it is the unsurprising oversight of an unqualified person.

6a.     No injury mechanism: Example: "There was no injury mechanism present to account for Ms. X's claimed back injuries."

6b.     Probst proposes a two part test for whether injury occurred:

1. Did the subject incident load the body in a manner known to cause damage to a body part? That is, did the subject event create a known injury mechanism?
2. If any injury mechanism was present, did the subject event load the body with sufficient magnitude to exceed the tolerance or strength of the specific body part? That is, did the event create a force sufficiently large to cause damage to the tissue?

DECLARATION OF ANNE VANKIRK - 10

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

The key to understanding Probst's opinions is that he consistently – 117 out of 117 reports[1] – answers the first question NO. He never finds that there is any mechanism that could even account for an injury. Thus, he never actually needs to get to the magnitude question. He goes ahead and talks about the magnitude, but his conclusion of no injury (or no biomechanical failure) is always premised on finding no mechanism of injury was present – irrespective of the magnitude of forces.

6c.    Probst does not just deny that these 117 people were injured in a particular collision – he denies that there was even a mechanism by which someone could potentially be injured. So, this is not even that these 117 people just got lucky and escaped the collision uninjured. Probst opines that there is no mechanism that could possibly injury anyone in any of these 117 cases that he reviewed. Probst's opinion is not only generic and non-specific to the 117 plaintiffs in these cases, but any of the 7,530,000,000+ humans on this planet could have been in all 117 collision, and no one would have gotten hurt. How do we know this? Because Probst opines that there was simply no mechanism present by which *anyone* could be injured.

6d.    The conclusion that "no biomechanical failure mechanism was present" is shocking enough, and clearly runs counter to the huge body of scientific literature regarding whiplash as an injury producing mechanism, but it looks even worse in the

---

[1] Note that there is one exception in the supplied reports at REPORTS0077. In this report, Probst does not opine that the plaintiff, an elderly woman, could not have been injured (she was killed after being run over by the defendant's truck). Outrageously, he finds that the plaintiff had 3.59 seconds to observe the defendant's vehicle and 0.25 seconds to get 14.75 feet to safety. His conclusion: "she had ample time" to get to safety and therefore her death was her own fault. REPORTS0077-0079.

DECLARATION OF ANNE VANKIRK - 11

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

context of the specifics of the collisions. For example, these are the photographs of the vehicle in which Baccay (REPORTS0208) was an occupant:



And the vehicle where Chalal (REPORTS1284) was an occupant:



This is the car that hit Chicas (REPORTS1211):

DECLARATION OF ANNE VANKIRK - 12

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640



And it went under Chicas's bumper as shown in this photo:



  In all three of these cases, Probst concludes that there was no injury mechanism. There was no mechanism that could have caused injury not only to the plaintiffs, but to any and all 7,530,000,000 people on this planet.

  6e. Obviously, there is an injury mechanism that is present in motor vehicle collisions. The scientific literature is full of studies about injuries from motor vehicle collisions. See Ex. 10, Combined Articles. People get hurt in car accidents. *Id*. The mechanism is usually whiplash (shearing forces, compression forces, hyper-extension, and hyper-flexion) but can involve other mechanisms such as blunt force trauma. *Id*. These

DECLARATION OF ANNE VANKIRK - 13

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

mechanisms are well described in the scientific literature and part of our common sense. *Id.*

6f.    I incorporate the discussion in 6c here. Often, Probst uses this conclusion to link in his impermissible medical opinions titled "evaluation of biomechanical failure mechanisms" as a back doored dismissal of the plaintiff's actual injuries, even though he is completely unqualified to offer a medical opinion.

7a.    <u>Magnitude of forces are within human tolerance</u>: "The acceleration experienced by Ms. X was within the limits of human tolerance and the personal tolerance levels of Ms. X based on an engineering analysis experienced during various daily activities." Probst suggests that he knows the personal tolerance levels of each of these 117 individuals – individuals that undoubtedly vary widely.

7b.    The first problem is that Probst is focused purely on the <u>magnitude</u> of the forces. We all know the difference between being poked in the shoulder and being poked in the eye. It is not simply the magnitude of the forces – it is also the application of the forces to the body that matter. Similarly, the forces would be exactly the same if I was dropped from one foot high onto my feet or my head. Dropping me on my feet is no problem – dropping me on my head is likely to send me to the emergency room. The fact that someone may consciously and voluntarily engage in activities such as running or jumping that generate high forces tells us nothing about a person's ability to undergo the non-physiological movements encountered in collisions or other incidents. It is truly not a question of magnitude. The human body can take lots of forces in the right way, but very

DECLARATION OF ANNE VANKIRK - 14

**GLP ATTORNEYS, P.S., INC.**
**ATTORNEYS AT LAW**
**2601 Fourth Avenue, Floor 6**
**Seattle, WASHINGTON 98121**
**(206) 448-1992**
**FACSIMILE (206) 448-4640**

little force in a situation like whiplash. This is why so many people get hurt in car accidents – the application of forces to our body in this way easily produces injury.

8a.   No causal link between the incidents and injuries: "There is no causal link between the reported back injuries of Ms. X and this reported collision. Ms. X's thoracic or lumber spine experience loading on a daily basis greater than that experienced in this incident." Probst denies causation.

9a.   Probst has been repeatedly precluded from testifying by trial courts in Washington because (1) he is unqualified to testify on the matters that he proposes to testify about, (2) his testimony either directly states or implies that a plaintiff was not injured, but he is not a medical provider, (3) his opinions are unscientific, (4) his opinions are not helpful to the jury, (5) his opinions are based on speculation or conjecture, and (6) his opinions are more prejudicial than probative. See Ex. 11, Combined Orders Excluding.

In excluding Mr. Probst's testimony in <u>Corner v. Lusardo</u>, King County # 11-2-04500-5KNT, the Honorable Jay White wrote:

> Medical injury causation must be proved by competent medical testimony. Probst's opinions rely on examination of photographs of damage to the subject vehicles and controlled low impact tests experienced by volunteers subjected to rear-end impacts which he asserts are of comparable or greater severity to that experienced by plaintiff. His conclusions that there is "no injury mechanism present in the subject incident" to account for plaintiffs injuries go well beyond the opinion testimony deemed within the discretion of the court to admit in *Ma'ele v. Arrington,* 111 Wn.App. 557 (2002). Probst's opinions are not helpful to the jury in determining whether this particular plaintiff in this particular case sustained injury from this particular accident.

DECLARATION OF ANNE VANKIRK - 15

**GLP ATTORNEYS, P.S., INC.**
**ATTORNEYS AT LAW**
**2601 Fourth Avenue, Floor 6**
**Seattle, WASHINGTON 98121**
**(206) 448-1992**
**FACSIMILE (206) 448-4640**

An Order signed by the Honorable Barbara Linde, excluding Mr. Probst's testimony in <u>Shim v. Swenson</u>, King County # 11-2-03939-1 SEA, and noted, "[t]he testimony offered leads to an inference that Mr. Probst is testifying, as a medical expert, about the plaintiffs injuries in this case. Mr. Probst is not qualified to do so."

In <u>Brumfield v. Bustamonte</u>, King County # 12-2-04210-2SEA, Judge Jim Rogers stated, "The proposed opinions mislead on several bases. First, assuming the opinions are true, injuries are awarded for more than "biomechanical failures" yet his opinions seek to imply that no injuries of any kind were suffered. Second, the expert never reviewed any of the medical records of this plaintiff. The Court understands that this expert is not giving opinions on medical causation, but that is exactly what he implies by his opinion of 'biomechanical failure.' Thus, there is a lack of foundation."

In <u>Williams v. McLean</u>, King County # 12-2-01978-9SEA, Judge Palmer Robinson found:

> Mr. Probst's offered testimony goes far beyond a description of the forces in this motor vehicle accident. It is an offer of testimony of medical causation from someone who is not qualified to give it. Even were Mr. Probst a physician and able to diagnose medical causation, which he is not, there is no showing that the idea that forces such as existed in this accident are incapable of producing injury is generally accepted in the relevant, i.e. medical, scientific community.

In <u>An v. Smith</u>, King County # 11-2-30189-3KNT, Judge Hollis R. Hill excluded Probst, finding:

> Medical injury causation must be proved by competent medical testimony based on a more probable than not standard. Dr. Probst's opinions that the impact at issue in this case was too slight to have resulted in plaintiff's alleged

DECLARATION OF ANNE VANKIRK - 16

**GLP ATTORNEYS, P.S., INC.**
**ATTORNEYS AT LAW**
**2601 Fourth Avenue, Floor 6**
**Seattle, WASHINGTON 98121**
**(206) 448-1992**
**FACSIMILE (206) 448-4640**

injuries is in essence a medical opinion which as a biomechanical engineer Dr.Proubst is not qualified to give. Furthermore, the "limits of human tolerance" as determined by Dr. Proubst using test subjects of unknown health, age and conditioning are irrelevant to the question of causation of Ms. An's alleged injuries. Therefore, the testimony regarding the lack of causal relationship between the subject incident and Ms. An's claimed injuries is inadmissible under ER 702 and ER 402.

Furthermore, this evidence would encourage impermissible speculation on the part of the jury, in the absence of competent medical evidence, that the plaintiff herself was not in fact injured in the subject incident. Therefore ER 403 precludes admission of this evidence because its probative value is substantially outweighed by its potential prejudicial impact.

Finally, in his report Dr. Probst states, "[t]he severity of the subject incident was consistent with a Delta-V less than 5 miles-per-hour with an average acceleration less than 1.5 g for the subject 2006 Lexus RX 400h in which Ms. An was seated." There is insufficient foundation for this conclusion in that he utilizes an Insurance Institute for Highway Safety (IIHS) low speed test of an "essentially the same" vehicle which showed certain damage when crashed into a flat barrier at *5* miles an hour. There is no assertion or showing that the rear end collision in this case was comparable to a crash into a flat barrier. The opinions based on these test studies lack sufficient foundation and are therefore irrelevant under ER 402. Because they would not assist the trier of fact to understand the evidence or determine a fact in issue they are also inadmissible under ER 702.

In <u>Guzek v. Rubino</u>, Pierce Co. # 09-2-06071-7, Judge Garold E. Johnson found:

Having said that, after reviewing his materials, I find that they're not helpful compared to their potential harm. In other words, while somewhat probative at some level, I think, I tend to agree with the court's comment it's fascinating science, but not very helpful to the finder of fact. And therefore, its probative value is outweighed by its prejudicial effect.

One of the things that concerned me as I was reading through it is that there's no indication, whatsoever, of how susceptible this particular person is to injury. None, whatsoever. And neither could he make that kind of a calculation. There's no indication he has any idea of the location, the movement, the forward forces, the lateral movement, any of that on the part of the plaintiff before impact. There's no indication of how much energy may have been

DECLARATION OF ANNE VANKIRK - 17

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

enforced because she applied the brakes, because he has no idea how fast the car was going when the brakes were applied.

There's no indication of energy to be absorbed by other matters at the scene, non-photographed matters, such as underneath of the car, or the curb, or the – in this case wouldn't be a curb, but whatever else may have been there. None -- nothing, whatsoever. No photographs of the area that he reviewed at all.

And clearly, the inference that this expert is trying to persuade the jury -- because he said so outright -- but even if I was to strike that portion of it, the only import of this testimony is the inference that the defendant [sic] was not hurt in this accident. But there's no medical testimony that supports that conclusion whatsoever.

Thus, judges have routinely excluded Probst for lack of qualifications as a healthcare provider, lack of foundation, and for proffered testimony that is more prejudicial than probative.

10a.    Probst's opinions contradict numerous scholarly articles. These are discussed below.

10b.    Davis, <u>Rear-end impacts: vehicle and occupant response</u>, J. Manipulative Physiol. Ther., Nov-Dec 1998, p. 629-39, establishes that there is no relationship between property damage and injuries. ("In low-impact collisions, there are usually no skid marks or visible damage to the vehicle. There is a lack of relationship between occupant injury, vehicle speed and/or damage. There does not seem to be an absolute speed or amount of damage a vehicle sustains for a person to experience injury. Crash tests indicated that a change of vehicle velocity of 4 km/hr (2.5 mph) may produce occupant symptoms. Vehicle damage may not occur until 14-15 km/hr (8.7 mph).") [Decl. of Elder, Ex. 6]

DECLARATION OF ANNE VANKIRK - 18

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

10c.   <u>Human Tolerance to Impact Conditions as Related to Motor Vehicle Design</u>, SAE J885, establishes that there are no scientifically established tolerance levels for injury. In other words, there is no force at which we can say with confidence that injury will not occur. There is simply too much human variability.

4.2.2 DETERMINATION OF TOLERANCE LEVELS—A comprehensive discussion of the factors involved in the determination of human tolerance levels is beyond the scope of this report. Indeed, such specifications are beyond the state-of-the-art in biomechanics except perhaps for a few academic situations. There are several difficulties which prevent a ready establishment of human tolerance levels. First, there are differences in judgement as to the specific degree of injury severity that should serve as the tolerance level. Second, large differences exist in the tolerances of different individuals. It is not unusual for bone fracture tests on a sample of adult cadavers to show a three-to-one load variation. Presumably, variations of at least this magnitude exist in the living population. Finally, most tolerance levels are sensitive to modest changes in the direction, shape and stiffness of the loading source. The above considerations indicate that complete and precise definitions of human tolerance levels will require large amounts of data based on controlled statistical samples. Only in this way can the influence of age, size, sex, and weight be comprehensively assessed and only in this way can mean loads and statistical measures of scatter be linked to specific tolerance levels.

The paper goes on to discuss limitations in using "crash test dummies" or "surrogates" to apply to humans generally. Section 6, pages 46-48. "An area of concern in the restaging of accidents is the uncertainty in matching the surrogates' positioning in the vehicle to that of the human occupant. The latter's exact pre-impact position is generally unknown; yet, crash test experience has indicated that small differences in dummy placement can often produce substantial differences in the level of the measured injury indicators." (p. 48, para. 6.2.2.1)

DECLARATION OF ANNE VANKIRK - 19

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

10d.    Brault, et al, <u>Clinical Response of Human subjects to Rear-End Automobile Collisions</u>, Archives of Physical Medicine Rehabilitation, Vol. 79, January 1998, establishes that 29% and 38% of subjects exposed to 2.5 mph and 5 mph speed changes in collisions experience whiplash associated disorder. "Approximately 29% and 38% of the subjects exposed to 4km/hr and 8km/hr speed changes, respectively, experienced WAD symptoms, with cervical symptoms and headaches predominating."

"Approximately 6.5 million motor vehicle accidents occurred in the United States in 1994, resulting in approximately 3.2 million injuries. Eighteen percent of the accidents involving passenger cars were rear-end impacts that caused injury to 500,000 persons. Rear-end impacts result in a higher frequency of "whiplash" injuries in comparison with other crash configurations.  According to the Insurance Research Council, the incidence of bodily injury liability claims associated with motor vehicle accidents has been increasing, with sprain/strain injuries accounting for the greatest share of injuries. Frequently, scientific literature uses the term *whiplash* to describe not only a mechanism of injury but also the injury or syndrome associated with the mechanism. According to the recommendations proposed by the Quebec Task Force in 1995, this study uses the term *whiplash-associated disorders* (WAD) to refer to the various clinical manifestations associated with the whiplash injury mechanism, including cervical soft-tissue strain, headache, dizziness, tinnitus, memory loss, temporomandibular joint (TMJ) pain, and others.

The results of this study reveal objective clinical deficits consistent with WAD at both 4 km/h and 8km/h speed changes in both men and women. The distribution of symptoms by body region agrees with clinical reviews and descriptive case series of WAD, with cervical symptoms and headaches predominating.

10e.    Bartlett, <u>Evaluating the Uncertainty in Various Measurement Tasks Common to Accident Reconstruction</u>, SAE 2002-01-0546, highlights the uncertainty associated with crush estimates based on photographs:

CRUSH ESTIMATES FROM PHOTOGRAPHS

DECLARATION OF ANNE VANKIRK - 20

**GLP ATTORNEYS, P.S., INC.**
**ATTORNEYS AT LAW**
**2601 Fourth Avenue, Floor 6**
**Seattle, WASHINGTON 98121**
**(206) 448-1992**
**FACSIMILE (206) 448-4640**

Participants were asked to estimate the crush and or Equivalent Barrier Speed (EBS) of a vehicle from a single photograph (Figure 19) or a set of two photographs (Figure 20a and 20b) without any additional information. In the single photograph exercise, 57 participants provided 11 crush estimates and 49 EBS estimates. … In the two photograph exercise, 52 participants provided 8 crush estimates and 51 EBS estimates. … Most of the participants in this exercise reported that they would not attempt to use information generated in this fashion in a reconstruction without additional details and analysis.

10f.    McConell, et al, <u>Analysis of Human Test Subject Kinematic Responses to Low Velocity Rear End Impacts</u>. Tests were run with the struck vehicle experiencing speed changes of 6-8 kph (4-5 mph) and 3-5 kph (1.9-2.4 mph).

The data from our low velocity rearend collision test series using volunteer test subjects supports the preliminary conclusion that substantial Gz direction acceleration occurs and is associated with both compressive and tensile forces sequentially directed axially through the cervical spine.

These push-pull forces probably represent an injury causation mechanism independent of the commonly described cervical "whiplash" hyperextension/hyperflexion mechanism. For rearend collisions within the velocity range included in our test series, the classic "whiplash" injury mechanism, seems unlikely since no hyperextension or hyperflexion was observed in any of our test subjects. Despite having experienced no neck excursions beyond their voluntary range limits, three of our four test subjects transiently had very mild, but clinically classic neck discomfort symptoms.

10g.    Freeman, <u>The Problems with Probability</u>. Michael Freeman, Ph.D., M.P.H., D.C. discusses the problems with biomechanics using probability after a crash to determine that, since the probability of injury in a low-speed crash is very low, the plaintiff could not have been injured. This type of reasoning is obviously flawed.

The defense's use of probability in minor impact soft tissue (MIST) cases differs from its use in major auto injury and death (MAID) cases in several ways. The defense uses probability after the fact to deny causality in MIST

DECLARATION OF ANNE VANKIRK - 21

**GLP ATTORNEYS, P.S., INC.**
**ATTORNEYS AT LAW**
**2601 Fourth Avenue, Floor 6**
**Seattle, WASHINGTON 98121**
**(206) 448-1992**
**FACSIMILE (206) 448-4640**

cases. For example, an expert will say it is within the realm of possibility that a plaintiff who developed neck pain within a day of a minor collision, or felt arm pain within a week, or was diagnosed with a herniated cervical disc within a month had these symptoms before the collision, was injured some other way, or is not really injured. This allows the defendant to ask the jury to speculate about some other, unnamed injury cause.

In contrast, the defense cannot claim that a plaintiff who has been catastrophically injured or killed in a high-speed collision was paralyzed or dead before the collision or was injured in some other way shortly afterward. In MAID cases, the defense must account for the injury while pointing to a higher probability that the failure to wear a seat belt or the plaintiffs excessive speed, for example-rather than a product failure or the negligence of the defendant-caused injury.

In MIST cases statements of probability form the entire basis for the defense strategy. The defense will tell the jury that injuries are unlikely when there is minimal damage to a vehicle. Defense experts will claim that at low speeds injury is so improbable that it is virtually impossible. Defense medical examiners will opine that most patients will recover from injury in a matter of weeks or months, and so the plaintiff's protracted recovery is so unlikely that it must be due to some other injury or preexisting condition.

With these proclamations the defense and its experts are telling the jury: If something is unlikely to have happened then it *probably* didn't happen. Many judges will allow such testimony over the plaintiff's objections, relying on the jury to assign the appropriate weight to the opinions they hear.

…

For MIST cases:

- Risk is a predictive tool, and you cannot predict the past. Risk or probability cannot be used retrospectively to cast doubt on or deny an injury that has been observed and recorded. The defense may try to use the low likelihood of injury after a crash to deny that the crash caused injury. …

- What is "usual," "typical," or "average" has no application to a specific case. References to average injury responses to a crash are irrelevant to individual outcomes. The defense may use expressions like "most people" or "usually" when discussing a plaintiff's injuries in an effort to cast doubt on them because they are somehow out of the ordinary. Even if it is true that the average person would not suffer permanent injuries in a particular crash – a statement that would have to be validated with real data – this does not mean that 30 percent of the population would not be permanently

DECLARATION OF ANNE VANKIRK - 22

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

injured, or that the plaintiff is "average." A good analogy is body weight: If the average person weighs 170 pounds, this does not mean that the next person who walks through the door cannot weigh 200 pounds.

- Injury risk is population-specific. Gender, age, physical condition, vehicle type, and other variables all contribute to risk injury in a crash. A 53-year old woman with a history of neck surgery belongs to a relatively rare demographic group, and so the claim that injury from a minimal-damage crash is highly unlikely to the general public has little meaning for her case. Even if accurate, such claims are relevant only when there is no specific individual with an injury. Once the injury has occurred, the various risk factors for injury present in an individual define a target population for which injury-frequency statistics do not exist. …

- The opinion must have a sound basis. When an expert testifies that injuries are unusual in crashes with less than a certain amount of vehicle damage, this opinion must be challenged. It implies knowledge of injury risk for such crashes, and risk is a population-based inference. Evidentiary standards, such as those established by Frye and Daubert, allow for hearings in which unfounded and speculative claims of probability can be challenged and excluded.

10h.   Freeman, <u>Applications and limitations of Forensic Biomechanics: A Bayesian perspective.</u>

The accuracy of Forensic Biomechanics largely depends on the circumstances in which it is applied and the pre-test probability of the condition of interest. The technique results in the most accurate results when used to explain how an injury occurred, vs. when it is used to refute the causal relationship between an injury mechanism and an injury. The results may be mixed when the technique is used to evaluate the probability of an injury outcome for an actual scenario vs. a hypothetical scenario; we suggest that the biomechanical analysis be correlated with observational epidemiologic study that supports the biomechanical conclusions. A large part of the difficulty with the practical application of Forensic Biomechanics stems from the dichotomization of continuous variables such as risk into an "injury likely" vs- "injury unlikely" delineation, as this raises the potential for false positive results, particularly when the technique is used in an exclusionary manner. An Error Odds analysis that takes into account the pre-test probability of the test result, as well as the true and false positive rate of the test is an important tool for evaluating the accuracy of the forensic biomechanical analysis. A forensic biomechanical

DECLARATION OF ANNE VANKIRK - 23

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640

opinion that is supported by an Error Odds estimate of l0 or more is more likely to survive a Daubert challenge in the courts. p77.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 21st day of December, 2018.

SIGNED at: Seattle, Washington.


           s/Anne Vankirk
Anne Vankirk, WSBA No. 47321
GLP Attorneys, Inc., P.S.
2601 4th Ave., Floor 6
Seattle, WA 98121
Telephone: (206) 448-1992
Fax: (206) 448-4640
E-mail: avankirk@glpattorneys.com
Attorney for Plaintiff Brian Reef

DECLARATION OF ANNE VANKIRK - 24

GLP ATTORNEYS, P.S., INC.
ATTORNEYS AT LAW
2601 Fourth Avenue, Floor 6
Seattle, WASHINGTON 98121
(206) 448-1992
FACSIMILE (206) 448-4640