# EXHIBIT No. 2



*"Representing Quality Physicians"*

**Corporate Office**
2409 Pacific Ave. SE
Olympia, WA 98501
Phone (360) 867-4188
Fax (360) 867-0466
pds@physiciandirectservices.com

# Steven Klein, M.D.
## Board Certified Neurosurgeon

October 31, 2018

Natalie A. Heineman
Attorneys at Law
Forsberg & Umlauf, P.S.
901 Fifth Avenue, Suite 1400
Seattle, Washington 98164-2050

Claimant:                    **Brian Reef**
*Brian Reef vs. Target Corporation*
US District Court of Washington Cause No.: 2:18-cv-00203-RAJ
Date of Loss:                **April 11, 2015**
File No.:                     **1523.0091**
Date of Examination:         **October 9, 2018**

Dear Ms. Heineman:

Please review the enclosed **CR-35 Evaluation** report which was produced to document the evaluation that was performed on October 9, 2018. The evaluation was performed by Steven Klein, M.D., Board Certified Neurosurgeon.

The examinee was informed that this examination was scheduled at your request, that a written report would be sent to you, and that the examination was for evaluative purposes only.

The examinee was informed that the purpose of the evaluation was to address specific injuries or conditions and that it was not meant to constitute a general medical examination. The examinee was told that the evaluation was not a substitute for an appointment with a personal physician(s) or medical care.

**Natalie A. Heineman**                                          **Re: Brian Reef**
**Attorneys at Law**                                                      **Page #2**
**October 31, 2018**

The examinee was instructed at the time of the evaluation not to engage in any physical maneuvers beyond what could be tolerated, which might exceed personal limits, or may cause physical harm or injury.

Please review the following report:

Thank you for the opportunity to review Mr. Reef's medical records and conduct a CR-35 examination on this gentleman. As you know, this dispute is a result of a box, a load on a cart, consisting of several boxes, fell off and hit Mr. Reef in the back of his calves. This was at a Target Store. He fell forward and allegedly injured his lower back. Since the accident, he has had two operations, the first a discectomy and the second a two-level lumbar fusion. He claims ongoing disabilities as a result of this incident.

## RECORDS REVIEWED:

In forming opinions expressed in this report:

*1.*     Photographs of Mr. Reef prior to the subject incident;
*2.*     Deposition of Brian Reef;
*3.*     Recorded statement of Brian Reef;
*4.*     Declaration of Jarrod Durkee, M.D.;
*5.*     Declaration of Farzad Massoudi, M.D.; and
*6.*     Medical records from the following sources:
      a.  Fang Frank Yu, M.D., Ph.D;
      b.  The Oso Family Medical Group;
      c.  Community Orthopaedic Medical Group;
      d.  Mission Medical Center;
      e.  Dr. Pardise Moraghebi, M.D.;
      f.  Mission Medical Center Emergency Room notes;
      g.  Radiology studies from Mission Medical Center; including: MRI of the lumbar spine, as well as operative fluoroscopy reports.
      h.  Saddleback Valley Radiology; and
      i.  Memorial Care Saddleback Medical.
      j.
*7.*     Surveillance video of the subject event

**Natalie A. Heineman**                                    **Re: Brian Reef**
**Attorneys at Law**                                              **Page #3**
**October 31, 2018**

## INTRODUCTION:

I met with Mr. Reef on Tuesday, October 9, 2018. Present were the representative from the claimant's attorney's office and a videographer. The examination lasted approximately 50 minutes. During the examination, Mr. Reef deferred to medical records on several points.

I advised Mr. Reef that this is not to be considered medical care, and there is no patient-physician relationship sought or established. I also asked Mr. Reef to interrupt me at any time if anything looks at all unclear. Additionally, I asked Mr. Reef to speak up and to inform me if he believed anything I asked him to do would be painful, and this could be omitted. Also, Mr. Reef should speak up if any activity is painful.

I advised Mr. Reef that I was hired indirectly by defense attorneys in this matter.

At the end of the visit, the nurse present on behalf of the plaintiff's attorney's office inquired whether Mr. Reef was injured in any way, and he stated that he was not.

## HISTORY OF THE CURRENT INJURY:

Brian Reef is a 60-year-old, healthy male who had a load from a cart fall on him at Target on April 11, 2015. He fell forward, and this "jolted his lower back." This was not painful in his calves bilaterally. He sat for a few minutes waiting for the manager to appear, and when the manager did not, he after a while walked out "carefully with my wife." Treatment has consisted of physical therapy and two surgical interventions.

Mr. Reef claims he is "very pain tolerant."

Mr. Reef lives in California and was in Gig Harbor for a combination of business and to visit some children and grandchildren he has there.

Initially, all pain was in the lumbar region and was "in the back." Leg pain became more notable as time went on, with radiation into the left leg and neck.

Mr. Reef states his first operation "did very little." The second procedure was "a little more successful." Mr. Reef continues to have decreased sensation in the outside of his left foot and over the dorsum of his foot to his great toe. He claims it (is leg) is tight, and he has difficulty maintaining his balance.

**Natalie A. Heineman**                                    **Re: Brian Reef**
**Attorneys at Law**                                                **Page #4**
**October 31, 2018**

Mr. Reef states he is unable to hunt, play racquetball, or run as a result. He had been able to return to golfing "carefully." His back becomes sore "way easier than it should." The pain is not excruciating, but it is to the degree that he must curtail activities if he tries.

In the past three years, Mr. Reef states he has improved "25 to 30%." He missed "very little" work. His job is sedentary. Additionally, Mr. Reef was unable to "power walk."

Mr. Reef denies any history of previous back pain. He is on no medication. He is on no prescribed medication; however, he does take ibuprofen as need be. Mr. Reef drinks alcohol "occasionally." This is one to two drinks a couple of times a week. He does not smoke tobacco.

Mr. Reef is unaware of plans for further surgery.

Mr. Reef has also participated in water hydrotherapy which "did nothing."

## **RECORD REVIEW:**

### **Deposition of Brian Reef**

July 12, 2018. Mr. Reef was deposed on this date. Amy Miller, GLP Attorneys, was present for the plaintiff, and Roy Umlauf, of Forsberg & Umlauf, was present for the defendant.

Currently, Mr. Reef lives in Mission Viejo, California; however, he grew up locally and continues to have a residence in Gig Harbor. He is in this area, in the Northwest, once a month or once every other month.

Mr. Reef states he golfs and fishes. He started golfing when he moved to California. Prior to the subject event, Mr. Reef was able to play racquetball and tried to play racquetball two to three times per week, and "I was just very, very active."

Mr. Reef has no history of back pain or pain that resembled radiculopathy. Mr. Reef has had knee surgery (side not stated). The knee injury, a meniscal tear, was due to playing racquetball.

Mr. Reef states he is unable to play racquetball because he has "no feeling in my left foot. I can't push off." He tried one time but fell. He has gone back to playing golf. He is unable to fish and hunt and do activities associated with house remodeling.

Natalie A. Heineman                                            Re: Brian Reef
Attorneys at Law                                                   Page #5
October 31, 2018

Mr. Reef was taking no medications at the time of the accident. He had a family history of alcoholism. Mr. Reef states he consumes about 14 alcoholic beverages per week (or thereabouts). Mr. Reef has no history of tobacco abuse. He did have one daughter with diverticulitis.

Mr. Reef was in a minor motor vehicle accident possibly 30 years ago.

Mr. Reef was unable to play racquetball, which was his "first love." Mr. Reef is able to golf; however, he needs to be "careful when I golf. I can't - - I don't take a full swing when I tee off. I - - I'm scared. I'm nervous to do that, okay." Mr. Reef used to have climbing gear he used to trim palm trees on his property. Mr. Reef is limited in what he can do in his swimming pool and is unable to be on rollercoaster rides. Mr. Reef states he continues to do his own gardening, except for the palm trees.

On the date of the accident, Mr. Reef had been in the store for 15 or 20 minutes. He believes this was on a Saturday. He was parked six or eight spots away from the store.

Mr. Reef was on his way out of the store and noticed "a young Target employee was struggling with a load on a flat cart. I had to walk around him to the left. I had to wait to the left a little bit, get rid of my cart."

"As I went to the left-handed side of the door, he had already kind of snuck through and was parked in the left - - the door to the right. And to go around him, I had to go to the right. As I got past him, there was a - - I believe a lady and a - - with a shopping cart and young daughter or son, one of the two, kind of going real slow. I had to slow down, and I almost stopped waiting for them. And then, out of the blue, I - - the dresser came down - - hit me from behind and took me down."

Mr. Reef was asked whether he had seen the furniture that had fallen off of the cart, and his reply: "As I - - as I went to - - to leave the store out the right-hand door, the employee was struggling to try and keep something on the cart. I think it had fallen off the cart."

Mr. Reef states the object landed on his calves towards his thighs but mostly in the upper calves. It first hit his left side and then the right. He believed he was "obviously bruised." The thrust of his legs was going forward, and his back was "going back", and he was trying to catch himself.

Mr. Reef was asked how long the dresser was, and his answer was: "When the dresser came down on me, okay, and I did everything. I did my thing and everything, and I did my thing and everything, I got kind of woozy, okay. I thought the employees took it off my legs, okay, because that's where I felt it at, was the back of my legs - - that - - dresser,

okay. But when I turned around, it looked, turned to look, it - - it - - the dresser was sitting off to my right, okay."

Mr. Reef did not lose consciousness. The Target employee was there right away and apologized. He also moved the dresser out of the path of customers walking.

Mr. Reef does not recall whether the object needed to be removed from on top of him, or if it came off of him. Mr. Reef believes he was on the ground for a minute or two. While Mr. Reef was still in Target, he noticed lower back and right calf pain. He had bruising bilaterally in his calves that resolved within about a week. He placed ice and took over-the-counter acetaminophen. The Target employee attempted to locate a manager, but Mr. Reef left. "The biggest reason was I was totally embarrassed. I had never been in that position in my life. I had people coming and staring at me, and I just was totally embarrassed."

Mr. Reef believes himself to be an expert on load-securing because of his experience as running facilities. Mr. Reef believes that the cart was overloaded. "One little bump or wiggle, and one of them is going over."

"And he had - - he had put it back on, and I kind of, kind of noticed - - I taught safety for my company for a long time - -"

Starting about three days after the subject accident, Mr. Reef called the store multiple times. He had a return call about a week after this subject incident. Mr. Reef's primary concern was back pain which he rated as an 8/10. He reiterates that "I am a very high pain-tolerant person."

Mr. Reef was able to walk to the car.

Pain worsened with time, and Mr. Reef had three or four physician visits. He was x-rayed. "Three or four days before surgery is when I started feeling the - - shooting, the shooting pains. At one point, I went straight to the ground. My wife called aid car, the paramedics. They came - - because I - - I thought I was, it was having to do with my heart – a heart attack – because I had never felt that kind of shooting pain in my life. And so they determined my heart was fine." Mr. Reef went to Urgent Care when he developed leg numbness. This led to surgery.

Over the subsequent weeks, Mr. Reef was able to work and travel to Orlando for work for his employer. He visited his physician several times for injections. While in Orlando, Mr. Reef did not believe he went golfing but was able to go out to dinner with customers.

Natalie A. Heineman                                                    Re: Brian Reef
Attorneys at Law                                                            Page #7
October 31, 2018

Mr. Reef went to the emergency room at about 3 or 4 o'clock one morning, and he
received an MRI. He was prompted by "my leg had gone completely numb, and the
shooting pains were - - were - - it went shooting pains, numb, numb, shooting - - it was -
- it was messed up." Mr. Reef was "quivering I was in so much pain." Dr. Massoudi
explained that Mr. Reef's L4-5 area is "all messed up," and this needs to be fixed because
"it's cut off your nerves." Mr. Reef was operated on that same day, "an hour later." After
surgery, back pain resolved. Mr. Reef stayed in the hospital approximately a day-and-a-
half and was discharged home. Mr. Reef took a day or two of sick time. A month after his
surgery, "It's when the drop - - the drop foot kicked in. That's what he called it, drop
foot." Mr. Reef believes drop foot refers to decreased sensation in his foot and calf, his
left foot and calf.

Mr. Reef was referred to Dana Point Physical Therapy which he attended for one-and-a-
half or two months. Despite this, Mr. Reef's foot drop did not resolve. In 2017, he
underwent a second procedure. This "sounds like a PLIF, TLIF, or XLIF." After the
second procedure, Mr. Reef attended further physical therapy.

Mr. Reef claims that he still does not have any feeling in his left foot. He stumbled more
than he wanted to. Dr. Massoudi reassured him he could play golf, but he was "just
worried to death that I was going to screw it up some more."

After the second procedure, Mr. Reef states he "picked up feeling on the inside part of
my big toe, and I can feel this, I can feel all this 100% now." Current sensory distortion is
on the outside of his left calf.

Mr. Reef saw Dr. Massoudi about three months before this deposition, and EMG and
nerve conduction studies were recommended. Mr. Reef has not, as of this point, had an
appointment but believes it was scheduled by his wife.

After the incident at Target, Mr. Reef walked slowly back to his car. He tried to drive;
however, he needed to have his wife drive so that he could sit in a reclining seat. He was
able to drive subsequently, but his wife helped. Mr. Reef was using a walker after each
surgery. After this deposition, Mr. Reef plans to drive a company vehicle from Seattle to
Los Angeles. He usually drives two to three hours at a time and then needs to pull over
and stretch and then needs to pull over and rest for a bit.

Mr. Reef believes he will require another surgery at some point, and he was counseled on
this point by Dr. Massoudi. He believes it would be another fusion at L4-5. Mr. Reef has
not fallen but has "stumbled multiple times." He believes this was related to a tear in his
rotator cuff.

Natalie A. Heineman                                             Re: Brian Reef
Attorneys at Law                                                    Page #8
October 31, 2018

Mr. Reef is unable to wiggle his toes, and it is difficult for him to put on socks, and he believes he is limited with respect to this. He also states, "Mentally, I worry every day on what's going to happen with my back tomorrow. I worry every day that - - that this might be my last day I can physically go out and - - and do some things. I worry every day about that. That tomorrow - - something's going to - - it's going to tweak the wrong way, and I'm - - I'm going to be in tough shape. So that's, that's a - - that's a huge impact to me."

**Recorded Statement of Brian Reef**

May 8, 2015. This is a recorded statement of Brian Reef. Mr. Reef is in a salaried position, and, he does not believe he has lost wages at the point of this statement.

The subject accident occurred on April 11, 2015 at 1:15 in the afternoon. Mr. Reef had been to that Target location multiple times in the past. Ms. Reef was already out of the store and waiting in the car, and Mr. Reef describes the incident as:

> Well, it, it all happened so fast. All I remember is I was walking, uh, to the right of a, young man, a Target employee that had a big dresser and something else on a cart. Okay, and apparently, uh, the dresser may not have been on the cart all the way, I'm not sure, I'm guessing that it, that's what it was. But, and as I passed him, uh, the dresser must have fallen off the cart and come and came and struck me from behind and took me out, and I went straight to the ground.

Mr. Reef was asked how large the object was, and he replied, "I'm saying it was maybe 4 feet long, 3 feet long, 3 or 4 feet tall. I, I don't know. I didn't see it until it was lying on me, and by that time, the young man was, the young man he was very, very polite, very, uh, apologetic and took the dresser off the top of me, and you know, I'm saying it's 3 x 4 tall, something like that. I really don't remember. It was solid, it was made of wood." Mr. Reef guesses that it was 40 or 50 pounds.

The item "mostly struck on the left side of my body, a little bit, uh, to the right, but mostly to the left of my body it struck me. More, it more or less startled me and, and just basically threw me to the ground an awkward way, kind of whipped me down into the, into the ground." Mr. Reef states it hit him twice on the way down. Mr. Reef is certain the dresser made him fall and he did not fall spontaneously. The Target employee called for management. Mr. Reef stayed on the ground for about a minute. People were trying to get past him, and he was running late to pick up his grandson, so he did not have time to wait for the manager.

Natalie A. Heineman                                              Re: Brian Reef
Attorneys at Law                                                      Page #9
October 31, 2018

Mr. Reef first sought medical attention on April 27, 2015, approximately two-and-a-half
weeks after the subject event. He received an injection and a prescription for medications
and was told to follow up in May. Mr. Reef went into Urgent Care the day before his
scheduled appointment, claiming, "Something is not right." He started having tingling in
his legs. On April 27, 2015, Mr. Reef was having pain in his legs, along with some
numbness. He called the paramedics because he believed he was having a heart attack.
Paramedics came and reassured him, and then he was taken by Ms. Reef to Urgent Care.
The next day, April 28, 2015, Mr. Reef returned because he continued to have severe
pain. He also had numbness and "shooting pains." His regular doctor gave him another
injection, and his primary care physician stated Mr. Reef needed to be referred. On April
29, 2015, at midnight, Mr. Reef "lost all feeling in my foot," and his wife drove him to
the emergency room. Mr. Reef is quite confused about the timeframe, and it may have
been May 5, 2015 or the May 5 or May 6, 2015 when he was in the "Urgent Care." He
received an MRI at 6:00 or 7:00 in the morning, and Mr. Reef states he required
"emergency surgery." Mr. Reef was operated on at 7:00 in the morning on May 7, 2015.
He missed a trip to Salt Lake City because of this, and Mr. Reef left the hospital just an
hour before this interview. Surgery was performed at Mission Viejo Hospital.

In clarifying dates, Mr. Reef clarified that paramedics arrived/went to his house on May
4, 2015, and he went to his primary care physician on May 5, 2015. He went to the
emergency room on May 6, 2015 and was operated on May 7, 2015.

Mr. Reef did not know Dr. Massoudi before his presentation on May 7, 2015. Prior to
April 11, 2015, Mr. Reef had no back complaints.

## Declaration of Jarrod Durkee, M.D.

Dr. Durkee is a musculoskeletal radiologist at the Center for Diagnostic Imaging in
Federal Way, Washington. Dr. Durkee states, "From the medical records presented, I
understand that a 5/6/2015 MRI was performed and diagnosed Mr. Reef with an L5-S1
disc herniation and floating disc fragment. A left-sided L5-S1 microdiscectomy was
performed on 5/7/2015 to remove the fragment, and an L4-5 interlaminar fusion was
performed on 3/15/2017 due to ongoing symptoms." Dr. Durkee goes on to state, "Being
struck in the back of the legs and falling to the ground is consistent with the mechanism
of injury, that in my experience, can cause a disc herniation as seen on the 5/6/2015
MRI." Dr. Durkee believes Mr. Reef could not have had a disc herniation prior to this
event because he would not have been able to participate in "activities of daily living."
Dr. Durkee also concludes that, based on reports and imaging received for review, it is
"not probable that the lumbar findings and injuries to Mr. Reef's lower back predated
April 11, 2015." Dr. Durkee believes that the disc herniation and two surgeries were a
direct result of the subject event. The MRI obtained on March 12, 2018 "is consistent

Natalie A. Heineman                                         Re: Brian Reef
Attorneys at Law                                                  Page #10
October 31, 2018

with the radicular symptoms, numbness, and pain Mr. Reef is experiencing, as it shows the following:

- Canal stenosis at L2-3. Right moderate neuroforaminal narrowing which abuts the L2 nerve root. Moderate facet arthropathy.

- Mild L3-4 canal stenosis. Disc bulge abuts the left L4 nerve root posteriorly. Moderate facet arthropathy; and

- Right L4-5 neuroforaminal narrowing which may abut the exiting L4 nerve root. The right L4 and L5 nerve roots are conjoined. Moderate facet arthropathy."

Dr. Durkee believes, "Mr. Reef will continue to suffer from his current complaints of numbness, pain, and weakness. Due to the amount of time since the injury-causing event, it is likely Mr. Reef's current condition is permanent." *(Reviewer's Note: See discussion.)*

### Declaration of Farzad Massoudi, M.D.

Dr. Massoudi is a neurosurgeon in Laguna Hills, California. Dr. Massoudi believes Mr. Reef suffered a right-sided herniated disc at the time of the incident. He believes a 40-pound wooden dresser can cause "significant and lasting damage." Examination prior to surgery demonstrated diminished sensation in his left foot with the inability to dorsiflex the left ankle. The MRI demonstrated a lumbarization of S1 and S2. At L5-S1, there was a left paracentral disc extrusion with superior subligamentous migration measuring 7 mm AP x 9 mm TR x 7 mm. Dr. Massoudi believes this was causing mass effect of the traversing S1 nerve root. Mr. Reef also had moderate-to-severe central canal stenosis at L5-S1, a bulging disc at L4-5, and moderate central canal stenosis (which was not presumably at L4-5). Dr. Massoudi recommended urgent left-sided L5-S1 microdiscectomy. This was done the following day.

On May 15, 2015, Mr. Reef's first follow up appointment demonstrated strength of 3/5 in the left dorsiflexion of the left foot. Mr. Reef had regained his plantarflexion strength which was noted at 5/5. Sensation was intact. His surgical incision was healing well, and the staples were removed. Mr. Reef was referred to outpatient physical therapy.

On August 17, 2015, Mr. Reef was seen again, and he continued with left 3/5 dorsiflexion on the left. Dr. Massoudi recommended further physical therapy and a repeat MRI to rule out any recurrent residual nerve compression. Mr. Reef complained of "severe unprecedented and unusual left-sided frontal headaches in the last month." Because of this, a head CT scan was ordered. This demonstrated sinus disease.

Natalie A. Heineman                                         Re: Brian Reef
Attorneys at Law                                                Page #11
October 31, 2018

On September 9, 2015, an MRI of Mr. Reef's lumbar spine was performed with and without contrast. There was a 2 mm retrolisthesis and a 2 to 3 mm posterior disc bulge, bilateral degenerative facets, and ligamentum flavum hypertrophy. This caused severe spinal stenosis. *(Reviewer's Note: See report.)* The left neural foramina were "widely patent."

On October 7, 2016, about a year later, Mr. Reef had another MRI which demonstrated "severe spinal stenosis at L4-5." Weakness in the left lower extremity continued. Dr. Massoudi recommended an L4-5 interlaminar interbody fusion with plating.

On March 2, 2017, Mr. Reef had another MRI without contrast. This was due to ongoing low back pain. This demonstrated L4-5 disc desiccation. There was "very minimal retrolisthesis" at L4-5. Moderate-to-severe spinal canal stenosis was noted. Disc material was in "contact" with the left L4 nerve root with "mild compression."

On March 15, 2017, Mr. Reef was admitted and underwent the L4-5 interlaminar interbody fusion with plating. Mr. Reef had a laminectomy with interspinous process fixation instrumentation.

On March 24, 2017, Mr. Reef returned for his first postoperative visit, and physical therapy was again reordered.

On March 12, 2018, Mr. Reef continued to have low back pain and left lower extremity radiculopathy into his foot (side not stated). It has been 11 months since surgery, and the MRI demonstrated L4-5 foraminal narrowing bilaterally, slightly worse on the left "partly due to the appearance of the left root sleeve which was enlarged due to a conjoined root."

Dr. Massoudi believes total charges for medical bills "due to the April 11, 2015 incident at Target" is $164,699.13, and Dr. Massoudi further opines that another $100,000.00 of treatment will be necessary.

**Chronological Medical Records**

May 26, 2005. Fang Frank Yu, M.D., Ph.D. Abdominal pain with a family history of colon cancer. Mr. Reef had an episode of left lower quadrant pain and had a CAT scan without evidence of diverticulitis. He was treated with Levaquin and Flagyl and improved. It was felt he had "mild diverticulitis." A colonoscopy was recommended.

November 22, 2011. Ellen Song, M.D. Health maintenance physical examination.

January 4, 2012. Ellen Song, M.D. Mild hypertension, diet controlled. Hypercholesterolemia.

January 19, 2012. Dr. Ellen Song, M.D. Hypertension and lump under right axilla, lump in right axilla.

September 30, 2013. Oso Medical Group, Gregory Joy, M.D. Left knee pain.

December 16, 2013. Oso Medical Group, Gregory Joy, M.D. Health maintenance.

January 8, 2014. Community Orthopaedic Medical Group, Tom Thomas, M.D. Mr. Reef complained of left knee pain that began in October of 2013. He was playing racquetball when he planted his foot and states he had immediate onset of significant left knee pain. Knee x-rays were normal. Dr. Thomas was concerned about a meniscal tear or other intra-articular process.

January 17, 2014. Community Orthopaedic Medical Group. MRI of the knee. This study demonstrates a "complex tear in the posterior horn of the medial meniscus with medial posterior horn and body tears surfacing inferiorly."

February 13, 2014. California Specialty Surgery Center, Dr. Tom Thomas. Left knee arthroscopic partial medial meniscectomy.

February 19, 2014. Community Orthopaedic Medical Group, Dr. Tom Thomas, M.D. Postoperative visit #1.

March 21, 2014. Community Orthopaedic Medical Group, Amanda Shanklin, P.A.-C. Post op visit #2. He is "mildly frustrated with ongoing symptoms. Mr. Reef is still having sharp pain medially with lateral tightening movements. Initially after surgery, felt improvement but over the last few weeks, he feels that his symptoms have been stagnant. He did return to the stationary bike and soreness the next day in the knee."

May 5, 2014. Community Orthopaedic Medical Group, Tom Thomas, M.D. Mr. Reef continues to have anteromedial pain, predominantly at night. He states he is 75% better than he was preoperatively and has returned to golf and racquetball, and both of these activities are painless.

April 27, 2015. Oso Family Medical Group, Barbara Witowska, P.A.-C. It has been approximately 16 days since the subject accident. Mr. Reef presented with low back pain. He described it as "aching and dull." "Pertinent negatives include bruising, joint instability, joint tenderness, limping, locking, numbness, popping, swelling, tingling in

Natalie A. Heineman                                              Re: Brian Reef
Attorneys at Law                                                     Page #13
October 31, 2018

the legs and weakness." Mr. Witowska further documented, "Patient was in Target when a shelf transported by Target employees slipped off the cart and fell on patient lower legs pushing him forward to the ground. It took him a few minutes to get himself up. He has had pain since, thought it would be better now but is not resolving. Left side feels tight." Mr. Reef requested some pain medication because of traveling, and he was given a prescription for Norco and Flexeril.

April 27, 2015. Oso Family Medical Group. Normal lumbar spine series.

May 4, 2015. Oso Family Medical Group, Hector Torres, P.A.-C. Mr. Reef returns because of back pain. This radiates to his left thigh. Mr. Reef describes pain as "sharp and stabbing." Aggravating factors include bending, changing positions, flexion, standing, and walking.

May 5, 2015. Oso Family Medical Group, Gregory Joy, M.D. Mr. Reef was felt to have back pain and sciatica.

May 6, 2015. Mission Medical Center Emergency Department, James Keany, M.D. Mr. Reef presented to the emergency room and was seen at 5:30 in the morning. He had severe pain. He had "constant pain that radiated from his back and left buttock to his lower left leg." He previously, before this visit, had been able to find a comfortable position, and this was no longer the case. Oxycodone and ibuprofen, which he was taking, were not helpful. Mr. Reef also related that he had "steroid shots in his back" with no relief. Mr. Reef had a positive straight leg raise on the left. There was also diminished sensation in the left foot. He was unable to dorsiflex his foot. Mr. Reef was admitted and had an MRI obtained.

May 6, 2015. Admitting Physician: Pardise Moraghebi, M.D.

May 6, 2015. Inpatient consultation, Dr. Farzad Massoudi, M.D. The MRI demonstrated a 12-mm disc fragment and herniation at L5-S1. Transitional anatomy was noted. On physical examination, Mr. Reef had a "left foot drop."

May 7, 2015. Left L5-S1 microdiscectomy, Dr. Farzad Massoudi, M.D. This procedure was complicated by a CSF leak.

May 8, 2015. Mr. Reef was discharged. He was noted to be ambulatory and no postural headache.

May 8, 2015. Mission Medical Center discharge summary. Date of Admission: May 6, 2015. Date of Discharge: May 8, 2015. Discharge Diagnoses: 1) Lumbar stenosis with

Natalie A. Heineman                                          Re: Brian Reef
Attorneys at Law                                                   Page #14
October 31, 2018

lumbar radiculopathy; 2) L5-S1 herniated nucleus pulposus; 3) Status post left-sided L5-
S1 microdiscectomy on May 7, 2015; 4) Left foot drop due to above, resolved; and 5)
Obesity.

May 15, 2015. Orange County Neurosurgical Associates, Farzad Massoudi, M.D.

May 15, 2015. Orange County Neurosurgical Associates, Farzad Massoudi, M.D.
Postoperative visit #1. Mr. Reef continues to have a left foot drop. Strength is 3-/5 on the
left (of his tibialis anterior strength). It is weak 3-/5. Plantarflexion strength is 5/5.
"Sensory modalities are intact bilaterally." Dr. Massoudi believed the foot drop would be
expected to improve.

May 16, 2015. Dana Point Physical Therapy and Rehabilitation.

Mr. Reef had ten visits at Dana Point Physical Therapy and Rehabilitation starting on
May 16, 2015 and finishing on June 19, 2015.

August 5, 2015. Brian Hauser, M.D. Health maintenance. "Has some headaches,
migraine-like, more severe lately, has talked to PCP about them. Was referred to neuro
but hasn't gone yet. Has info at home for the specialist and plans to call and get in. Has
some back pain, as well, and has been referred to specialist by PCP, as well."

August 17, 2015. Orange County Neurosurgical Associates, Farzad Massoudi, M.D. Mr.
Reef continues to have 3/5 left dorsiflexion weakness. Dr. Massoudi recommended
continued physical therapy and another MRI without contrast. A CT scan of the head
without contrast because of headaches.

August 31, 2015. Saddleback Valley Radiology. CT of head. Normal intracranial
contents.

September 9, 2015. Saddleback Valley Radiology. MRI of the lumbar spine. At L4-5,
there is disc space collapse. There is 2 mm of retrolisthesis and a 2- to 3-mm posterior
disc bulge. There are bilateral degenerative facets and ligamentum flavum. This causes
"severe spinal stenosis." There is no significant enhancement noted. There is mild
encroachment of the right neural foramen. The left neural foramen is widely patent.

October 7, 2016. Saddleback Valley Radiology. MRI of the lumbar spine. No significant
change. At L4-5: "The previously seen disc bulge at this level is less evident."

December 13, 2016. Optum Medical Group, Brian Hauser, M.D. Otalgia, right ear, right
otalgia.

Natalie A. Heineman                                                      Re: Brian Reef
Attorneys at Law                                                             Page #15
October 31, 2018

December 28, 2016. Optum Medical Care, Randall Ricketts, D.O. Right ear pain (follow up).

January 9, 2017. Orange County Neurosurgical Associates, Farzad Massoudi, M.D. Mr. Reef's foot drop is not improved. Dr. Massoudi believed there was "interim worsening of the L4-5 lumbar stenosis. Neural compression is now noted to be present to a very significant degree at L4-5." Dr. Massoudi recommended L4-5 interlaminar interbody fusion with plating.

March 2, 2017. Saddleback Valley Radiology. MRI of the lumbar spine without contrast. No change from the study of October 7, 2016.

March 15, 2017. Saddleback Memorial Care Center, Dr. Farzad Massoudi, M.D. An L4-5 interlaminar interbody fusion and plating.

**Video**

Target surveillance video. Mr. Reef appears to have been struck across the calves with an item of moderate size of a moderate-sized dresser. There were two pieces of furniture on the cart. One had fallen off previously and was easily maneuvered back on the cart by the employee. This was the smaller of the two dressers. The dresser fell, at least from the video, and it appears to have struck his left calf, but he did not grab his right calf. Mr. Reef was on the ground for approximately 35 seconds before getting up and walking away without assistance.

**DIAGNOSTIC TESTS:**

Review of radiology studies:

May 6, 2015. MRI of the lumbar spine without contrast. L5-S1 left-sided disc herniation superior migration. This is superimposed on a relatively small spinal canal.

May 7, 2015. Lumbar spine films, intraoperative mobilization.

August 31, 2015. CT scan of the brain with mild ethmoid sinus and right maxillary sinus opacification.

September 9, 2015. MRI of the lumbar spine with and without contrast. This study demonstrates no residual nerve root compression. Additionally, there is facet hypertrophy predominantly at L4-5 and L5-S1.

**Natalie A. Heineman**                                          **Re: Brian Reef**
**Attorneys at Law**                                                   **Page #16**
**October 31, 2018**

October 7, 2016. MRI of the lumbar spine without contrast. Persistent moderate spinal
stenosis at L4-5.

March 2, 2017. Saddleback Valley Radiology. MRI of the lumbar spine. No significant
change.

Postoperative film with interspinous clamping and decompression and laminectomy at
L5-S1 noted. *(Reviewer's Note: There is a segmentation abnormality at what I refer to as
L5-S1, but Dr. Massoudi referred to it as L4-5. The location of comment is, however, the
same.)*

## PAST MEDICAL HISTORY:

**Injuries:** Mr. Reef denies any history of previous back pain.

**Medications:** He is on no prescribed medication; however, he does take ibuprofen as
need be.

## FAMILY MEDICAL HISTORY:

Mr. Reef has two brothers and one sister who are alive and healthy, and none have issues
with back pain.

## REVIEW OF SYSTEMS:

Review of systems was developed from the interview and medical records.

Review of systems

HEENT: no history of foreign body, previous ocular surgery, recurrent ear infections,
sinus infections or sinus problems, double vision, or hearing deficit.

Cardiac: negative for arrhythmia, chest pain, coronary artery disease or hypertension.

Pulmonary: negative for asthma chronic cough or shortness of breath.

Gastrointestinal: History of abdominal pain, etiology unknown

Genitourinary: negative for kidney disease or bladder infection.

**Natalie A. Heineman**                                         **Re: Brian Reef**
**Attorneys at Law**                                                  **Page #17**
**October 31, 2018**

Hematologic: negative for history of lymphoma or leukemia, anemia, anticoagulation, or night sweats.

Endocrine: negative for hyper or hypothyroidism and diabetes.

Neuropsychiatric: see report. Negative for anxiety or depression.

Mr. Reef describes decreased sensation over the dorsum of his foot and also mostly in the left S1 distribution.

## SOCIOECONOMIC HISTORY:

**Alcohol/Tobacco:** Mr. Reef drinks alcohol "occasionally", one to two drinks a couple of times a week. He does not smoke tobacco.

## PHYSICAL EXAMINATION:

Cranial nerve examination:
Pupils are equal and reactive to light and accommodation.
Extraocular movements are intact.
Facial sensation is normal.
Face is symmetrical.
Hearing is intact grossly (conversation and finger rub bilaterally).
Tongue protrudes in the midline.
Swallow is normal, grossly.
Shoulder shrug is strong.

Cerebellar function:
Finger to nose testing is intact.
Heel to toe gait without loss of balance.
Romberg sign is negative.
Gait and station is normal.
Rapid alternating movement without deficit.

Motor and sensory examination:
Deltoid, biceps, triceps, extensor carpi ulnaris, extensor carpi radialis, pronator, extensor digitorum, flexor digitorum (superficialis and profundus), interossei, opponens pollicis, and abductor digiti quinti are intact with 5/5 strength bilaterally.
 Quadriceps, hamstrings (semitendinosus, semitendinosis and biceps femoris), peroneus longus and brevis, tibialis anterior, extensor hallux longus, and gastrocnemius muscle intact on the right.

Natalie A. Heineman                                                    Re: Brian Reef
Attorneys at Law                                                          Page #18
October 31, 2018

There is slight decreased sensation over the lateral aspect of the left foot. There is also
decreased vibration sense in the left calf. He has mild weakness of the extensor hallucis
longus on the left. A partial foot drop is noted with ambulation.

Cortical exam:
Visual fields are intact.
Speech is normal without expressive or receptive aphasia or dysphasia; speech tone is
normal.
Eye movements are smooth, nystagmus is absent.

Mr. Reef is diffusely hyperreflexic with Hoffmann signs present bilaterally. Toes are
downgoing bilaterally.

**DIAGNOSTIC IMPRESSION:**

1.  Left foot drop.

2.  Lumbar disc herniation.

3.   History of Left knee meniscal tear.

4.  H/o hypertension.

5.  H/o hypercholesterolemia.

6.  Hyperreflexia-etiology unknown.

**DISCUSSION:**

Mr. Reef had a ruptured disc which resulted in a foot drop. This was noted a few weeks
after the subject event. The load fell on Mr. Reef's legs and not onto his back.

Disc herniations are degenerative in nature and spontaneous, not related to being struck in
another part of the body. I believe the disc herniation is independent of the event in
Target.

For a disc to herniate due to trauma, I would expect to see disrupted muscle, ligamentous
injury, fracture and possible injury to solid viscus. This is not the case.

A foot drop describes a condition whereby the main muscle that pulls the foot up. A
person with a foot drop lifts the foot higher than the other in the swing portion of gait. A
corrective measure is brace (EFO- external foot orthosis). Mr. Reef continues to have

Natalie A. Heineman                                          Re: Brian Reef
Attorneys at Law                                                  Page #19
October 31, 2018

some weakness, and I suspect he may not improve further. It is not so severe he needs an
EFO.

Several of Dr. Durke's statement are concerning and cannot supported. The concept a
person is unable to conduct activities of daily living is not correct. Thirty present of the
asymptomatic population has a disc herniation with not pain or weakness or sensory
deficit. There is not a way to date an HNP.

The disc became clinically relevant after the event in Target, but it is incorrect to
conclude it is due to that event. This is a logical fallacy.

Mr. Reef had preexisting degenerative changes. This is not a risk factor for an HNP.
Degenerative changes are ubiquitous in the population. In females, degenerative changes
are about a decade behind those of males, yet the incidence of HNP is no different.

In response to the questions posed in your letter, I offer the following comments:

1.   *What injuries/conditions, if any, did Mr. Reef have prior to the incident on
     4/11/15 at Target? What evidence do we see of this in the records, radiology, or
     his symptoms?*

     Before the subject incident, Mr. Reef had the following diagnoses: hypertension,
     history of hypercholesterolemia, left knee meniscal tear status post-surgery. He
     has a remote history of possible diverticulitis. Mr. Reef has hyperreflexia and this
     is not documented in the record, so I'm not certain when it started.

2.   *Are there any limitations Mr. Reef claims now that can be attributed to the
     underlying issue?*

     Mr. Reef claims he is unable to play racquetball and his golf game has been
     altered. He also claims he is unable to hunt or run. He claims ongoing pain.

3.   *Were any of Mr. Reefs pre-existing injuries/conditions ongoing and/or
     degenerative at the time of the incident on 4/11/15?*

     No. There is no mention of back pain or radiculopathy prior the subject event in
     the records.

**Natalie A. Heineman**                                              **Re: Brian Reef**
**Attorneys at Law**                                                      **Page #20**
**October 31, 2018**

4.   *What injuries/conditions, if any, did Mr. Reef sustain that were proximately caused by the 4/11/15 incident?*

Possible pain across his legs, where the load struck him.

5.   *Are plaintiff's radiology, records and symptoms consistent with an acute disc herniation? Why /why not?*

No. See discussion above.

6.   *Are the biomechanics of the fall consistent with plaintiff's claimed injury? Why / why not?*

No. Mr. Reef's disc herniation, and indirectly the second surgery are not due to the event in Target. Acute (traumatic disc herniation) is associated with injury to adjacent structures. This is not even a ground level fall; Mr. Reef caught himself on the wall. Additionally, load struck his legs.

7.   *Do you believe that Mr. Reef's subsequent back surgery was related to the 4/11/15 incident?*

No. See rational above.

8.   *What is the basis for your opinion?*

There is insufficient scientific evidence to attribute the cause of lumbar disc herniation to any minor trauma event or ergonomic risk factor. The cases in which there were there is just a temporal association between an event and the onset of sciatica temporally related to the onset of leg pain marks when the radiculopathy (sciatica) started, **but not why.**

Contradictory evidence is notes for the following factors: Obesity, height, smoking, sports participation, strenuous work, sedentary work, and history of previous disc herniations.  Genetic factors are consistent and are responsible.

9.   *What of Mr. Reef's post-incident treatment was reasonable, necessary and incident- related?*

Mr. Reef's post incident treatment was reasonable but not related to the incident, with the exception of the first PCP visit on April 27, 2015

**Natalie A. Heineman**                                                                **Re: Brian Reef**
**Attorneys at Law**                                                                          **Page #21**
**October 31, 2018**

10.     *Did Mr. Reef's incident-related injuries/conditions resolve? If so, when?*

        He continues to have a foot drop.

11.     *Does Mr. Reef have any current limitations or restrictions? Are those current
        limitations and/or restrictions proximately caused by the 4/11/15 incident?*

        Mr. Reef claims he is excluded from many activities. These ongoing limitations
        are not due to the April 11, 2915 incident.

12.     *Will Mr. Reef improve with time and/or additional treatment? If treatment, what
        kind?*

        I believe his foot drop, although has improved, will never normalize.

13.     *What is Mr. Reef's prognosis? Do you anticipate future treatment? If so, what
        treatment would be reasonable, necessary and/or accident related?*

        Mr. Reef is fixed and stable.

This report was prepared by me and is true and correct to the best of my knowledge. The
opinions and conclusions stated herein are more probably than not based upon reasonable
medical probability.

I, Steven Klein, M.D., declare under the penalty of perjury under the laws of the State of
Washington that the following is true and correct:

   1. I am over the age of 18 years, I am competent to testify, and have personal
      knowledge of the facts contained herein in this declaration.

   2. I declare that the attached independent medical evaluation report of Brian Reef
      was prepared by myself and is true and correct to the best of my knowledge.

   3. On October 9, 2018, I performed an examination on Brian Reef, and I reviewed
      his medical records.

**Natalie A. Heineman**                                    **Re: Brian Reef**
**Attorneys at Law**                                       **Page #22**
**October 31, 2018**

    4. The opinions and conclusions stated herein are stated on a more-probable-than-not basis and to a reasonable degree of medical certainty.

Thank you for allowing me to participate in the evaluation of this particular individual. If I can be of any further assistance, please contact me through Physician Direct Services.

Sincerely,

_____

Steven Klein, M.D.
Board Certified Neurosurgeon

SK/qt/rms