# EXHIBIT No. 7

# Deposition of Bradley Probst

# LaCroix v. Healy, et vir

# September 18, 2018





**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com

## Page 1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING
_____

KRISTIN LA CROIX,            )
                             )
          Plaintiff,         )
                             )
vs.                          ) No. 17-2-04131-9 SEA
                             )
LAURA JEAN HEALY AND JOHN DOE  )
HEALY, individually and as wife )
and husband, and the marital   )
community composed thereof,    )
                             )
          Defendants.        )
                             )

_____

DEPOSITION UPON ORAL EXAMINATION

OF

BRADLEY PROBST
_____

Taken at 2601 Fourth Avenue, Floor 6
Seattle, Washington

DATE TAKEN:  SEPTEMBER 18, 2018
REPORTED BY:  ANITA W. SELF, RPR, CCR #3032

## Page 2

1          A P P E A R A N C E S
2
   FOR THE PLAINTIFF:
3
       BRYAN PRINCE-OLSEN
4      GLP Attorneys, P.S., Inc.
       2601 Fourth Avenue, Floor 6
5      Seattle, Washington  98121
       206.957.2534
6      bolsen@glpattorneys.com
7
   FOR THE DEFENDANTS:
8
       TAYLOR DAWSON
9      Law Offices of Mark Dietzler
       1001 Fourth Avenue, Suite 3300
10     Seattle, Washington  98154
       206.473.4047
11     taylor.dawson@libertymutual.com
12            * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1            DEPOSITION OF BRADLEY PROBST
2                EXAMINATION INDEX
3    EXAMINATION BY:                     PAGE
4    MR. PRINCE-OLSEN                      4
5
                EXHIBIT INDEX
6
     EXHIBITS FOR IDENTIFICATION            PAGE
7
      1    Report                 7
8
      2    David Wells' Report          29
9
      3    Email dated July 18, 2018      32
10
11                * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1      SEATTLE, WASHINGTON; SEPTEMBER 18, 2018
2              9:19 A.M.
3              -o0o-
4
5    BRADLEY PROBST,       witness herein, having been
6              first duly sworn on oath,
7              was examined and testified
8              as follows:
9
10        E X A M I N A T I O N
11   BY MR. PRINCE-OLSEN:
12      Q.  Good morning, Mr. Probst.  My name is Bryan
13   Prince-Olsen.  I'm one of the attorneys representing
14   the plaintiff, Kristin La Croix, in this case.
15        You've been listed as an expert, so we're
16   taking your deposition to find out what your testimony
17   will be at trial.  Have you ever been deposed before?
18      A.  I have.
19      Q.  All right.
20        And I'm sure your attorney has gone over this
21   with you, but let me just give you a few ground rules
22   for today's proceeding.
23        We have a court reporter who's taking down a
24   transcript of everything that's being said in this
25   room, so it's important that we speak one at a time to

1 (Pages 1 to 4)

LaCroix v. Healy, et vir                                                      Bradley Probst

Page 5

1    make her job a little easier.
2        Also, please make sure you give verbal
3    responses. It's difficult for her to note if you're
4    nodding your head or saying um-hmm or hmm-mm.
5        Okay?
6    A. We won't look at the transcript for those.
7    Q. If you ever don't understand my question,
8    will you let me know that?
9    A. Yes.
10   Q. Okay.
11       Otherwise, if you answer the question, is it
12   fair to assume that you understood what I asked?
13   A. Sure.
14   Q. Okay.
15       Can you please say and spell your full name
16   for the record?
17   A. Bradley William Probst, B-R-A-D-L-E-Y,
18   W-I-L-L-I-A-M, P-R-O-B-S-T.
19   Q. And what documents, if any, did you review to
20   prepare for this deposition?
21   A. Oh, more or less, my notes, a report I
22   generated, I think there's some statements as well,
23   photographs, and then there was also a report from
24   David Wells, so I think that's the majority of it.
25   Q. Okay.

Page 6

1        When you say you reviewed your notes, what
2    are you referring to?
3    A. Oh, just out of all the documents I reviewed,
4    I just have a couple of sheets of notes of who's
5    involved, a couple of things of interest, you know,
6    the year, make, model of the vehicle, a variety of
7    things like that.
8    Q. Are those handwritten notes?
9    A. No.
10   Q. Okay.
11       Are those notes contained in the file that
12   you provided to us?
13   A. Yes, they should be.
14   Q. Where could I locate those? Sorry, I don't
15   mean to make you go through your entire file, but what
16   do they look like?
17   A. It would say ARCCA Case Review --
18   Q. Got it.
19   A. -- on the top.
20   Q. Okay. Thanks. All right.
21       So other than the things that we've just
22   described, did you review anything else for today's
23   deposition?
24   A. Other than I looked at -- at ARCCA, we have
25   done some testing on a Yakima bicycle rack, so I

Page 7

1    looked up that specific rack relative to the rack
2    involved in this incident, and what kind of force
3    versus displacement was involved in that testing.
4        MR. PRINCE-OLSEN: Let's start with this.
5    We'll have this marked as Exhibit 1, please.
6            (Exhibit No. 1 was marked.)
7    BY MR. PRINCE-OLSEN:
8    Q. And can you tell me, is this a true and
9    accurate copy of the report that you're providing in
10   this case?
11   A. It appears to be, yes.
12   Q. If you could turn to page 2 of that report,
13   please. Under Information Reviewed, could you just
14   take a look at that and let me know if there's
15   anything that you've reviewed either at the time that
16   you were drafting this report or after, that in any
17   way your opinions are based on?
18   A. Oh, as I said, I reviewed some additional
19   testing on bike racks; however, it doesn't alter my
20   opinions. It was just more for further confirmation
21   of my opinions. And I don't believe that I had any
22   additional documents after that, after issuing my
23   report.
24   Q. In the way that you in your report have
25   citations for various studies, could you provide me

Page 8

1    with a citation for the ARCCA studies related to the
2    Yakima bike rack that you reviewed?
3    A. Oh, I could send the data files over. They're
4    more or less Excel spreadsheets, but if you print them
5    out, they're several hundred pages long. But we could
6    certainly give you a digital copy.
7    Q. Okay. That would be great, if you could just
8    give that to Mr. Dawson.
9    A. Sure.
10   Q. Did you review -- in formulating your report
11   or your opinions for your report, did you review any
12   of Ms. La Croix's medical records?
13   A. No, I don't believe I had any -- her medical
14   records of any sort.
15   Q. Do you know what injuries Ms. La Croix is
16   alleging she sustained in this collision?
17   A. Honestly, I don't recall as I sit here today
18   if that was in any of the -- in the complaint. It
19   just wasn't something I looked at or memorized.
20   Q. And you've never met Ms. La Croix, correct?
21   A. Not to my knowledge.
22   Q. Have you taken any measurements of
23   Ms. La Croix seated in her vehicle?
24   A. I have not.
25   Q. I want you to turn to page 4 of your report.

2 (Pages 5 to 8)

LaCroix v. Healy, et vir                                                    Bradley Probst

Page 9

1   **In the first paragraph there after the photo, you talk**
2   **about the Insurance Institute for Highway Safety and**
3   **testing on -- low-speed tests to assess the**
4   **performance of the vehicles' bumpers.**
5       **Do you see that?**
6   A.   I do.
7       **Q.   Is it your understanding that those studies**
8   **involve collisions that are -- have a bumper-to-bumper**
9   **contact?**
10  A.   I believe in this specific protocol, it was a
11  bumper to a simulated bumper.
12      **Q.   And what is a simulated bumper?**
13  A.   Oh, instead of just having another vehicle,
14  they, in essence, have something that mimics a bumper
15  mounted to a rigid barrier.
16      **Q.   So something that acts like a bumper?**
17  A.   Correct.
18      **Q.   Okay.**
19      **And something that's designed to take force**
20  **in the way that a bumper would take force?**
21  A.   More than just a rigid wall, so, yes,
22  something that mimics the height and curvature and
23  some of the other characteristics of a vehicle bumper.
24      **Q.   Do you know if, in any of the IIHS**
25  **simulations or tests with the simulated bumper, if any**

Page 10

1   **of those involved a simulated bumper that had a bike**
2   **rack?**
3   A.   They do not conduct testing such as that, to
4   my knowledge.
5       **Q.   Can you describe for me how you arrived at**
6   **your opinion that the Delta-V, or change of velocity**
7   **in this case was significantly less than 7.9 miles per**
8   **hour?**
9   A.   Oh, certainly, yes.
10      **Q.   Oh, sorry.**
11      **Can you -- will you now --**
12  A.   Sure.
13      **Q.   -- will you describe it for me?**
14  A.   Well, we looked at this a couple different
15  ways.  One, obviously the damage to both vehicle
16  [sic], the lack of damage to -- or any significant
17  damage to the Ford Flex.  In addition, the lack of
18  airbag deployment in the Ford Flex indicates that it
19  was generally below 8 to 14 miles per hour for that
20  vehicle.
21      We have the Insurance Institute for Highway
22  Safety empirical test data, and we can actually use
23  that because the way the vehicle is designed, if
24  you're pushing on the bicycle rack, the bicycle rack
25  is mounted into a receiver hitch, which is mounted to

Page 11

1   the bumper and frame of the vehicle, so if you're
2   pushing on the bumper, it's in essence the same as
3   pushing on a bike rack.
4       And in that stage testing, you get more
5   damage, or damage beyond the liftgate, so it just
6   tells us that the 6.2 mile per hour test speed, you
7   get greater damage than what we had in this incident.
8       And then finally, as I said, we, at ARCCA,
9   have conducted testing to -- drawing a blank -- the
10  Yakima bike rack, and it actually shows that the
11  Delta-V would probably be even much less significant
12  than what we noted in the reports, based off of force
13  deflection, or basically bending of a bike rack until
14  it hits the rear window and hatch.
15      **Q.   So at trial, it will be your testimony -- I'm**
16  **sorry -- will your testimony be that the Delta-V in**
17  **this case was significantly less than 7.9 miles per**
18  **hour?  Or will you have a different calculation given**
19  **the ARCCA studies you saw on bike racks?**
20  A.   Well, based off of the damage to the bike rack
21  in this incident and testing we've done on, in
22  essence, the same bike rack, I think -- I don't
23  remember the number off the top of my head, but it
24  places it closer to about a 5 mile per hour Delta-V,
25  so, yes, that would be significantly less than the 7.9

Page 12

1   we note.
2       **Q.   Have you examined the actual bike rack that**
3   **was involved in the subject collision?**
4   A.   Other than the photographs, I have not, no.
5       **Q.   And you haven't examined either of the**
6   **subject vehicles involved in the collision, right?**
7   A.   Again, we had multiple repair estimates and
8   photographs and statements, but I did not lay hands on
9   the vehicle.
10      **Q.   On that same page in the next paragraph, the**
11  **paragraph that begins:  By the laws of physics, the**
12  **roughly second sentence there, it says:  Therefore,**
13  **the average acceleration experienced during the rear**
14  **impact by the subject Honda Odyssey was significantly**
15  **less than 2.4 Gs.**
16      **Do you see that?**
17  A.   I do.
18      **Q.   Can you tell me, why do you look at the**
19  **average acceleration in forming your opinions?  What's**
20  **important about the average acceleration?**
21  A.   Oh, you could look at this either in peak or
22  average, but a number of researchers in the field of
23  biomechanics and rear-end impacts note the -- there's
24  an association with the average acceleration and
25  injury potential.  So it's -- it can be more

3 (Pages 9 to 12)

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

LaCroix v. Healy, et vir                                                Bradley Probst

Page 13

1   appropriate to use average just because that's what's
2   done in the literature.
3        And also, if you look at how an impact occurs,
4   the force obviously starts at zero, increases to some
5   maximum, and then decreases to zero once again in, in
6   essence, the shape of a bell curve.  So to say it's a
7   peak is pulling out one instantaneous moment in time,
8   where the average is giving you a more fair
9   representation of the overall event, so --
10      Q.  Right.
11      And I will -- I will admit to you a limited
12  scientific understanding, but wouldn't peak
13  acceleration be the most significant acceleration at
14  any point during the course of a collision?
15      A.  No, it would be the highest of magnitude, but
16  not necessarily the most significant.
17      Q.  Okay.
18      So couldn't injury occur -- well, isn't it
19  possible that an injury could occur at the moment that
20  the magnitude is the highest?
21      A.  Well, that's a very open-ended question, so it
22  would depend on what injury, what magnitude, a variety
23  of things like that, but in -- not in essence, but the
24  human body is more equipped to withstand accelerations
25  for a very brief amount of time.  But if the

Page 14

1   acceleration is applied for a longer period of time,
2   then it has a higher potential for injury.
3       Q.  But someone could, in fact, be injured during
4   the height of magnitude in a collision, correct?
5       A.  Well, again, you have an incomplete
6   hypothetical, so I can't say yes or no to that.
7       Q.  Is there any circumstance in which you
8   believe a person could suffer injury at the moment
9   that the magnitude is the highest in a collision?
10          MR. DAWSON:  Object to form.  Answer if
11  you can.
12      A.  Well, again, it's an incomplete hypothetical.
13  I don't know what type of --
14  BY MR. PRINCE-OLSEN:
15      Q.  Well, I'm asking you to complete the
16  hypothetical.  Is there any hypothetical situation in
17  which you can envision someone being physically
18  injured during the moment of peak magnitude?
19          MR. DAWSON:  Same objection.
20      A.  Well, certainly, if you have an incredibly
21  high-energy event where the force greatly exceeds the
22  tolerance level of that unique individual, certainly
23  there is potential there.
24      But without knowing really who you're talking
25  about in this hypothetical, what type of vehicle, what

Page 15

1   type of forces or anything else, there's really no way
2   of saying.  But certainly we know people are injured
3   when force is applied.  So, yes, there has to be a
4   point where somebody is injured.
5   BY MR. PRINCE-OLSEN:
6       Q.  Okay.
7       So to complete the hypothetical, you would
8   need to know other data points such as that unique
9   individual's susceptibility to injury?
10      A.  Possibly.  Again, your hypothetical is so
11  incomplete, I can't even say what I would or wouldn't
12  need.
13      Q.  In order to know if a particular person could
14  be injured during peak magnitude, what would you need
15  to know about that individual?
16      A.  Again, I'd have to know more about the event,
17  the environment, the forces involved, a variety of
18  things like that.
19      Q.  Yeah.
20      What would you need to know about the
21  individual specifically?
22      A.  I would still have to know about the event,
23  then know what I need to know about the individual.
24  So without knowing anything more about the event or
25  what's actually being claimed, I can't tell you what

Page 16

1   would need to be known about the individual either.
2   It's kind of a whole system.  You can't just pick one
3   or the other.
4       Q.  All right.
5       So in order to arrive at accurate conclusions
6   about someone sustaining injury in an accident, it
7   sounds like you've said it's a whole complete picture.
8   You can't look at just the collision forces and you
9   can't look at just individual factors; you really need
10  to know both?
11      A.  Well, more that I can't answer your question
12  because it's incomplete.  So, in general, when we're
13  doing a biomechanical analysis, we try to gather as
14  much data as possible.
15      Q.  Well, in an ideal world, if you had anything
16  available to you, what else would you have wanted to
17  view or examine in order to formulate your opinions in
18  this case?
19      A.  I don't think there was anything else that I
20  required to reach the opinions that I did.
21      Q.  So if you had had them available to you, you
22  would not have wanted to review Ms. La Croix's medical
23  records?
24      A.  I'm not offering any medical opinions.  There
25  might be some additional description in there of what

4 (Pages 13 to 16)

LaCroix v. Healy, et vir                                                                    Bradley Probst

Page 17

1  did or did not occur that might allow for further
2  confirmation, but I had more than enough information.
3      Q.  And that brings me to a point about
4  essentially all of page 4 and page 5 of your report.
5  It appears to me, in reading this, that you're looking
6  at averages, but not discrete cases; is that correct?
7      A.  I'm not sure if I'm following you.  I analyzed
8  this specific event to see what the forces -- the
9  magnitude of the forces were in this specific event
10  and what would be applied to Ms. La Croix.
11      Q.  Is it your opinion that Ms. La Croix
12  experienced any rebound into her seat as a result of
13  this collision?
14      A.  Just making sure I understand your question.
15      Do you mean rebound away from her seat, so
16  there's some prior contact and subsequent movement?
17      Q.  That's correct.
18      A.  So -- well, I think we noted in the report on
19  page 5 that she would move rearward due to contact, or
20  tend to move rearward due to contact from the other
21  vehicle; therefore, she is going to go rearwards
22  towards her seat.
23      Q.  So is that a yes?
24      A.  Well, I wouldn't call that rebound.  That's
25  just, she's moving rearward due to the contact to the

Page 18

1  rear of her vehicle.  Or, in essence, what's really
2  occurring, if you remember Sir Isaac Newton's basic
3  laws of physics, an object at rest tends to stay at
4  rest unless acted upon.  She, relative to the vehicle
5  is at rest, the vehicle is acted upon, it wants to
6  move forward while she remains at rest, so relative to
7  the vehicle, she moves rearward.
8      Q.  What -- what Delta-V or collision forces
9  would have been required in this case to result in
10  Ms. La Croix sustaining injury?
11      MR. DAWSON:  Object to form.  You can
12  answer if you can.
13      A.  Oh, I wasn't asked to analyze that, so I don't
14  have any opinions to that regard.
15  BY MR. PRINCE-OLSEN:
16      Q.  Well, I'm asking you if you can give an
17  opinion in that regard.
18      What amount of force would have been required
19  in this case to have caused Ms. La Croix to sustain
20  injury?
21      MR. DAWSON:  Same objection.
22      A.  Again, I have not analyzed that so I cannot
23  answer it.
24  BY MR. PRINCE-OLSEN:
25      Q.  What information would you need to analyze to

Page 19

1  be able to answer that question?
2      A.  Oh, I guess I would start with some of the
3  medical records, but I would have to see what
4  additional documents might be required from reviewing
5  those.  Again, I haven't even begun to look at that or
6  done any work to that regard, so I don't honestly know
7  what I would or would not need.
8      Q.  That's okay.
9      We have a starting point that we'd want to
10  look at some of the medical records and why.  Why
11  would we want to look at some of the medical records?
12      A.  Well, if we know what kind of biomechanical
13  failures have been claimed to occur, then we can
14  determine what kind of mechanism is required to create
15  that, meaning both what magnitude and what direction
16  or force application would be required, and that's
17  just a basic starting point.
18      Q.  In reviewing a person's medical records to do
19  an analysis like that, would it be important for you
20  to know if that person had any prior injuries or any
21  other conditions that might make them particularly
22  susceptible to injury?
23      A.  Possibly.  Again, it depends on what's being
24  claimed, what type of event we're analyzing.  And
25  certainly a lot of preexisting conditions or prior

Page 20

1  conditions are noted in the medical records, so it
2  might have been included in that.  And, again,
3  depending on the magnitude of the event, that might
4  not come into play.
5      Q.  Okay.
6      But worth -- you would agree that it's worth
7  taking a cursory look at?
8      A.  Certainly you would like to look at this
9  individual and see, you know, who you're dealing with.
10  If you're looking at a unique individual in a unique
11  event, you would like to have some understanding of
12  that individual.
13      Q.  And sitting here today, you don't have an
14  understanding of the injuries claimed or the prior
15  medical history of the unique individual in this case,
16  Kristin La Croix?
17      A.  Correct.  I'm not offering any opinions on
18  whether or not any type of injury or biomechanical
19  failures actually occurred.  I'm opining on the
20  forces, kinematics, and giving a trier of fact some
21  better understanding of what this event would be --
22  you know, what they might compare it to, and some
23  other real-world activities that they might have
24  experienced or something that they can relate to.  Not
25  everybody's been in a motor vehicle accident or knows

5 (Pages 17 to 20)

LaCroix v. Healy, et vir                                                    Bradley Probst

Page 21

1   what 2.4 Gs actually is, or a variety of things like
2   that.
3       Q.   Could you go to -- it's page 6 in your
4   pagination or 37 in the pagination in the bottom
5   right.
6       A.   Okay.
7       Q.   Could you just review your conclusions for
8   me -- I'll give you a minute -- and let me know if
9   there's anything that you'll be testifying to at trial
10  that differs from what is listed in your conclusions
11  in this report?
12      A.   Oh, again, aside from number 2 where we say
13  the severity of the rear impact during the subject
14  incident was significantly below 7.9 miles per hour,
15  with an average acceleration less than 2.4 Gs, again,
16  it's not changing because it's still below, but it's
17  probably closer to, I think, 5 miles per hour; in a
18  peak acceleration, less than -- oh, it's getting
19  closer to 1 G.
20      So, again, it's not changing anything.  It's
21  still below all of that.  But we might have a
22  different value for the Delta-V in acceleration.
23      Q.   Okay.
24      And what you just said, you said the peak
25  acceleration is getting closer to 1 G, what would the

Page 22

1   average acceleration be?
2       A.   Oh, again, if we just simply, well, halve
3   that, then we're going to get down to what the average
4   acceleration would be, right?
5       Q.   So having what, 2.4, so you're looking at 1.2
6   average?  Or I'm sorry.  I'm not clear.
7       A.   No.  If we're looking at the way conclusion
8   number 2 is written, if I wrote it to have a peak
9   acceleration instead of average acceleration, for that
10  same 7.9 miles per hour, we would say the peak
11  acceleration was less than roughly 4.8 Gs.
12      But based off of the testing of the bike rack,
13  the peak acceleration is actually closer to 1 G.  So,
14  again, pretty significantly below.
15      Q.   Okay.
16      Other than what we just talked about with
17  respect to number 2, any other changes in your
18  opinions?  Or do those appear to be what your
19  conclusion will be that you'll testify to at trial?
20      A.   Unless I have received some additional
21  information or something changes with documents that
22  I'm unaware of, I don't plan on offering any different
23  opinions.
24      Q.   Okay.
25      Do you plan on providing a written addendum

Page 23

1   to your report that reflects the changes in your
2   opinions following your testing of the bike rack?
3       A.   I don't plan to, but, you know, if I'm asked,
4   I probably would certainly provide one.  But at this
5   point, I've not been asked to provide a supplemental
6   report.
7       Q.   Can you describe for me, when you talk about
8   the testing that you did on the bike rack, what did
9   that testing entail?
10      A.   Oh, taking a bike rack, a receiver hitch
11  rigidly mounted to a hydraulic test fixture that
12  allows you to both measure the force and displacement
13  of the bike rack as you apply, you know, increasing
14  force to it until failure occurs.
15      Q.   And what does failure look like?
16      A.   Oh, just -- I guess, in essence, two separate
17  criterion; one where you have permanent deformation,
18  and, two, such that you would have contact with the
19  vehicle or contact similar to what we have.  So enough
20  displacement that the bike rack is permanently
21  displaced and contacting the vehicle.
22      Q.   And is it your opinion that failure in the
23  way that you just defined it here occurred in this
24  case as a result of the collision?
25      A.   Oh, certainly, yes.

Page 24

1       Q.   Okay.
2       So the bike rack, as a result of this
3   collision, suffered permanent deformation and had
4   contact with the vehicle?
5       A.   Correct.
6       Q.   Moving to opinion number 4, you say:  The
7   acceleration experienced by Ms. La Croix in this
8   incident was well within the limits of human
9   tolerance.
10      Can you just describe for me what you mean
11  when you say that the acceleration experienced was
12  well within the limits of human tolerance?
13      A.   Oh, sure.  If you look back, I think, at the
14  bottom of page 4, we list -- we start with a few
15  things:  Just simply that hard brake application can
16  be .7 to .8 Gs, so below 2.4 Gs, but just gravity
17  itself is 1 G.  And then if you start to do any
18  movement, you know, climbing stairs, standing on one
19  leg, a variety of things like that, you can certainly
20  see multiple Gs, and doing something as simple as
21  doing a jumping jack, you can see 3 Gs of force.
22      So it's not anything that you might see just,
23  you know, going about your day-to-day life, exercise
24  or work or a variety of things like that.  And it's
25  certainly possible you could see that just while

6 (Pages 21 to 24)

LaCroix v. Healy, et vir

Bradley Probst

Page 25

1   driving a vehicle.  I don't know if I listed here, but
2   hitting potholes and speed bumps and a variety of
3   things like that could easily get up to 2 to 3 Gs,
4   again, depending on the size of a pothole or speed
5   bump and the speeds involved.
6      Q.   But you'd agree that all the activities that
7   you just described at least have injury potential for
8   a discrete individual, right?
9      A.   I don't know of any individuals who really
10  just suddenly suffer some catastrophic failure simply
11  by walking unless they misstep or something else is
12  occurring.  But just through normal gait, you know,
13  normal activity, it -- things such as disc herniations
14  certainly do not occur at those magnitudes.  Again,
15  certainly you can roll an ankle or something like
16  that, but that's a little bit different.
17     Q.   Okay.
18        But you mentioned a jumping jack.  Is it your
19  opinion that a discrete individual could not be
20  injured with the forces that are applied to the body
21  in a jumping jack?
22     A.   Again, if you're just jumping and not slipping
23  and falling and rolling your ankle, no.  It's just --
24  unless you had a highly unique individual, maybe
25  somebody who had just had some significant surgery,

Page 26

1   but, in essence, if you can get out of bed and go
2   about day-to-day life, you could withstand a jumping
3   jack.
4         And, again, if jumping jacks caused any type
5   of significant biomechanical failure, I don't know how
6   much physical education is done in schools anymore,
7   but it's been done for decades and decades in
8   elementary school and middle school and high school
9   and gyms and everywhere else, you would have an
10  unlimited number of people having significant trauma
11  by doing a benign task.
12     Q.   Okay.
13        But you keep going back to this unique
14  individual, and I'll grant you that, with respect to
15  the jumping jack, you said it would be highly unique
16  individual.
17        But your testimony, if I'm understanding it
18  correctly, is, if you had a highly unique individual,
19  it is possible that a discrete individual could be
20  injured as a result of the forces applied to the body
21  in a jumping jack.
22     A.   Sure.  You would have to, again, have somebody
23  who is highly unique.  Again, had they had some very
24  significant trauma, let's say they just broke their
25  bone in their leg and it's not been set or not wearing

Page 27

1   a rigid cast, certainly they could be reinjured by
2   doing a jumping jack.  So that would be a much -- you
3   know, a highly unique individual.
4      Q.   Sure.
5         So you really need to know things about that
6   unique individual and not the average population
7   performing jumping jacks, right?
8      A.   If we're analyzing a specific individual and a
9   specific incident, yes.
10     Q.   Okay.
11        And we are in this case analyzing a specific
12  incident and a specific individual, are we not?
13     A.   I'm, again, looking at the forces and
14  comparing those forces to a variety of other
15  activities.  Again, I'm not offering any opinions on
16  biomechanical failures or causation.
17     Q.   Can we look at -- it's attached to your
18  report -- your CV?  It should be the last few pages.
19        Do you see that?
20     A.   I do.
21     Q.   I want to ask you about your educational
22  background.  Can you tell me what it means when it
23  says in your academic background Ph.D. Candidate at
24  Tulane University?
25     A.   Sure.  I was at Tulane during the time of

Page 28

1   Hurricane Katrina, and because of that, school was
2   closed for, I think, at least a year, if not longer.
3   Members of faculty left, including members of my
4   committee, and because of that, while I had completed
5   all the educational requirements, testing, research,
6   teaching, anything that would be required except for
7   defending my dissertation, because of that delay, I
8   just did not pursue my Ph.D. beyond or to defend my
9   dissertation, but I completed all the other academic
10  requirements.
11        And so if you look at the guidelines from
12  Tulane, the School of Biomedical Engineering, the text
13  or the guidebook, the level I achieved -- or if I were
14  to reenter school, I would be considered a Ph.D.
15  candidate.  So it's just a succinct way of saying what
16  I had accomplished during my time at Tulane.
17     Q.   Okay.
18        And Tulane to this day continues to have a
19  biomedical engineering program, right?
20     A.   I believe so, yes.
21     Q.   Okay.
22        And that program is still awarding Ph.D.s,
23  correct?
24     A.   I haven't been following it, but I assume
25  that's -- that's still the case.

7 (Pages 25 to 28)

LaCroix v. Healy, et vir                                                          Bradley Probst

Page 29

1    Q.  And as far as you know, Tulane is open and
2  the department's open were you to decide to defend
3  your dissertation, correct?
4    A.  Correct.
5        MR. PRINCE-OLSEN:  Let me get this marked,
6  please, Exhibit 2.
7           (Exhibit No. 2 was marked.)
8  BY MR. PRINCE-OLSEN:
9    Q.  Mr. Probst, I'm handing you Exhibit 2, which
10  I believe is also in your file, and I will represent
11  to you is the report of accident reconstructionist
12  David Wells.
13        Have you examined this report before?
14    A.  I have.
15    Q.  Okay.
16        And I won't ask you to, like, review this in
17  its entirety at this moment, but do you recall, from
18  when you reviewed this, if there was anything about
19  this report that you disagreed with?
20    A.  Oh, not -- no, not to any real degree.  We
21  both said that, you know, it's -- he has, I think,
22  8.9 miles per hour for the maximum speed, but
23  that's -- I think he has that as an impact speed and
24  has a Delta-V slightly below that.
25        But I -- when analyzing any incident like

Page 30

1  this, I always give the benefit of the doubt to the
2  opposing side and try to make it the most severe event
3  that I possibly can.
4    Q.  So you don't -- you don't disagree with his
5  calculation of the impact speed or the Delta-V then?
6    A.  No.  Again, I think I said it was below
7  7.9 miles per hour, and he has it, you know, 5.9 miles
8  per hour, so I'd still -- you know, it's certainly
9  below the 7 miles per hour, so we're in agreement.
10    Q.  In both your report and in Mr. Wells' report,
11  there's a reference -- it may not be worded the same
12  way, but both of you refer to the fact that there was
13  no residual crush to the rear bumper of Ms. La Croix's
14  vehicle; is that correct?
15    A.  I don't recall if he says that, but I don't
16  believe that there was any significant permanent
17  deformation to the bumper, correct.
18    Q.  Okay.
19        But this wasn't a bumper-to-bumper impact as
20  we've discussed, correct?
21        MR. DAWSON:  Object to form.  Answer if
22  you can.
23    A.  It was not a direct bumper-to-bumper impact
24  because the bike rack was in between.  However, you
25  can still apply loads and forces to the bumper

Page 31

1  structure, if you will, so it still can have bumper
2  loading, I guess, is the most fair way to describe it.
3  BY MR. PRINCE-OLSEN:
4    Q.  Sure.
5        But would you expect to see permanent bumper
6  deformity where there was not bumper-to-bumper
7  contact?
8    A.  If you have forces applied, even if it's
9  indirectly, I would expect it based off of the
10  empirical crash data for the Honda, yes.
11    Q.  And I'm sorry.
12        Why -- why would you expect to see permanent
13  deformity to the rear bumper of the Honda?
14    A.  Well -- and maybe this is the easiest way to
15  describe it -- that in a 6.2 mile per hour rear-end
16  impact to a Honda Odyssey, you get damage to the
17  rear -- I just want to make sure I'm using their exact
18  same terminology -- but the floor of the rear body has
19  some damage.
20        So obviously, then, the bumper would be
21  mounted to structures that attach to the floor.  If
22  the floor is deformed, you're deforming the rear
23  bumper as well.
24        And so if you're pushing on the back of the
25  vehicle, you can still deform the floor.  Whether

Page 32

1  you're pushing on the back through the bumper, through
2  the receiver hitch or through the receiver hitch and
3  directly through a bike rack, it's all still going to
4  the floor one way or the other.
5    Q.  Okay.
6        MR. PRINCE-OLSEN:  Can I have this marked,
7  please, Exhibit 3?
8           (Exhibit No. 3 was marked.)
9  BY MR. PRINCE-OLSEN:
10    Q.  Mr. Probst, this is an email from your file
11  from Mr. Dawson.  I just want you to look at the
12  second paragraph there.  Could you just read the first
13  line of that second paragraph to me, please?
14    A.  The one that begins "I realize"?
15    Q.  Yes.
16    A.  "I realize that it is difficult to perform any
17  detailed or thorough analysis without being able to
18  examine/inspect the actual rack itself."
19    Q.  And would you agree with that statement?
20    A.  No.
21    Q.  Why not?
22    A.  Because it's not difficult to do.
23    Q.  What is not difficult to do?
24    A.  To analyze what type of forces would be
25  required to cause the deformation to the rack in this

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

LaCroix v. Healy, et vir                                                      Bradley Probst

Page 33

1   incident.  It might be difficult to somebody who
2   doesn't have testing background or an engineering
3   background, but for somebody like myself, it's not a
4   difficult task.
5       Q.  If the bike rack -- the subject bike rack
6   were still in existence, would you want to examine it?
7       A.  Oh, it would certainly, you know, be nice, and
8   then I can answer questions in affirmative that, yes,
9   I have inspected it.  Again, it's not necessary,
10  but -- it certainly would allow me to possibly be more
11  precise, but not any more accurate in my analysis.
12          MR. PRINCE-OLSEN:  So let's just take,
13  like, a five-minute break.  Let me just look at my
14  notes and we might be done.
15          THE WITNESS:  Sure.
16              (A break was taken from
17              10:03 to 10:09 a.m.)
18  BY MR. PRINCE-OLSEN:
19      Q.  Mr. Probst, is it your opinion that the
20  Delta-V that you opine occurred in this case would
21  have been sufficient to cause the front seat belt
22  locking mechanism that Ms. La Croix was using to
23  engage?
24      A.  The front seat belt would lock by Federal
25  Motor Vehicle Safety Standards, correct.

Page 34

1       Q.  What is the threshold at which the locking
2   mechanism in a seat belt is supposed to engage?
3       A.  It's .7 Gs; however, because there's some
4   other scenarios that can lock the seat belt, it could
5   be as slow as .3 G, but .7 G is a safe number.
6       Q.  And, again, you haven't seen any photos or
7   done any measurements of Ms. La Croix actually seated
8   in her vehicle, correct?
9           MR. DAWSON:  Object to form.  Answer if
10  you can.
11      A.  I do not have any photographs of her seated in
12  the vehicle, correct.
13  BY MR. PRINCE-OLSEN:
14      Q.  Would it be important for you to know, for
15  example, where the seat belt crossed her body to know
16  how her body individually might have sustained the
17  forces in this collision?
18      A.  No.  Again, in this particular incident, the
19  primary means of restraint is the seat, seat back and
20  head restraint, because the occupant tends to move
21  rearward.  And then, you know, that's really the --
22  again, the primary means of restraint.  So you're, in
23  essence, moving away from the seat belt at that point
24  in time.
25      Q.  Do you believe the forces in this collision

Page 35

1   were sufficient to cause Ms. La Croix, after moving
2   backward toward the seat, to then be moved in a
3   forward fashion?
4       A.  Well, obviously the vehicle came to a stop
5   after this incident, so there had to be some
6   deceleration of her vehicle through a brake
7   application.  But she would move, in essence, no
8   different than somebody would be moving during any
9   other brake application.
10      Q.  Which is to say, backward, then forward?
11      A.  Potentially.  I mean, it could be highly
12  insignificant forward motion.  I'm not sure if an
13  average person, if you asked them:  Define how they
14  move when they apply the brakes in their vehicle, if
15  they would say they move at all.  But the potential,
16  because there is forces in that direction due to brake
17  application, could be there.  But you also have your
18  foot on the brake, hands on the steering wheel, muscle
19  activation and the seat belt itself.
20      Q.  Okay.
21          But in this collision, the forces were
22  sufficient for at least the potential of
23  Ms. La Croix's body to have moved appreciably forward
24  after first having moved backward?
25          MR. DAWSON:  Object to the form.  Answer

Page 36

1   if you can.
2       A.  You would have to define "appreciably."
3   BY MR. PRINCE-OLSEN:
4       Q.  Let's say enough for her to notice.  You
5   mentioned that some people wouldn't notice that
6   movement, but enough for her to notice.
7       A.  I'm not sure if I can give a fair scientific
8   answer to that in the sense that we're now discussing
9   somebody's perception, and somebody might perceive
10  that they moved when, in fact, they did not.  And so
11  certainly somebody might have that perception, but it
12  might not necessarily mean that they moved at all.
13      Q.  Okay.
14          Let's take away someone's perception, then,
15  and just ask:  Do you think there were forces in this
16  collision sufficient to cause Ms. La Croix's body to
17  move first backward and then forward?
18      A.  Now we're asking a slightly different question
19  than what you asked previously, but certainly based
20  off of the magnitude of the contact to the rear of the
21  vehicle, you could have some rearward motion.  And
22  then, again, if this individual moves normally forward
23  during brake application, then that might occur as
24  well.
25          But if you're asking, do they spring off of

9 (Pages 33 to 36)

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

LaCroix v. Healy, et vir                                                                    Bradley Probst

```
                                              Page 37
 1      the seat or trampoline or anything like that,
 2      that's -- that certainly does not happen based off of
 3      physics and seat design and a variety of other
 4      reasons.
 5              MR. PRINCE-OLSEN:  All right.  I have no
 6      further questions.
 7              MR. DAWSON:  Nothing from me.
 8                  (Deposition concluded at
 9                   10:14 a.m.)
10                  (By agreement between counsel and
11                   witness, signature was waived.)
12
13                     -oOo-
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 38
 1                  C E R T I F I C A T E
 2
 3      STATE OF WASHINGTON     )
                                ) ss.
 4      COUNTY OF KING          )
 5
 6
 7          I, ANITA W. SELF, a Certified Shorthand
 8      Reporter in and for the State of Washington, do
 9      hereby certify that the foregoing transcript is true
10      and accurate to the best of my knowledge, skill and
11      ability.
12          IN WITNESS WHEREOF, I have hereunto set my hand
13      and seal this 26th day of September 2018.
14
15
16
17      _____
18          ANITA W. SELF, RPR, CCR #3032
19
20
21
22
23
24
25
```

BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

LaCroix v. Healy, et vir                                                              Bradley Probst

**A**

**a.m** 4:2 33:17 37:9
**ability** 38:11
**able** 19:1 32:17
**academic** 27:23
  28:9
**acceleration** 12:13
  12:19,20,24 13:13
  13:13 14:1 21:15
  21:18,22,25 22:1
  22:4,9,9,11,13
  24:7,11
**accelerations** 13:24
**accident** 16:6 20:25
  29:11
**accomplished**
  28:16
**accurate** 7:9 16:5
  33:11 38:10
**achieved** 28:13
**acted** 18:4,5
**activation** 35:19
**activities** 20:23
  25:6 27:15
**activity** 25:13
**acts** 9:16
**actual** 12:2 32:18
**addendum** 22:25
**addition** 10:17
**additional** 7:18,22
  16:25 19:4 22:20
**admit** 13:11
**affirmative** 33:8
**agree** 20:6 25:6
  32:19
**agreement** 30:9
  37:10
**airbag** 10:18
**alleging** 8:16
**allow** 17:1 33:10
**allows** 23:12
**alter** 7:19
**amount** 13:25
  18:18
**analysis** 16:13

19:19 32:17 33:11
**analyze** 18:13,25
  32:24
**analyzed** 17:7
  18:22
**analyzing** 19:24
  27:8,11 29:25
**ANITA** 1:25 38:7
  38:18
**ankle** 25:15,23
**answer** 5:11 14:10
  16:11 18:12,23
  19:1 30:21 33:8
  34:9 35:25 36:8
**anymore** 26:6
**appear** 22:18
**appears** 7:11 17:5
**application** 19:16
  24:15 35:7,9,17
  36:23
**applied** 14:1 15:3
  17:10 25:20 26:20
  31:8
**apply** 23:13 30:25
  35:14
**appreciably** 35:23
  36:2
**appropriate** 13:1
**ARCCA** 6:17,24
  8:1 11:8,19
**arrive** 16:5
**arrived** 10:5
**aside** 21:12
**asked** 5:12 18:13
  23:3,5 35:13
  36:19
**asking** 14:15 18:16
  36:18,25
**assess** 9:3
**association** 12:24
**assume** 5:12 28:24
**attach** 31:21
**attached** 27:17
**attorney** 4:20
**attorneys** 2:4 4:13

**available** 16:16,21
**Avenue** 1:18 2:4,9
**average** 12:13,19
  12:20,22,24 13:1
  13:8 21:15 22:1,3
  22:6,9 27:6 35:13
**averages** 17:6
**awarding** 28:22

**B**

**B-R-A-D-L-E-Y**
  5:17
**back** 24:13 26:13
  31:24 32:1 34:19
**background** 27:22
  27:23 33:2,3
**backward** 35:2,10
  35:24 36:17
**barrier** 9:15
**based** 7:17 11:12
  11:20 22:12 31:9
  36:19 37:2
**basic** 18:2 19:17
**basically** 11:13
**bed** 26:1
**begins** 12:11 32:14
**begun** 19:5
**believe** 7:21 8:13
  9:10 14:8 28:20
  29:10 30:16 34:25
**bell** 13:6
**belt** 33:21,24 34:2,4
  34:15,23 35:19
**bending** 11:13
**benefit** 30:1
**benign** 26:11
**best** 38:10
**better** 20:21
**beyond** 11:5 28:8
**bicycle** 6:25 10:24
  10:24
**bike** 7:19 8:2 10:1
  11:3,10,13,19,20
  11:22 12:2 22:12
  23:2,8,10,13,20

24:2 30:24 32:3
  33:5,5
**biomechanical**
  16:13 19:12 20:18
  26:5 27:16
**biomechanics**
  12:23
**biomedical** 28:12
  28:19
**bit** 25:16
**blank** 11:9
**body** 13:24 25:20
  26:20 31:18 34:15
  34:16 35:23 36:16
**bolsen@glpattor...**
  2:6
**bone** 26:25
**bottom** 21:4 24:14
**Bradley** 1:15 3:1
  4:5 5:17
**brake** 24:15 35:6,9
  35:16,18 36:23
**brakes** 35:14
**break** 33:13,16
**brief** 13:25
**brings** 17:3
**broke** 26:24
**Bryan** 2:3 4:12
**bump** 25:5
**bumper** 9:11,11,12
  9:14,16,20,23,25
  10:1 11:1,2 30:13
  30:17,25 31:1,5
  31:13,20,23 32:1
**bumper-to-bum...**
  9:8 30:19,23 31:6
**bumpers** 9:4
**bumps** 25:2

**C**

**C** 2:1 38:1,1
**calculation** 11:18
  30:5
**call** 17:24
**candidate** 27:23

28:15
**case** 4:14 6:17 7:10
  10:7 11:17 16:18
  18:9,19 20:15
  23:24 27:11 28:25
  33:20
**cases** 17:6
**cast** 27:1
**catastrophic** 25:10
**causation** 27:16
**cause** 32:25 33:21
  35:1 36:16
**caused** 18:19 26:4
**CCR** 1:25 38:18
**certainly** 8:6 10:9
  14:20,22 15:2
  19:25 20:8 23:4
  23:25 24:19,25
  25:14,15 27:1
  30:8 33:7,10
  36:11,19 37:2
**Certified** 38:7
**certify** 38:9
**change** 10:6
**changes** 22:17,21
  23:1
**changing** 21:16,20
**characteristics** 9:23
**circumstance** 14:7
**citation** 8:1
**citations** 7:25
**claimed** 15:25
  19:13,24 20:14
**clear** 22:6
**climbing** 24:18
**closed** 28:2
**closer** 11:24 21:17
  21:19,25 22:13
**collision** 8:16 12:3
  12:6 13:14 14:4,9
  16:8 17:13 18:8
  23:24 24:3 34:17
  34:25 35:21 36:16
**collisions** 9:8
**come** 20:4

LaCroix v. Healy, et vir

Bradley Probst

committee 28:4
community 1:8
compare 20:22
comparing 27:14
complaint 8:18
complete 14:15
  15:7 16:7
completed 28:4,9
composed 1:8
concluded 37:8
conclusion 22:7,19
conclusions 16:5
  21:7,10
conditions 19:21,25
  20:1
conduct 10:3
conducted 11:9
confirmation 7:20
  17:2
considered 28:14
contact 9:9 17:16
  17:19,20,25 23:18
  23:19 24:4 31:7
  36:20
contacting 23:21
contained 6:11
continues 28:18
copy 7:9 8:6
correct 8:20 9:17
  14:4 17:6,17
  20:17 24:5 28:23
  29:3,4 30:14,17
  30:20 33:25 34:8
  34:12
correctly 26:18
counsel 37:10
COUNTY 1:2 38:4
couple 6:4,5 10:14
course 13:14
court 1:1 4:23
crash 31:10
create 19:14
criterion 23:17
Croix 1:4 4:14 8:15
  8:20,23 17:10,11

18:10,19 20:16
24:7 33:22 34:7
35:1
Croix's 8:12 16:22
  30:13 35:23 36:16
crossed 34:15
crush 30:13
cursory 20:7
curvature 9:22
curve 13:6
CV 27:18

———————
D
———————
damage 10:15,16
  10:17 11:5,5,7,20
  31:16,19
data 8:3 10:22 15:8
  16:14 31:10
DATE 1:24
dated 3:9
David 3:8 5:24
  29:12
Dawson 2:8 8:8
  14:10,19 18:11,21
  30:21 32:11 34:9
  35:25 37:7
day 28:18 38:13
day-to-day 24:23
  26:2
dealing 20:9
decades 26:7,7
deceleration 35:6
decide 29:2
decreases 13:5
defend 28:8 29:2
Defendants 1:9 2:7
defending 28:7
define 35:13 36:2
defined 23:23
deflection 11:13
deform 31:25
deformation 23:17
  24:3 30:17 32:25
deformed 31:22
deforming 31:22

deformity 31:6,13
degree 29:20
delay 28:7
Delta-V 10:6 11:11
  11:16,24 18:8
  21:22 29:24 30:5
  33:20
department's 29:2
depend 13:22
depending 20:3
  25:4
depends 19:23
deployment 10:18
deposed 4:17
deposition 1:13 3:1
  4:16 5:20 6:23
  37:8
describe 10:5,13
  23:7 24:10 31:2
  31:15
described 6:22 25:7
description 16:25
design 37:3
designed 9:19
  10:23
detailed 32:17
determine 19:14
Dietzler 2:9
different 10:14
  11:18 21:22 22:22
  25:16 35:8 36:18
differs 21:10
difficult 5:3 32:16
  32:22,23 33:1,4
digital 8:6
direct 30:23
direction 19:15
  35:16
directly 32:3
disagree 30:4
disagreed 29:19
disc 25:13
discrete 17:6 25:8
  25:19 26:19
discussed 30:20

discussing 36:8
displaced 23:21
displacement 7:3
  23:12,20
dissertation 28:7,9
  29:3
documents 5:19 6:3
  7:22 19:4 22:21
DOE 1:7
doing 16:13 24:20
  24:21 26:11 27:2
doubt 30:1
drafting 7:16
drawing 11:9
driving 25:1
due 17:19,20,25
  35:16
duly 4:6

———————
E
———————
E 2:1,1 4:10 38:1,1
easier 5:1
easiest 31:14
easily 25:3
education 26:6
educational 27:21
  28:5
either 7:15 12:5,21
  16:1
elementary 26:8
email 3:9 32:10
empirical 10:22
  31:10
engage 33:23 34:2
engineering 28:12
  28:19 33:2
entail 23:9
entire 6:15
entirety 29:17
environment 15:17
envision 14:17
equipped 13:24
essence 9:14 11:2
  11:22 13:6,23
  18:1 23:16 26:1

34:23 35:7
essentially 17:4
estimates 12:7
event 13:9 14:21
  15:16,22,24 17:8
  17:9 19:24 20:3
  20:11,21 30:2
everybody's 20:25
exact 31:17
EXAMINATION
  1:13 3:2,3
examine 16:17 33:6
examine/inspect
  32:18
examined 4:7 12:2
  12:5 29:13
example 34:15
exceeds 14:21
Excel 8:4
exercise 24:23
Exhibit 3:5 7:5,6
  29:6,7,9 32:7,8
EXHIBITS 3:6
existence 33:6
expect 31:5,9,12
experienced 12:13
  17:12 20:24 24:7
  24:11
expert 4:15

———————
F
———————
F 38:1
fact 14:3 20:20
  30:12 36:10
factors 16:9
faculty 28:3
failure 23:14,15,22
  25:10 26:5
failures 19:13
  20:19 27:16
fair 5:12 13:8 31:2
  36:7
falling 25:23
far 29:1
fashion 35:3

LaCroix v. Healy, et vir

Bradley Probst

**Federal** 33:24
**field** 12:22
**file** 6:11,15 29:10
  32:10
**files** 8:3
**finally** 11:8
**find** 4:16
**first** 4:6 9:1 32:12
  35:24 36:17
**five-minute** 33:13
**fixture** 23:11
**Flex** 10:17,18
**floor** 1:18 2:4 31:18
  31:21,22,25 32:4
**following** 17:7 23:2
  28:24
**follows** 4:8
**foot** 35:18
**force** 7:2 9:19,20
  11:12 13:4 14:21
  15:3 18:18 19:16
  23:12,14 24:21
**forces** 15:1,17 16:8
  17:8,9 18:8 20:20
  25:20 26:20 27:13
  27:14 30:25 31:8
  32:24 34:17,25
  35:16,21 36:15
**Ford** 10:17,18
**foregoing** 38:9
**form** 14:10 18:11
  30:21 34:9 35:25
**forming** 12:19
**formulate** 16:17
**formulating** 8:10
**forward** 18:6 35:3
  35:10,12,23 36:17
  36:22
**Fourth** 1:18 2:4,9
**frame** 11:1
**front** 33:21,24
**full** 5:15
**further** 7:20 17:1
  37:6

**G**

**G** 21:19,25 22:13
  24:17 34:5,5
**gait** 25:12
**gather** 16:13
**general** 16:12
**generally** 10:19
**generated** 5:22
**getting** 21:18,25
**give** 4:21 5:2 8:6,8
  18:16 21:8 30:1
  36:7
**given** 11:18
**giving** 13:8 20:20
**GLP** 2:4
**go** 6:15 17:21 21:3
  26:1
**going** 17:21 22:3
  24:23 26:13 32:3
**Good** 4:12
**grant** 26:14
**gravity** 24:16
**great** 8:7
**greater** 11:7
**greatly** 14:21
**ground** 4:21
**Gs** 12:15 21:1,15
  22:11 24:16,16,20
  24:21 25:3 34:3
**guess** 19:2 23:16
  31:2
**guidebook** 28:13
**guidelines** 28:11
**gyms** 26:9

**H**

**halve** 22:2
**hand** 38:12
**handing** 29:9
**hands** 12:8 35:18
**handwritten** 6:8
**happen** 37:2
**hard** 24:15
**hatch** 11:14
**head** 5:4 11:23

34:20
**HEALY** 1:7,7
**height** 9:22 14:4
**hereunto** 38:12
**herniations** 25:13
**high** 26:8
**high-energy** 14:21
**higher** 14:2
**highest** 13:15,20
  14:9
**highly** 25:24 26:15
  26:18,23 27:3
  35:11
**Highway** 9:2 10:21
**history** 20:15
**hitch** 10:25 23:10
  32:2,2
**hits** 11:14
**hitting** 25:2
**hmm-mm** 5:4
**Honda** 12:14 31:10
  31:13,16
**honestly** 8:17 19:6
**hour** 10:8,19 11:6
  11:18,24 21:14,17
  22:10 29:22 30:7
  30:8,9 31:15
**human** 13:24 24:8
  24:12
**hundred** 8:5
**Hurricane** 28:1
**husband** 1:8
**hydraulic** 23:11
**hypothetical** 14:6
  14:12,16,16,25
  15:7,10

**I**

**ideal** 16:15
**IDENTIFICATI...**
  3:6
**IIHS** 9:24
**impact** 12:14 13:3
  21:13 29:23 30:5
  30:19,23 31:16

**impacts** 12:23
**important** 4:25
  12:20 19:19 34:14
**incident** 7:2 11:7
  11:21 21:14 24:8
  27:9,12 29:25
  33:1 34:18 35:5
**included** 20:2
**including** 28:3
**incomplete** 14:5,12
  15:11 16:12
**increases** 13:4
**increasing** 23:13
**incredibly** 14:20
**INDEX** 3:2,5
**indicates** 10:18
**indirectly** 31:9
**individual** 14:22
  15:15,21,23 16:1
  16:9 20:9,10,12
  20:15 25:8,19,24
  26:14,16,18,19
  27:3,6,8,12 36:22
**individual's** 15:9
**individually** 1:7
  34:16
**individuals** 25:9
**information** 7:13
  17:2 18:25 22:21
**injured** 14:3,18
  15:2,4,14 25:20
  26:20
**injuries** 8:15 19:20
  20:14
**injury** 12:25 13:18
  13:19,22 14:2,8
  15:9 16:6 18:10
  18:20 19:22 20:18
  25:7
**insignificant** 35:12
**inspected** 33:9
**instantaneous** 13:7
**Institute** 9:2 10:21
**Insurance** 9:2
  10:21

**interest** 6:5
**involve** 9:8
**involved** 6:5 7:2,3
  10:1 12:3,6 15:17
  25:5
**Isaac** 18:2
**issuing** 7:22

**J**

**jack** 24:21 25:18,21
  26:3,15,21 27:2
**jacks** 26:4 27:7
**JEAN** 1:7
**job** 5:1
**JOHN** 1:7
**July** 3:9
**jumping** 24:21
  25:18,21,22 26:2
  26:4,15,21 27:2,7

**K**

**Katrina** 28:1
**keep** 26:13
**kind** 7:2 16:2 19:12
  19:14
**kinematics** 20:20
**KING** 1:2 38:4
**know** 5:8 6:5 7:14
  8:15 9:24 14:13
  15:2,8,13,15,16
  15:20,22,23,23
  16:10 19:6,12,20
  20:9,22 21:8 23:3
  23:13 24:18,23
  25:1,9,12 26:5
  27:3,5 29:1,21
  30:7,8 33:7 34:14
  34:15,21
**knowing** 14:24
  15:24
**knowledge** 8:21
  10:4 38:10
**known** 16:1
**knows** 20:25
**Kristin** 1:4 4:14

LaCroix v. Healy, et vir                                                                Bradley Probst

20:16

**L**

**La** 1:4 4:14 8:12,15
    8:20,23 16:22
    17:10,11 18:10,19
    20:16 24:7 30:13
    33:22 34:7 35:1
    35:23 36:16
**lack** 10:16,17
**LAURA** 1:7
**Law** 2:9
**laws** 12:11 18:3
**lay** 12:8
**left** 28:3
**leg** 24:19 26:25
**let's** 7:4 26:24
    33:12 36:4,14
**level** 14:22 28:13
**life** 24:23 26:2
**liftgate** 11:5
**limited** 13:11
**limits** 24:8,12
**line** 32:13
**list** 24:14
**listed** 4:15 21:10
    25:1
**literature** 13:2
**little** 5:1 25:16
**loading** 31:2
**loads** 30:25
**locate** 6:14
**lock** 33:24 34:4
**locking** 33:22 34:1
**long** 8:5
**longer** 14:1 28:2
**look** 5:6 6:16 7:14
    12:18,21 13:3
    16:8,9 19:5,10,11
    20:7,8 23:15
    24:13 27:17 28:11
    32:11 33:13
**looked** 6:24 7:1
    8:19 10:14
**looking** 17:5 20:10

22:5,7 27:13
**lot** 19:25
**low-speed** 9:3

**M**

**M** 4:10
**magnitude** 13:15
    13:20,22 14:4,9
    14:18 15:14 17:9
    19:15 20:3 36:20
**magnitudes** 25:14
**majority** 5:24
**making** 17:14
**marital** 1:8
**Mark** 2:9
**marked** 7:5,6 29:5
    29:7 32:6,8
**maximum** 13:5
    29:22
**mean** 6:15 17:15
    24:10 35:11 36:12
**meaning** 19:15
**means** 27:22 34:19
    34:22
**measure** 23:12
**measurements** 8:22
    34:7
**mechanism** 19:14
    33:22 34:2
**medical** 8:12,13
    16:22,24 19:3,10
    19:11,18 20:1,15
**members** 28:3,3
**memorized** 8:19
**mentioned** 25:18
    36:5
**met** 8:20
**middle** 26:8
**mile** 11:6,24 31:15
**miles** 10:7,19 11:17
    21:14,17 22:10
    29:22 30:7,7,9
**mimics** 9:14,22
**minute** 21:8
**misstep** 25:11

**model** 6:6
**moment** 13:7,19
    14:8,18 29:17
**morning** 4:12
**motion** 35:12 36:21
**motor** 20:25 33:25
**mounted** 9:15
    10:25,25 23:11
    31:21
**move** 17:19,20 18:6
    34:20 35:7,14,15
    36:17
**moved** 35:2,23,24
    36:10,12
**movement** 17:16
    24:18 36:6
**moves** 18:7 36:22
**moving** 17:25 24:6
    34:23 35:1,8
**multiple** 12:7 24:20
**muscle** 35:18

**N**

**N** 2:1 4:10,10
**name** 4:12 5:15
**necessarily** 13:16
    36:12
**necessary** 33:9
**need** 15:8,12,14,20
    15:23 16:1,9
    18:25 19:7 27:5
**never** 8:20
**Newton's** 18:2
**nice** 33:7
**nodding** 5:4
**normal** 25:12,13
**normally** 36:22
**note** 5:3 12:1,23
**noted** 11:12 17:18
    20:1
**notes** 5:21 6:1,4,8
    6:11 33:14
**notice** 36:4,5,6
**number** 11:23
    12:22 21:12 22:8

22:17 24:6 26:10
    34:5

**O**

**O** 4:10
**o0o-** 4:3 37:13
**oath** 4:6
**object** 14:10 18:3
    18:11 30:21 34:9
    35:25
**objection** 14:19
    18:21
**obviously** 10:15
    13:4 31:20 35:4
**occupant** 34:20
**occur** 13:18,19 17:1
    19:13 25:14 36:23
**occurred** 20:19
    23:23 33:20
**occurring** 18:2
    25:12
**occurs** 13:3 23:14
**Odyssey** 12:14
    31:16
**offering** 16:24
    20:17 22:22 27:15
**Offices** 2:9
**oh** 5:21 6:3 7:18
    8:3 9:13 10:9,10
    12:21 18:13 19:2
    21:12,18 22:2
    23:10,16,25 24:13
    29:20 33:7
**okay** 5:5,10,14,25
    6:10,20 8:7 9:18
    13:17 15:6 19:8
    20:5 21:6,23
    22:15,24 24:1
    25:17 26:12 27:10
    28:17,21 29:15
    30:18 32:5 35:20
    36:13
**once** 13:5
**open** 29:1,2
**open-ended** 13:21

**opine** 33:20
**opining** 20:19
**opinion** 10:6 17:11
    18:17 23:22 24:6
    25:19 33:19
**opinions** 7:17,20,21
    8:11 12:19 16:17
    16:20,24 18:14
    20:17 22:18,23
    23:2 27:15
**opposing** 30:2
**ORAL** 1:13
**order** 15:13 16:5,17
**overall** 13:9

**P**

**P** 2:1,1
**P-R-O-B-S-T** 5:18
**P.S** 2:4
**page** 3:3,6 7:12
    8:25 12:10 17:4,4
    17:19 21:3 24:14
**pages** 8:5 27:18
**pagination** 21:4,4
**paragraph** 9:1
    12:10,11 32:12,13
**particular** 15:13
    34:18
**particularly** 19:21
**peak** 12:21 13:7,12
    14:18 15:14 21:18
    21:24 22:8,10,13
**people** 15:2 26:10
    36:5
**perceive** 36:9
**perception** 36:9,11
    36:14
**perform** 32:16
**performance** 9:4
**performing** 27:7
**period** 14:1
**permanent** 23:17
    24:3 30:16 31:5
    31:12
**permanently** 23:20

LaCroix v. Healy, et vir

Bradley Probst

Page 43

**person** 14:8 15:13 19:20 35:13
**person's** 19:18
**Ph.D** 27:23 28:8,14
**Ph.D.s** 28:22
**photo** 9:1
**photographs** 5:23 12:4,8 34:11
**photos** 34:6
**physical** 26:6
**physically** 14:17
**physics** 12:11 18:3 37:3
**pick** 16:2
**picture** 16:7
**places** 11:24
**plaintiff** 1:5 2:2 4:14
**plan** 22:22,25 23:3
**play** 20:4
**please** 5:2,15 7:5,13 29:6 32:7,13
**point** 13:14 15:4 17:3 19:9,17 23:5 34:23
**points** 15:8
**population** 27:6
**possible** 13:19 16:14 24:25 26:19
**possibly** 15:10 19:23 30:3 33:10
**potential** 12:25 14:2,23 25:7 35:15,22
**Potentially** 35:11
**pothole** 25:4
**potholes** 25:2
**precise** 33:11
**preexisting** 19:25
**prepare** 5:20
**pretty** 22:14
**previously** 36:19
**primary** 34:19,22
**Prince-Olsen** 2:3 3:4 4:11,13 7:4,7

14:14 15:5 18:15 18:24 29:5,8 31:3 32:6,9 33:12,18 34:13 36:3 37:5
**print** 8:4
**prior** 17:16 19:20 19:25 20:14
**probably** 11:11 21:17 23:4
**Probst** 1:15 3:1 4:5 4:12 5:17 29:9 32:10 33:19
**proceeding** 4:22
**program** 28:19,22
**protocol** 9:10
**provide** 7:25 23:4,5
**provided** 6:12
**providing** 7:9 22:25
**pulling** 13:7
**pursue** 28:8
**pushing** 10:24 11:2 11:3 31:24 32:1

**Q**

**question** 5:7,11 13:21 16:11 17:14 19:1 36:18
**questions** 33:8 37:6

**R**

**R** 2:1 38:1
**rack** 6:25 7:1,1 8:2 10:2,24,24 11:3 11:10,13,20,22 12:2 22:12 23:2,8 23:10,13,20 24:2 30:24 32:3,18,25 33:5,5
**racks** 7:19 11:19
**reach** 16:20
**read** 32:12
**reading** 17:5
**real** 29:20
**real-world** 20:23

**realize** 32:14,16
**really** 14:24 15:1 16:9 18:1 25:9 27:5 34:21
**rear** 11:14 12:13 18:1 21:13 30:13 31:13,17,18,22 36:20
**rear-end** 12:23 31:15
**rearward** 17:19,20 17:25 18:7 34:21 36:21
**rearwards** 17:21
**reasons** 37:4
**rebound** 17:12,15 17:24
**recall** 8:17 29:17 30:15
**received** 22:20
**receiver** 10:25 23:10 32:2,2
**reconstructionist** 29:11
**record** 5:16
**records** 8:12,14 16:23 19:3,10,11 19:18 20:1
**reenter** 28:14
**refer** 30:12
**reference** 30:11
**referring** 6:2
**reflects** 23:1
**regard** 18:14,17 19:6
**reinjured** 27:1
**relate** 20:24
**related** 8:1
**relative** 7:1 18:4,6
**remains** 18:6
**remember** 11:23 18:2
**repair** 12:7
**report** 3:7,8 5:21 5:23 7:9,12,16,23

7:24 8:10,11,25 17:4,18 21:11 23:1,6 27:18 29:11,13,19 30:10 30:10
**REPORTED** 1:25
**reporter** 4:23 38:8
**reports** 11:12
**represent** 29:10
**representation** 13:9
**representing** 4:13
**required** 16:20 18:9,18 19:4,14 19:16 28:6 32:25
**requirements** 28:5 28:10
**research** 28:5
**researchers** 12:22
**residual** 30:13
**respect** 22:17 26:14
**responses** 5:3
**rest** 18:3,4,5,6
**restraint** 34:19,20 34:22
**result** 17:12 18:9 23:24 24:2 26:20
**review** 5:19 6:17,22 8:10,11 16:22 21:7 29:16
**reviewed** 6:1,3 7:13 7:15,18 8:2 29:18
**reviewing** 19:4,18
**right** 4:19 6:20 12:6 13:10 16:4 21:5 22:4 25:8 27:7 28:19 37:5
**rigid** 9:15,21 27:1
**rigidly** 23:11
**roll** 25:15
**rolling** 25:23
**room** 4:25
**roughly** 12:12 22:11
**RPR** 1:25 38:18

**rules** 4:21

**S**

**S** 2:1
**safe** 34:5
**Safety** 9:2 10:22 33:25
**saw** 11:19
**saying** 5:4 15:2 28:15
**says** 12:12 27:23 30:15
**scenarios** 34:4
**school** 26:8,8,8 28:1,12,14
**schools** 26:6
**scientific** 13:12 36:7
**SEA** 1:6
**seal** 38:13
**seat** 17:12,15,22 33:21,24 34:2,4 34:15,19,19,23 35:2,19 37:1,3
**seated** 8:23 34:7,11
**Seattle** 1:19 2:5,10 4:1
**second** 12:12 32:12 32:13
**see** 9:5 12:16 17:8 19:3 20:9 24:20 24:21,22,25 27:19 31:5,12
**seen** 34:6
**SELF** 1:25 38:7,18
**send** 8:3
**sense** 36:8
**sentence** 12:12
**separate** 23:16
**September** 1:24 4:1 38:13
**set** 26:25 38:12
**severe** 30:2
**severity** 21:13
**shape** 13:6

LaCroix v. Healy, et vir                                           Bradley Probst

Page 44

| | | | | |
|---|---|---|---|---|
| **sheets** 6:4 | **speeds** 25:5 | **sustain** 18:19 | 24:15,19,24 25:3 | 27:3,6 |
| **Shorthand** 38:7 | **spell** 5:15 | **sustained** 8:16 | 25:13 27:5 | **University** 27:24 |
| **shows** 11:10 | **spreadsheets** 8:4 | 34:16 | **think** 5:22,24 11:22 | **unlimited** 26:10 |
| **sic** 10:16 | **spring** 36:25 | **sustaining** 16:6 | 16:19 17:18 21:17 | **use** 10:22 13:1 |
| **side** 30:2 | **ss** 38:3 | 18:10 | 24:13 28:2 29:21 | |
| **signature** 37:11 | **stage** 11:4 | **sworn** 4:6 | 29:23 30:6 36:15 | **— V —** |
| **significant** 10:16 | **stairs** 24:18 | **system** 16:2 | **thorough** 32:17 | **value** 21:22 |
| 11:11 13:13,16 | **Standards** 33:25 | | **threshold** 34:1 | **variety** 6:6 13:22 |
| 25:25 26:5,10,24 | **standing** 24:18 | **— T —** | **time** 4:25 7:15 13:7 | 15:17 21:1 24:19 |
| 30:16 | **start** 7:4 19:2 24:14 | **T** 4:10 38:1,1 | 13:25 14:1 27:25 | 24:24 25:2 27:14 |
| **significantly** 10:7 | 24:17 | **take** 7:14 9:19,20 | 28:16 34:24 | 37:3 |
| 11:17,25 12:14 | **starting** 19:9,17 | 33:12 36:14 | **today** 8:17 20:13 | **various** 7:25 |
| 21:14 22:14 | **starts** 13:4 | **taken** 1:18,24 8:22 | **today's** 4:22 6:22 | **vehicle** 6:6 8:23 |
| **similar** 23:19 | **State** 1:1 38:3,8 | 33:16 | **tolerance** 14:22 | 9:13,23 10:15,20 |
| **simple** 24:20 | **statement** 32:19 | **talk** 9:1 23:7 | 24:9,12 | 10:23 11:1 12:9 |
| **simply** 22:2 24:15 | **statements** 5:22 | **talked** 22:16 | **top** 6:19 11:23 | 14:25 17:21 18:1 |
| 25:10 | 12:8 | **talking** 14:24 | **trampoline** 37:1 | 18:4,5,7 20:25 |
| **simulated** 9:11,12 | **stay** 18:3 | **task** 26:11 33:4 | **transcript** 4:24 5:6 | 23:19,21 24:4 |
| 9:25 10:1 | **steering** 35:18 | **TAYLOR** 2:8 | 38:9 | 25:1 30:14 31:25 |
| **simulations** 9:25 | **stop** 35:4 | **taylor.dawson@l...** | **trauma** 26:10,24 | 33:25 34:8,12 |
| **Sir** 18:2 | **structure** 31:1 | 2:11 | **trial** 4:17 11:15 | 35:4,6,14 36:21 |
| **sit** 8:17 | **structures** 31:21 | **teaching** 28:6 | 21:9 22:19 | **vehicles** 12:6 |
| **sitting** 20:13 | **studies** 7:25 8:1 9:7 | **tell** 7:8 12:18 15:25 | **trier** 20:20 | **vehicles'** 9:4 |
| **situation** 14:16 | 11:19 | 27:22 | **true** 7:8 38:9 | **velocity** 10:6 |
| **size** 25:4 | **subject** 12:3,6,14 | **tells** 11:6 | **try** 16:13 30:2 | **verbal** 5:2 |
| **skill** 38:10 | 21:13 33:5 | **tend** 17:20 | **Tulane** 27:24,25 | **versus** 7:3 |
| **slightly** 29:24 36:18 | **subsequent** 17:16 | **tends** 18:3 34:20 | 28:12,16,18 29:1 | **view** 16:17 |
| **slipping** 25:22 | **succinct** 28:15 | **terminology** 31:18 | **turn** 7:12 8:25 | **vs** 1:6 |
| **slow** 34:5 | **suddenly** 25:10 | **test** 10:22 11:6 | **two** 23:16,18 | |
| **somebody** 15:4 | **suffer** 14:8 25:10 | 23:11 | **type** 14:13,25 15:1 | **— W —** |
| 25:25 26:22 33:1 | **suffered** 24:3 | **testified** 4:7 | 19:24 20:18 26:4 | **W** 1:25 38:7,18 |
| 33:3 35:8 36:9,11 | **sufficient** 33:21 | **testify** 22:19 | 32:24 | **W-I-L-L-I-A-M** |
| **somebody's** 36:9 | 35:1,22 36:16 | **testifying** 21:9 | | 5:18 |
| **someone's** 36:14 | **Suite** 2:9 | **testimony** 4:16 | **— U —** | **waived** 37:11 |
| **sorry** 6:14 10:10 | **SUPERIOR** 1:1 | 11:15,16 26:17 | **um-hmm** 5:4 | **walking** 25:11 |
| 11:16 22:6 31:11 | **supplemental** 23:5 | **testing** 6:25 7:3,19 | **unaware** 22:22 | **wall** 9:21 |
| **sort** 8:14 | **supposed** 34:2 | 9:3 10:3 11:4,9,21 | **understand** 5:7 | **want** 8:25 19:9,11 |
| **sounds** 16:7 | **sure** 4:20 5:2,13 8:9 | 22:12 23:2,8,9 | 17:14 | 27:21 31:17 32:11 |
| **speak** 4:25 | 10:12 17:7,14 | 28:5 33:2 | **understanding** 9:7 | 33:6 |
| **specific** 7:1 9:10 | 24:13 26:22 27:4 | **tests** 9:3,25 | 13:12 20:11,14,21 | **wanted** 16:16,22 |
| 17:8,9 27:8,9,11 | 27:25 31:4,17 | **text** 28:12 | 26:17 | **wants** 18:5 |
| 27:12 | 33:15 35:12 36:7 | **Thanks** 6:20 | **understood** 5:12 | **Washington** 1:1,19 |
| **specifically** 15:21 | **surgery** 25:25 | **thereof** 1:8 | **unique** 14:22 15:8 | 2:5,10 4:1 38:3,8 |
| **speed** 11:6 25:2,4 | **susceptibility** 15:9 | **things** 6:5,7,21 | 20:10,10,15 25:24 | **wasn't** 8:19 18:13 |
| 29:22,23 30:5 | **susceptible** 19:22 | 13:23 15:18 21:1 | 26:13,15,18,23 | 30:19 |

LaCroix v. Healy, et vir                                                                    Bradley Probst

Page 45

**way** 7:17,24 9:20
   10:23 15:1 22:7
   23:23 28:15 30:12
   31:2,14 32:4
**ways** 10:15
**We'll** 7:5
**we're** 4:15 16:12
   19:24 22:3,7 27:8
   30:9 36:8,18
**we've** 6:21 11:21
   30:20
**wearing** 26:25
**Wells** 5:24 29:12
**Wells'** 3:8 30:10
**wheel** 35:18
**WHEREOF** 38:12
**wife** 1:7
**William** 5:17
**window** 11:14
**withstand** 13:24
   26:2
**witness** 4:5 33:15
   37:11 38:12
**worded** 30:11
**work** 19:6 24:24
**world** 16:15
**worth** 20:6,6
**wouldn't** 13:12
   15:11 17:24 36:5
**written** 22:8,25
**wrote** 22:8

---
**X**
---
**X** 4:10

---
**Y**
---
**Yakima** 6:25 8:2
   11:10
**Yeah** 15:19
**year** 6:6 28:2

---
**Z**
---
**zero** 13:4,5

---
**0**
---

---
**1**
---
**1** 3:7 7:5,6 21:19,25
   22:13 24:17
**1.2** 22:5
**10:03** 33:17
**10:09** 33:17
**10:14** 37:9
**1001** 2:9
**14** 10:19
**17-2-04131-9** 1:6
**18** 1:24 3:9 4:1

---
**2**
---
**2** 3:8 7:12 21:12
   22:8,17 25:3 29:6
   29:7,9
**2.4** 12:15 21:1,15
   22:5 24:16
**2018** 1:24 3:9 4:1
   38:13
**206.473.4047** 2:10
**206.957.2534** 2:5
**2601** 1:18 2:4
**26th** 38:13
**29** 3:8

---
**3**
---
**3** 3:9 24:21 25:3
   32:7,8 34:5
**3032** 1:25 38:18
**32** 3:9
**3300** 2:9
**37** 21:4

---
**4**
---
**4** 3:4 8:25 17:4 24:6
   24:14
**4.8** 22:11

---
**5**
---
**5** 11:24 17:4,19
   21:17
**5.9** 30:7

---
**6**
---
**6** 1:18 2:4 21:3

**6.2** 11:6 31:15

---
**7**
---
**7** 3:7 24:16 30:9
   34:3,5
**7.9** 10:7 11:17,25
   21:14 22:10 30:7

---
**8**
---
**8** 10:19 24:16
**8.9** 29:22

---
**9**
---
**9:19** 4:2
**98121** 2:5
**98154** 2:10

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989