# EXHIBIT No. 12

Bradley Probst, Volume I - August 8, 2013

SUPERIOR COURT OF WASHINGTON
IN AND FOR KING COUNTY

LAURA D. WOLF, a single person,    )
                                   )
        Plaintiff,                 )
                                   )
        vs.                        ) No. 12-2-11026-3 SEA
                                   )
MELISSA STEVENS and JOHN DOE       )
STEVENS, husband and wife and the  )
marital community comprised        )
thereof,                           )
                                   )
        Defendants.                )

DEPOSITION UPON ORAL EXAMINATION OF BRADLEY W. PROBST

10:00 a.m.
Thursday, August 8, 2013
1215 Fourth Avenue, Suite 1700
Seattle, Washington

ELAINE K. RIPPEN, CCR
NORTHWEST COURT REPORTERS
1415 Second Avenue, Suite 1107
Seattle, Washington  98101
(206) 623-6136
northwestcourtreporters.com

<!-- Page 2 -->

APPEARANCES

On behalf of Plaintiff:

    SAMUEL ELDER
    Law Office of Sam Elder
    12716 Northeast 106th Lane
    Kirkland, WA  98033

On behalf of Defendants:

    CHRISTOPHER J. NYE
    Reed McClure
    1215 Fourth Avenue, Suite 1700
    Seattle, WA  98161

Also Present:        DYLAN W. KILPATRIC
    Davidson & Kilpatric
    520 Kirkland Way, Suite 400
    Kirkland, WA  98083

    MICHAEL MAXWELL
    Maxwell & Blair
    P.O. Box 183
    Mercer Island, WA  98040

<!-- Page 3 -->

EXAMINATION INDEX

Examination By:                          Page
Mr. Elder                                 5

                * * *

EXHIBIT INDEX

No.  Description                                         Page
1    Subpoena Duces Tecum to Bradley W. Probst (5 pgs)     5
2    06-25-13 Report by Bradley Probst (13 pgs)            5
3    Acceleration/Velocity Graph (1 pg)                   47
4    Human Occupant Kinematic Response to Low Speed       94
     Rear-End Impacts by Szabo, et al. (15 pgs)

5    European Spine Society - The AcroMed Prize for Spinal  94
     Research 1997 by Castro, et al. (10 pgs)
6    Human Subject Responses to Repeated Low Speed Impacts  94
     Using Utility Vehicles by Nielsen, et al. (26 pgs)

7    Rear-End Impact Testing with Human Test Subjects by   94
     Braun, et al. (9 pgs)
8    Low Speed Rear-End Collision Testing Using Human      94
     Subjects by West, et al. (5 pgs)

9    Investigation of the Kinematics and Kinetics of       94
     Whiplash by Mertz, et al. (29 pgs)
10   Spreadsheet of Acceleration Pulses (3 pgs)            94
11   Insurance Institute for Highway Safety Low-Speed      94
     Crash Test Report for 2000 Subaru Legacy (2 pgs)

12   Insurance Institute for Highway Safety Low-Speed      94
     Crash Test Report for 2001 Hyundai Elantra (2 pgs)
13   06-10-13 Report by Michael Battaglia, M.D. (29 pgs)  138
14   Stipulation (10 pgs)                                 138

<!-- Page 4 -->

EXHIBIT INDEX (Continued)

No.  Description                                         Page
15   23 Reports Authored by Bradley Probst (241 pgs)     140
16   08-24-12 Report by Bradley Probst (10 pgs)          158
17   09-14-12 Report by Barbara Jessen, MD (44 pgs)      158
18   06-29-12 Report by Bradley Probst (11 pgs)          158
19   10-02-10 Report by Richard Rivera, D.C. (11 pgs)    158
20   09-21-11 Report by Bradley Probst (11 pgs)          158
21   02-29-12 Report by Joseph Robin, M.D., and Allen    158
     Jackson, M.D. (21 pgs)

22   02-03-12 Report by Bradley Probst (9 pgs)           158

23   11-17-11 Report by James Russo, M.D. (25 pgs)       158

24   Color Copies of Photographs (2 pgs)                 158

Bradley Probst, Volume I - August 8, 2013

5

1          (Exhibits 1 and 2 marked for
              identification.)
2
3    BRADLEY PROBST,      being first duly sworn by the Court
                          Reporter, testified as follows:
4
              (Deposition commenced at 10:05 a.m.)
5
6              EXAMINATION
7    BY MR. ELDER:
8    Q    Mr. Probst, I'm going to show what's been marked as Exhibit
9         Number 1, and that's a subpoena duces tecum that we sent
10        over for this deposition.  Did you receive that?
11   A    Yes, I did.
12   Q    Did you bring some documents that are responsive to that
13        subpoena?
14   A    I did.
15   Q    Let me ask you specifically before I kind of get the whole
16        bunch, did you manage to find copies of those articles that
17        are listed in item number ten?
18   A    I did.
19   Q    And did you bring those?
20   A    I did.
21   Q    Did you bring along copies of your reports that you've
22        authored from January 1st, 2011 to present?
23   A    I have not.
24   Q    And is there a reason that you did not bring those?
25   A    I, one, don't have any means by which to just know which

6

1         ones I have produced or authored or a date or anything like
2         that, it's just not any way in which I file anything.
3    Q    How do you keep your reports?  First of all, when you sort
4         of author them, do you do it on a computer?
5    A    Yes.
6    Q    It looked to me like a computer.  And do you have a saved
7         file that you save for each report that you generate?
8    A    Correct.
9    Q    And how do you file those?  Do you have like a computer
10        system where you have a number of different folders and then
11        each folder you keep the documents that are for that
12        particular file or case?
13   A    Honestly, I don't know because I send them into a report
14        editor who finalizes the report, then they are sent out from
15        there, and I know that they store them on a corporate
16        server, but how and where, I don't know because I don't
17        actually do that process.
18   Q    Who's your report editor?
19   A    Generally it would be Laurie Renner.
20   Q    And is she an employee OF ARCCA or is she employed by
21        somebody else?
22   A    ARCCA.
23   Q    Now, when I look at your report it's got a signature on it.
24        Are you actually signing these things in pen or is that just
25        an electronic thing that somebody else puts on there?

7

1    A    Generally it's electronic.  There's certainly times where
2         it's an actual signature, but if they're being done, as I
3         said, by a report editor just to finalize them, I think they
4         place an electronic signature.
5    Q    I'm going to show you what's been marked as Exhibit Number
6         2, which is your report in the Laura Wolf case; is that
7         correct?
8    A    It appears to be the report in this matter, yes.
9    Q    Sir, are you telling me that after you wrote the report
10        yourself, that it gets sent off to somebody else, they make
11        changes to it, and then affix your signature, but you don't
12        actually see it during that process?
13   A    That's not what I said.
14   Q    So clarify for me.  You send it off to an editor, but I
15        think somewhere in there I think you said that you don't
16        actually keep a copy of the final report; is that correct?
17   A    Correct.  The editor looks at it for spelling, grammar,
18        somebody else might look at it for technical accuracy, it's
19        sent back to me, I make revisions, send it back to the
20        report editor who then finalizes it, makes it -- formats it,
21        all those wonderful things, and at that point the signature
22        is affixed and it's sent out.
23   Q    So do you have electronic files on your computer of the
24        unedited reports that you're authoring?
25   A    Not to my knowledge.  There might be some that inadvertently

8

1         are there, but generally I don't keep any copies.  It's just
2         I send it to the report editor and then it's finalized.
3    Q    Like if you sat down on your computer at work, you couldn't
4         pull up the electronic version of Laura Wolf's report?
5    A    I probably could if I looked for it, sure.
6    Q    And what about the other reports that you've authored from
7         2011 to present, couldn't you just sit down at your computer
8         and pull up the electronic versions of those?
9    A    If I knew what those reports were, it's possible.  I don't
10        have a list of anything -- I don't keep a list of what I've
11        authored from any time to any other time or what I did
12        author or did not author.  It's just not a list I have, so
13        there's no way of me searching for something like that.
14   Q    Well, aside from coming up with a comprehensive list, can
15        you identify any reports that you've authored other than
16        Laura Wolf's report from January 1st of 2011 to present?
17   A    Certainly probably the ones I've been working on this week,
18        but I don't know if there are any under protective order or
19        what the status is or I don't know if I'm free to release
20        those to you at this date.
21   Q    Are you aware of any reason that you cannot release them to
22        me?
23   A    I don't know.  I simply don't know if I can or can't, so
24        it's safer for me to not release them than to violent
25        something and release them to you.

Bradley Probst, Volume I - August 8, 2013

9

1    Q    Has anyone instructed you that there are protective orders
2         that mean that you cannot release the reports that you
3         generate when you receive a subpoena?
4    A    I don't know.  It's not something I generally ask or it
5         affects how I do my work, so it's not something again I ask
6         or have any knowledge of.
7    Q    Well, let me ask you this.  Do you have a standard naming
8         convention when you write reports as to what you title them?
9         For example, maybe you would call this like Wolf, comma,
10        Laura, and maybe add a date to it and save the file as that
11        name?
12   A    I think the report editor finalizes it.  I think it's
13        usually what we have here.  You can see up in the heading we
14        have a case number, and then generally there'll be a case
15        name, and generally, depending upon who's retained us, but
16        in this case it would probably be called like Wolf or Laura
17        Wolf.
18   Q    And do you make any special designation for it to reflect
19        the fact that this is your report for Laura Wolf as opposed
20        to maybe a correspondence?
21   A    No.
22   Q    Could you do a search on your computer and find your reports
23        that you've authored from January 1st, 2011 to present?
24   A    I don't know.  I've never attempted that.
25   Q    When you transmit your reports to an editor, how do you do

10

1         that?
2    A    Through e-mail.
3    Q    So could you just look through your e-mails and see what
4         reports you've sent out to the editor from January 1st of
5         2011 to present and thereby determine which reports you've
6         authored during that period of time?
7    A    It's possible.  Again I don't know.  I sometimes edit other
8         people's reports and send them back, so I'm not sure if it
9         would fully show what I have authored or what I've reviewed
10        that are authored by others, but it's possible.  Again, I
11        haven't performed that search.  I don't know if it's
12        possible.
13   Q    Could you do that for me when we stop for today?  Because I
14        would like to see your reports from January 1st, 2011 to
15        present in this case.  If you tell me that you've tried and
16        that you've come up with some, but you can't tell me with a
17        hundred percent certainty that that is every report that
18        you've authored, that would be more satisfactory than
19        telling me that you haven't even tried to find them.  So I
20        would like you to make that effort to see if you can find
21        any of your reports, okay?
22   A    Well, first I have to see what's even possible and what it
23        would entail doing, and then what it will entail from any
24        people that have possibly hired us.  So I can't say as I sit
25        here today how quick and easy that is of a task to do.  It's

11

1         certainly something that I can look into and I'll let you
2         know what we can and cannot do.
3    Q    Where is your editor physically located?  Is she here in
4         Seattle, is she somewhere else in the country?
5    A    Somewhere else in the country.
6    Q    Where is she?
7    A    In Pennsylvania.
8    Q    And is that sort of your firm, ARCCA's headquarters?
9    A    Correct.
10   Q    And let's talk for a minute about the physical files that
11        you have.  Do you keep physical files, like hard copies,
12        printouts of the reports that you generate?
13   A    I do not, no.
14   Q    So back at your office did you have a copy of Laura Wolf's
15        file in hard copies?
16   A    I did not, no.
17   Q    Do you have a copy of Laura Wolf's report that you authored
18        with you today?
19   A    I do.
20   Q    Where did you get that?
21   A    That was off our corporate computers.
22   Q    So you have access to the corporate computers?
23   A    Correct.
24   Q    And if you know the names of the files that you're working
25        on or the file numbers, you can get copies of the reports?

12

1    A    Yes.
2    Q    Now, as I understand it, you use a computerized billing
3         system to enter your time for the work that you do; isn't
4         that correct?
5    A    Correct.
6    Q    Could you use the computerized billing system to determine
7         what cases you've worked on from January 1st, 2011 to
8         present?
9    A    Again, I don't know.  I just use it to enter my time, so I'm
10        not sure what the capabilities of that system actually are.
11        It's possible, I just don't know.  I've never attempted
12        that.
13   Q    But at this point you haven't tried to see which cases
14        you've worked on from January 1st, 2011 to present; is that
15        fair?
16   A    Again, because I'm not sure what I am allowed to release or
17        not release or how I'd go about doing it, it's simply not
18        something I've ever done before.  I don't have a list, so I
19        don't have anywhere to start with, so...
20   Q    Well, you have produced in the past a list of all the cases
21        that you've testified in and provided deposition testimony
22        or arbitration testimony; isn't that true?
23   A    That's correct.
24   Q    And that would include a list of various cases that you've
25        issued reports in?

Bradley Probst, Volume I - August 8, 2013

13

1  A   Possibly.  There's certainly times in which I haven't
2      authored reports in various states, so that list alone just
3      tells me where I've testified, not any other additional work
4      that I might or might not have performed.
5  Q   Okay.  Can you hand me the documents that you have brought
6      that are responsive to the subpoena?
7  A   Basically it's everything I have here today.
8  Q   So let me ask you a few questions about the report that you
9      authored for Laura Wolf.  First of all, does this report
10     contain your opinions that you formed based on your
11     investigation and analysis of this file?
12 A   Correct.
13 Q   And have you reviewed it in preparation for your deposition
14     today?
15 A   The report, yes.
16 Q   Do you have any changes, edits, modifications that you found
17     were appropriate when you reviewed it?
18 A   Not that I'm aware of, but it could be.  I can't see the
19     forest for the trees because I'm re-reviewing what I've
20     already authored, so there certainly could be something I'm
21     overlooking, but because I'm reading it in a different
22     light, I don't notice anything significant.
23 Q   When you authored your report you knew that this case was in
24     litigation; isn't that true?
25 A   I was under the assumption that it was, yes.  There was, I

14

1      think, a deposition, at least, so obviously it appeared as
2      if it was.
3  Q   And you knew that people would be making decisions on this
4      case based on the report that you authored?
5  A   Honestly, I just know that somebody asked me to produce a
6      report.  What they choose to do with it, that's up to them.
7      So I end it where I produce a report and I allow somebody
8      else to use it as they see fit.
9  Q   When you expressed your opinions in your report you tried to
10     be fair?
11 A   I'm simply presenting facts and scientific evidence.
12 Q   You tried to be fair?
13 A   Again, I'm simply presenting facts and information.  I'm not
14     picking sides or doing anything.  Just presenting scientific
15     information.
16 Q   And you try to be as accurate as you can be?
17 A   Certainly.
18 Q   You try to express all of your opinions?
19 A   I express the opinions that seem relevant.  Obviously, I
20     don't know what might or might not be asked at time of trial
21     or what might change as the matter proceeds, but at that
22     point in time those were my relevant opinions.
23 Q   And it sounds like when you're hired on to a case you don't
24     try to present any particular perspective in terms of taking
25     sides or presenting a defense perspective or a plaintiff's

15

1      perspective?
2  A   Again, as I've answered multiple times, I'm simply
3      presenting scientific facts.
4  Q   Do you ever hold yourself out as being someone who defends
5      motor vehicle cases, collisions?
6  A   I do not.  But obviously as I sit here today, I'm working on
7      the defendant's side, so somebody could make that
8      implication, but I don't state that I'm working as a person
9      of one side or the other.
10 Q   Have you ever held yourself out as someone who defends motor
11     vehicle cases?
12 A   A similar answer.  I've never stated that I do one thing or
13     the other, but obviously yes, I have worked where somebody
14     has used my information in defending a motor vehicle
15     accident.
16 Q   What about your company, ARCCA?  Have they ever marketed or
17     held themselves out or advertised themselves as being a
18     company that should be hired to defend motor vehicle cases?
19 A   It's certainly possible.  I mean, they can market the
20     company as they see fit.  I'm not in charge of the
21     marketing, so it's certainly something that they could
22     choose to do.
23 Q   You use a term in your report, biomechanical failure.  What
24     do you mean by that?
25 A   Basically it's a mechanical failure that's biologic in

16

1      nature.
2  Q   Do you mean the same thing as injury?
3  A   No.  I mean specifically mechanical failure that's biologic
4      in nature.
5  Q   What's the difference between biomechanical failure and
6      injury?
7  A   I would have to ask you to define injury.
8  Q   Do you use the term injury?
9  A   Certainly at times I use, from a medical point of view, that
10     they say somebody has been injured.
11 Q   Sometimes you use the term biomechanical failure, sometimes
12     you use the term injury; isn't that fair?
13 A   Well, it depends on what context.  Sometimes it's a quote
14     that somebody claims they were injured or something from
15     another report, but certainly it's possible we use the term
16     injury.
17 Q   What's the difference in the way that you use the terms
18     biomechanical failure and injury when you use those terms?
19 A   Again, it would depend upon the context in which they were
20     used to begin with.
21 Q   Do you use those terms interchangeably?
22 A   I try not to because specifically, again, trying to allow
23     the readers of the report to understand exactly what we're
24     doing, I attempt to say biomechanical failure just so
25     there's no confusion as to what I'm actually doing or what

Bradley Probst, Volume I - August 8, 2013

## 17

1    I'm analyzing or what my opinions are.

2 Q  Do you believe that it would be improper to use them

3    interchangeably?

4 A  Again, it depends on the context.  It's possible they could

5    be.  It depends upon your definition of injury.

6 Q  Let me ask you this.  You've authored a number of different

7    reports over the years.  Have you used the terms

8    biomechanical failure and injury interchangeably?

9 A  I don't know about interchangeably, but as I said, I think

10    I've tried to use biomechanical failure much more so now

11    because there appears to be some confusion as to what

12    biomechanics is and what a biomechanical failure is.  So

13    again, just to be precise and specific I attempt to say

14    biomechanical failure.

15 Q  You don't hold any healthcare credentials from the state of

16    Washington, do you?

17 A  I do not.

18 Q  And you don't hold any healthcare credentials from any

19    state?

20 A  I do not.

21 Q  You're not authorized to diagnose and treat injuries?

22 A  Not licensed, no, but again from a biomechanical point of

23    view and educational background, it's certainly something

24    that we've done quite a number of times and been allowed to

25    testify to quite a number of times as well.

## 18

1 Q  Let me be clear.  Can you diagnose and treat injuries?

2 A  Not treat.  I apologize if you said treat.  I'm talking

3    about diagnosing.  Certainly in the world of biomechanics we

4    have to understand what has occurred, so to some people

5    that's called diagnosing an injury.  We're specifically

6    looking at forensically what has occurred.

7 Q  So you believe that you can diagnose injury?

8 A  Again, through education, training, background, and prior

9    testimony it's certainly something I do.  It's not something

10    -- I'm not doing it for the public, I'm not working as a

11    medical professional.  I'm doing it solely from a

12    biomechanist's point of view.

13 Q  In the first paragraph of your report you wrote, Your firm

14    retained ARCCA, Incorporated, to evaluate the subject

15    incident in relation to the forces and claimed biomechanics

16    involved in the incident of Laura Wolf.

17    And I just want to ask some clarifications about that.

18    First of all, do you believe that some biomechanics were

19    claimed?

20 A  Certainly.

21 Q  And who are they being claimed by?

22 A  Well, Laura Wolf or whoever is representing her.  I'm not

23    sure what she has specifically stated, but the documents

24    that I have received for her.

25 Q  And what biomechanics are being claimed?  Describe the

## 19

1    biomechanics that are claimed.

2 A  Well, obviously, parts of it is her physical movement inside

3    the vehicle, again the forces that were placed upon her, and

4    then as we note later in the report, any biomechanical

5    failures that are being claimed as a result of this.

6 Q  Has Laura Wolf ever claimed any biomechanical failures?

7 A  Certainly, yes.

8 Q  What biomechanical failures has she claimed?

9 A  They are well documented in my report starting on page

10    three.  Well, simply just on the bottom of page three.

11 Q  And so what you're talking about is cervical spine

12    strain/sprain, thoracic and lumbar spine sprain/strain, and

13    right shoulder rotator cuff tear?

14 A  Correct.

15 Q  Aren't those the injuries that she's claiming?

16 A  These are biomechanical failures, as I note.

17 Q  I don't think she's ever called them biomechanical failures.

18    I've never called them biomechanical failures.  She said

19    that she was injured and these are her injuries, her doctors

20    have said that these are her injuries, but I haven't heard

21    anyone call it biomechanical failures but you.  Did you see

22    any reference to anyone calling this a biomechanical failure

23    other than you?

24    MR. NYE:  Object to the form.

25 A  Again, as it states here, according to the documents this is

## 20

1    what's reported in her records that these are the

2    biomechanical failures.  Again, I'm looking at it from a

3    biomechanical point of view.  That is what's in those

4    documents.

5 Q  In any document do you see anyone ever call this a

6    biomechanical failure?

7 A  I don't recall.  I have hundreds and hundreds of pages of

8    documents.  I don't recall honestly.

9 Q  Is that a term that doctors typically use?

10 A  I don't know if I've seen it quite often.  Generally not.

11    It might just be noted as sprain or strain or something like

12    that.

13 Q  You indicate in your report that you have experience with

14    testing on human subjects.  Describe for me what testing on

15    human subjects you have experience with.

16 A  Well, it's a very broad question, but I have conducted

17    testing on live human subjects looking into low

18    accelerations, high accelerations, the effect of forces

19    placed on the body.  Just again, the easiest way to say it

20    is biomechanics of the human body.  Your question is so

21    general it's difficult to answer.

22 Q  Have you authored any papers based on human test studies

23    involving human subjects?

24 A  If I could look at my file I might be able to see if

25    something reminds me.  Some of these, obviously, we had

Bradley Probst, Volume I - August 8, 2013

21

1    performed some live human testing.  I don't know if it's
2    actually in the reports, but certainly a number of these
3    papers that I've authored, some form of live human subject
4    testing has been performed looking into these various
5    subjects.
6    Q    Which articles?
7    A    Well, certainly the first one noted, A Three-Dimensional
8    Nonlinear Kinematic Finite Element Model of the Human
9    Cervical Spine Under Dynamic Inertial Loading.  The second
10   one, Seat Design, A Risk/Benefit Approach.  And the fourth
11   one, I think it's the same title as the first, A
12   Three-Dimensional Nonlinear Kinematic Finite Model of the
13   Human Cervical Spine Under Dynamic Inertial Loading.  I
14   could be mistaken, When Driver Safety Fails, Then What,
15   Vehicular Accident Analysis, The Big Picture.  Again, I know
16   we've done some slip-and-fall analyses.  I'm not sure if it
17   was in this paper, but Biomechanics for Risk Managers,
18   Analysis of Slip, Trip and Fall Injuries.  And then
19   Performance of Automotive Seat Belts During Inverted
20   Negative Gz Rollover Drop Test.
21   Q    How many human subjects did you use in each of these
22   studies?
23   A    As I sit here today I don't know.  I can't say.  And again,
24   it might not be specifically for that report, but in a
25   bigger picture study of those events and scenarios, again

22

1    certainly we've conducted live human subject testing.  I
2    don't know specifically for those reports.
3    Q    Do any of those reports identify specifically how many human
4    beings were tested as part of generating that article?
5    A    Again, I don't know as I sit here today.
6    Q    Have you participated yourself in any crash tests involving
7    automobiles where you were inside the vehicle during the
8    crash test?
9    A    I don't recall with a full-scale vehicle.  We certainly have
10   used parts of vehicles where we've done live human testing,
11   and certainly I've been involved in that, but I'm not sure
12   about an entire vehicle, if you will.  Certainly sometimes
13   we're looking at just we might only use the seat, we didn't
14   need the entire vehicle to do the type of testing we're
15   performing.
16   Q    You're talking about situations where you're the one sitting
17   in the seat during the test, during the crash; is that
18   right?
19   A    We're not always looking at crashes.  There are certainly
20   other things we're doing with live human testing.
21   Q    Let me go back and ask this again.  Have you done any
22   automobile testing involving crashing where you've been
23   inside either the vehicle or the seat that's replicating a
24   crash?
25   A    Can you be more specific by what you mean by crash?

23

1    Q    Something that's involving forces to -- either a crash
2    itself or something to replicate the forces of a cash where
3    you're the one that's actually sitting in the seat.
4    A    That's why I asked you to define that because where you said
5    just replicating forces, we've certainly done events like
6    that.
7    Q    And I'm not talking about "we", I'm talking about you.
8    A    The royal we and the company I work for involving me.
9    Obviously, we don't do these tests solely by ourselves.
10   Generally there's multiple people involved.  So "we" meaning
11   myself and others, and one myself being a participant as
12   well.
13   Q    So tell me about the tests that you've done where you're the
14   participant, Bradley Probst.  I'm not curious about
15   everybody else, just you for this question.
16   A    What do you want to know?
17   Q    I want to know what tests you did.  Describe them for me.
18   How many?  Let's start with that.
19   A    I don't know.  It's not something I keep track of.
20   Q    And then describe for me what you've actually participated
21   in directly yourself in terms of testing involving crashes
22   or replication of crash forces.
23        MR. NYE:  I'm going to object for a second.  You
24   keep going back and forth between testing he's involved in
25   generally versus testing where it sounds like you're

24

1    wondering if he's actually the test subject.  So if maybe
2    you can clarify what you're talking about?
3        MR. ELDER:  Your objection is noted.  Could you
4    read back the question?
5        (Pending question read back.)
6    A    I guess I would have to ask for clarification.
7    Participation.  I can conduct a test and I'm participating
8    in the test.  If I'm actually the one where the forces are
9    being applied to my person or I'm the test subject?
10   Q    Test subject.
11   A    The test subject.  Okay.  I don't have a -- I'll try to
12   remember what we've done.  I know we've conducted tests, in
13   essence a rear-end collision type test or a force that would
14   produce rearward movement of an occupant looking at seats,
15   seat backs, head restraints, various things like that.  The
16   other paper we noted where inverted Gz or negative Gz
17   accelerations.  I think we've done a variety of other things
18   where we're looking at lifting and moving things that are
19   not necessarily automotive crash-related, but they're
20   involving forces placed upon the body, so slipping,
21   tripping, falling, lifting, moving, pushing, pulling, things
22   of that nature.  In a general sense, that covers the
23   majority of them.  I can certainly not be remembering
24   everything.
25   Q    Can you give me any specifics of where you were the subject,

6 (Pages 21 to 24)

Bradley Probst, Volume I - August 8, 2013

25

```
 1        the test subject, and an article was written regarding the
 2        findings of the test that you were involved in?
 3    A   I don't know -- I have not authored any articles where I
 4        myself was a test subject.  I don't know what has been
 5        authored in my office by others in which I might have been a
 6        test subject, but I have not authored any articles where I
 7        myself was a test subject.  Generally that's not something
 8        you would do scientifically.
 9    Q   It would be kind of unscientific to use like the author of
10        the paper as one of the test subjects; is that what you're
11        saying?
12    A   It's just generally something that's not done.  So generally
13        you use somebody else, so you attempt to eliminate any bias,
14        so you would not utilize yourself necessarily.  Again it
15        depends upon the test.  But the type of work that I would
16        have been doing I don't think would have lent itself to me
17        being a test subject and also authoring a report.
18    Q   And then I want to be very specific.  Have you authored any
19        articles in which you did testing on human subjects and
20        reported the findings on the human subjects as part of your
21        published article?
22    A   I think it would be included in some of those articles, but
23        it wasn't necessarily the intent of those articles to
24        discuss what's happening to a live human test subject.
25        Again, throughout the research phase on a variety of these
```

26

```
 1        different articles, different types of live human subject
 2        testing was performed, then that information was utilized in
 3        some form or fashion, and it's not necessarily the intent of
 4        the research, so I don't know if it would be noted
 5        specifically as here was a test conducted, here is the
 6        result of that test of a live human subject in, I guess,
 7        maybe the terms in which you were asking the question.
 8    Q   Let me ask you a few questions about your methodology.  Is
 9        it fair to say that in analyzing a case like Laura Wolf's
10        case you want to form some opinion as to the severity of the
11        collision?
12    A   Well, I think we note quite clearly, I guess it's on page
13        three of my report, and this is an accepted methodology, and I
14        think we even cite multiple references, that one of the
15        steps is to quantify the nature of the subject incident in
16        terms of forces, accelerations, and changes in velocity of
17        the vehicle.
18    Q   So is the answer to my question yes?
19    A   I think I answered it.  I was just trying to be very
20        specific.
21    Q   Mr. Probst, I'm just going to ask you today, I'm asking you
22        questions, very specific questions, and I'd like answers to
23        those.  I'm paying for your time, so you may want to talk
24        about some other stuff, but I'm going to ask that you listen
25        to my questions and just try to answer the questions that
```

27

```
 1        I'm asking.
 2            The first question that I asked was whether part of your
 3        analysis is to get some idea of the severity of the
 4        collision.  And it sounds like the answer to that question
 5        is yes; is that correct?
 6    A   As I answered the question previously, step two of my
 7        analysis is to quantify the nature of the subject incident
 8        in terms of forces, accelerations, and changes in velocity.
 9    Q   Okay.  And the methodology that you're using is that you're
10        looking to see whether various components of the vehicle
11        have failed in the collision; is that fair?
12    A   Again to be specific, it's noted in my report we performed
13        what is known as a damage threshold speed change analysis.
14    Q   Correct.  And as part of that you're looking to see whether
15        components on the vehicle have failed?
16    A   Not necessarily.  We're looking at the difference between
17        empirical testing of the same vehicle, similar vehicle, same
18        make, model, same production run to our actual subject
19        vehicle, and we're comparing the damage or the deformation
20        or the energy required to produce those changes.
21    Q   What you're doing is you know the fail point of certain
22        components; isn't that fair?
23    A   We know what occurs to a test vehicle at a given speed.
24    Q   And so if you know that a component is going to fail at, for
25        example, a collision involving a certain range of speeds or
```

28

```
 1        forces, and that component did not fail, then do you draw
 2        the conclusion that the collision must have involved forces
 3        or speeds that are below the threshold of failure?
 4    A   I would say yes, in a general sense I would agree with you,
 5        that we're comparing, again, empirical data from one test to
 6        actual data from our subject incident and looking to see if
 7        there's more or less structural change which would therefore
 8        indicate more or less energy application.
 9    Q   And so when you're looking at photographs and when you're
10        looking at damage estimates, what you're really looking at
11        is are the structures involved in the automobiles being
12        deformed, failing, or having other types of alterations as a
13        result of the collision?
14    A   Potentially.  Sometimes we're looking to see if there is
15        damage or is there no damage.  Again it depends upon what
16        the incident is, what we're asked to do, how we're analyzing
17        it.
18    Q   So let me give you a specific example.  If a bumper is rated
19        at five miles per hour and the bumper does not have failed
20        components, then you would generally conclude that the
21        collision must have been five miles per hour or less?
22    A   I wouldn't simply look at as at what the bumper is rated
23        for.
24    Q   So you use your words, because I tried to give you a very
25        clear example.  Let's use a very simplified thing that a
```

7 (Pages 25 to 28)

Bradley Probst, Volume I - August 8, 2013

29

1    jury could understand like a bumper and the type of -- it
2    either fails or it doesn't fail in a collision, and the
3    conclusions that you draw from that.
4         MR. NYE:  Is that a question?
5    A    It's a very generic question.  Whether a bumper fails or
6    doesn't fail, what conclusions can I draw?
7    Q    Yeah.
8    A    That's so open-ended.  I could answer it in any manner in
9    which I choose and that's not offering any insight into
10   anything.
11   Q    Fair enough.  Let me ask the questions this way.  Did you
12   conclude in the context of Laura Wolf's collision that the
13   motor vehicle collision must have occurred --
14        Let me take that back.  I'm going to start over.
15        Did you conclude in the context of Laura Wolf's case
16   that the speed change of her Subaru was five miles per hour?
17   A    We noted that it's comparable to a five-mile-per-hour change
18   in velocity, correct.
19   Q    Let me ask you specifically.  You added the word
20   "comparable".  What the does the word comparable mean in the
21   specific context that you used it?
22   A    Well, in this particular test, generally it's not exactly at
23   five miles per hour.  It's four point nine to five
24   point-something.  So at the range of five miles per hour.
25   So it's somewhere close to five-mile-per-hour, meaning

30

1    comparable.  You have an empirical test, they weren't
2    conducted at precisely five miles per hour, but as close as
3    possible, and then in our incident it works out to be the
4    same, so it's comparable.
5    Q    So your word comparable, you just mean sort of approximately
6    or in the range of?
7    A    Again, just because we weren't specific in noting the exact
8    test speed at which the empirical testing was performed,
9    this isn't an approximation.  We could note specifically at
10   which the test speed was and say this is at above or below,
11   but just in normal English terms we're saying it's
12   comparable to.
13   Q    How did you arrive at the conclusion that the speed change
14   for Laura Wolf's Subaru was comparable to five miles per
15   hour?
16   A    Well, as I stated earlier, we conducted a damage threshold
17   speed change analysis.
18   Q    And what did you find in that regard that led you to the
19   conclusion that the speed change for Laura Wolf's Subaru was
20   comparable to five miles per hour?
21   A    That the damage noted to her vehicle through photographs,
22   repair records, and, I guess, repair invoices was comparable
23   to that when conducted to a similar vehicle at five miles
24   per hour.
25   Q    And what specifically about the repair estimates or the

31

1    photographs led you to believe that it's comparable to a
2    five-mile-an-hour speed change for her Subaru Outback?
3    A    Again, I think we made it fairly clear in the report that
4    the only noted damage to the subject Subaru was to the
5    bumper cover.  And to the trailer hitch itself, that it was,
6    in essence, pushed forward.  And when you strike the rear of
7    a Subaru at five miles per hour you sustain damage beyond
8    the bumper cover and so you have other components that would
9    be damaged indicating greater energy.
10   Q    What would you have to see in terms of the property damage
11   that is different in order to reach a conclusion that's
12   there's greater than five-mile-an-hour speed change for
13   Laura Wolf's Subaru?
14   A    Basically what we noted in the report, that in the test
15   vehicle we had damage that went beyond the bumper cover.  I
16   believe not only the bumper cover, but there was damage to
17   the reinforcing bar itself, a structural portion of the
18   bumper, and there was damage to that as well which didn't
19   occur in this case.
20   Q    And what are you referencing specifically in terms of the
21   comparable?  You're comparing Laura Wolf's vehicle damage to
22   something else.  What specifically are you comparing that
23   to?
24   A    Again, as we note in the report, the Insurance Institute for
25   Highway Safety tested actually two 2000 Subaru Legacies in a

32

1    series of five-mile-per-hour impacts.
2    Q    And let me make sure that I understand.  You're using the
3    Insurance Institute for Highway Safety testing on Subaru
4    Legacies.  But Laura Wolf was in a Subaru Outback; correct?
5    A    Subaru has a weird naming convention.  So the Subaru Legacy
6    is the same as the Subaru Outback.  It's more of a trim
7    level than an actual vehicle, so it's the same vehicle.
8    Q    Do they weigh the same?
9    A    I don't have my file.  I don't know if I printed everything
10   out from all those stats, but it would show that these
11   vehicles weigh the same, yes.
12   Q    So you're comparing the damage to Laura Wolf's vehicle to
13   the Insurance Institute for Highway Safety tests that they
14   performed at collisions involving a speed change at five
15   miles per hour and you found that they were comparable or
16   similar; correct?
17   A    Correct.
18   Q    Did the Subaru Legacies used in the Insurance Institute for
19   Highway Safety crash tests have tow hitches installed?
20   A    They did not.
21   Q    Is it significant that Ms. Wolf's Subaru Outback had a tow
22   hitch that was involved in this collision?
23   A    Not as part of my analysis, no.
24   Q    And why not?
25   A    Basically it doesn't affect the manner in which I performed

Bradley Probst, Volume I - August 8, 2013

---

**33**

1 the analyses. The tow hitch is of less significance
2 structurally than the reinforcing bar. And again there was
3 no damage beyond the instance of the bumper cover on this
4 vehicle. So again it still shows a comparable energy
5 between a test vehicle and the subject vehicle.
6 Q   And do you believe that it's fair to compare a collision
7 involving a tow hitch where the tow hitch is hit to
8 collisions done by the Insurance Institute for Highway
9 Safety involving vehicles that do not include tow hitches in
10 their collision?
11 A   Certainly it is.
12       MR. MAXWELL:  Sam, can we take a break?
13       MR. ELDER:  We'll take a break in a few minutes.
14 Q   What kind of tow hitch did Laura Wolf have on her Subaru
15 Outback?  Was it a factory installed tow hitch or was it an
16 after-market tow hitch?
17 A   That I don't know.  That wasn't part of my analysis, so it
18 didn't -- it wouldn't affect my opinions if it was factory
19 or after-market.
20 Q   What's the towing capacity of a Subaru Outback tow hitch?
21 A   Again, I didn't look that up, so I don't know.  It, again,
22 wasn't part of the manner in which I performed my analyses.
23 Q   Are you familiar with the process of testing that's
24 necessary to get a tow hitch approved for use on automobiles
25 in the United States?

**34**

1 A   Not intimately, no, I would say I don't know that as I sit
2 here today.
3 Q   Isn't it true that in order to be approved, a vehicle tow
4 hitch has to be able to carry its maximum load and be able
5 to perform an emergency stop without any deformation of the
6 tow hitch?
7 A   Again, as I said, as I sit here today I don't know all the
8 specifics, so I can't say whether that's correct or
9 incorrect.
10 Q   Prior to the collision, what was the distance between the
11 tow hitch ball and the bumper on Laura Wolf's Subaru
12 Outback?
13 A   That I don't know.  Again, it wasn't part of the manner in
14 which I performed my analyses, so it didn't matter, so I
15 didn't seek to find that information.
16 Q   During the subject collision did the tow hitch ball on Laura
17 Wolf's Subaru Outback get compressed in to where it was all
18 the way up against her bumper?
19 A   Well, not just the ball, but more the whole hitch assembly
20 moved forward, and it appears there's contact between the
21 ball and the rear bumper cover.
22 Q   And, in fact, the ball went from a position behind the
23 bumper, it got compressed, and it actually deformed the
24 bumper itself; isn't it true?
25 A   I assuming that all this occurred in the event.  I'm giving

**35**

1 the benefit of the doubt to Ms. Wolf that prior to this
2 incident the ball hitch was in some different location and
3 that some deformation did, in fact, occur.
4 Q   How much force does it take to take a tow hitch on a Subaru
5 Outback and compress it in from its normal position to where
6 it's up against the bumper?
7 A   I haven't tested any and all Subaru Outbacks and all tow
8 hitches, but looking at this specific case it's about a
9 five-mile-per-hour change in velocity.
10 Q   How do you know that?
11 A   Again, we know quite clearly -- we can compare testing from
12 empirical testing where it's focalized loading to the rear
13 of a vehicle, which is what would occur when you contact a
14 tow hitch, so you are comparing apples to apples, focalized
15 loading to a test vehicle to focalized loading of the
16 subject vehicle, and you note that it's comparable damage.
17 Therefore, that tells us what it takes in this specific case
18 with this specific vehicle to move a tow hitch, assuming it
19 was not in contact with the rear bumper cover, forward such
20 that it's now in contact with the rear bumper cover.
21 Q   Have you seen any specific tests done on Subaru Legacy tow
22 hitches that look at how much force of a collision is
23 necessary to take the tow hitch from its original position
24 to compress up against the bumper?
25 A   I have not seen any tests specifically like that, but you

**36**

1 don't have to look at a test specifically like that to
2 analyze that or to form an opinion regarding that.
3 Q   Now let's take it out of the context of a Subaru Legacy.
4 Have you seen any tests on any model of vehicle with any
5 type of tow hitch that shows how much force of a collision
6 it takes to take the tow hitch from its original position
7 and compress it up against the bumper?
8 A   I don't recall seeing those.  It doesn't mean that that type
9 of research hasn't been performed.  I simply don't know of
10 anything off the top of my head.
11 Q   Let me ask you this.  Exhibit Number 2, your report,
12 contains 60 different footnotes and references to various
13 scholarly articles.  Do any of those citations reference
14 testing that was done on tow hitches?
15 A   Again, I don't know every detail on every one of those 60
16 articles as I sit here today, but I don't recall any
17 specific mention of rear impacts to tow hitches.
18 Q   Do any of the 60 articles that you cited contain studies on
19 how much force or how severe of an impact does it take in
20 order to compress a tow hitch from its original position to
21 up against the bumper of a vehicle?
22 A   Again, I do not recall and I don't believe that any of those
23 address that specific thing.
24 Q   Now let me ask you:  Are there articles that you have not
25 cited that specifically look at the issue of tow hitch

Bradley Probst, Volume I - August 8, 2013

37

1    collisions, either in terms of the severity of the injuries
2    that arise from them or in terms of the forces that are
3    necessary to compress the tow hitch?
4  A    Again, as I stated, I'm not aware of articles, scholarly
5    articles discussing the amount of force necessary to
6    compress a tow hitch.  So certainly if I'm unaware of them,
7    it's not something I would or would not exclude from the
8    report.
9  Q    Let me ask you this.  Did you make any attempt to research
10    and find out whether there are any published articles,
11    published statistics showing how much force or how severe of
12    a collision it takes to compress a tow hitch into the
13    bumper?
14  A    Again, the manner in which I perform my analyses, it wasn't
15    necessary to perform that, so there was no need to research
16    any scholarly articles looking at the amount of force
17    required to compress a tow hitch.
18  Q    Let me ask you again because you said that it wasn't
19    necessary.  My question was only:  Did you do it?  Did you
20    research whether there are any published studies, statistics
21    that show how much force or how severe of a collision it
22    takes to press a tow hitch into a bumper in a collision?
23  A    Again, as I stated, it wasn't the manner in which I
24    performed the analyses, so there would be no need to search
25    for scholarly articles on something that I'm not actually

38

1    working on, so that would be just a waste of my time,
2    effort, and somebody else's money, so that's not something I
3    would have done.
4  Q    And then let me ask you.  Did you research any articles that
5    are published about injuries resulting from collisions
6    involving tow hitches?
7  A    Again, the same thing.  It's not the manner in which the
8    methodology was performed, so there was no need to look up
9    any articles regarding injury potential in tow hitch
10    impacts.
11  Q    Did you reach your conclusion that the speed change for
12    Laura Wolf's vehicle was five miles per hour based on the
13    fact that the bumper did not sustain more damage?
14  A    That's not what I've stated earlier.  Again, it's quite
15    clear in my report.  I was trying to be quite clear in my
16    answers previously in the manner in which we analyzed this.
17  Q    I still don't think that you've answered the question, so
18    I'll try it again.
19       Is the reason that you reached the conclusion that Laura
20    Wolf's, the speed change of her vehicle is five miles per
21    hour, is because there was not more damage done to the
22    bumper?
23  A    Again, to be more specific I could read from my report and
24    probably read back a previous answer, but what we did was
25    perform a damage threshold speed change analysis comparing

39

1    focalized loading to a 2002 Subaru, compared the damage
2    deformation, structures, whatever way you want to put it, to
3    the test vehicle to the subject Wolf vehicle.  That's what
4    was performed.
5  Q    And the only comparison that you did was the comparing of
6    the severity of the damage to her vehicle with the severity
7    of the damage reported by the Insurance Institute for
8    Highway Safety crash tests on a Subaru Legacy involving no
9    tow hitch?
10  A    As far as the damage threshold speed change analysis, we did
11    utilize the test of the 2000 Subaru Legacy in comparison to
12    the Wolf vehicle.
13  Q    So the answer is yes, for the speed change all that you
14    looked at was a comparison of the damage of her vehicle to
15    the comparison of the Insurance Institute for Highway Safety
16    tests on a Subaru Legacy without a tow hitch?
17  A    That's not what I stated.  What I stated was as far as the
18    damage threshold speed change analysis.
19  Q    Okay.  The damage threshold speed change analysis, that's
20    where you came up with the fact that Ms. Wolf's vehicle
21    speed change was five miles per hour?
22  A    That's one means.
23  Q    What's the other means?  Other than the Subaru Legacy
24    testing done by the Insurance Institute for Highway Safety,
25    tell me the other ones.

40

1  A    Well, just from my experience and background, I've conducted
2    hundreds of energy-based crush analysis, either programs
3    such as EDCRASH or PC-Crash, and vehicles such as the
4    Hyundai or the Subaru in a ten-mile-per-hour collision is
5    going to exhibit multiple inches of crush, and when you
6    focalize the loading you're going to have even more
7    significant crush, and that tells us it's well below a
8    ten-mile-per-hour rear-end collision, and that tells us that
9    five-mile-per-hour is a valid analysis.
10  Q    You referenced a couple of different computer programs;
11    correct?
12  A    Correct.
13  Q    Did you use either of those computer programs in your
14    analysis of Laura Wolf's case and your preparation of the
15    report in her case?
16  A    Specifically, no.  As I stated, I've conducted, I don't know
17    how many numerous analyses, and in no case at ten miles per
18    hour has there been crush comparable to what is noted in the
19    photographs and the repair estimates to either of these
20    vehicles.
21       MR. ELDER:  Let's take a break for a couple of
22    minutes.
23       (Recessed 10:58 a.m. to 11:03 a.m.)
24  Q    Mr. Probst, I prepared a little chart that's blank that
25    shows sort of a graph of acceleration and time.  I was

Bradley Probst, Volume I - August 8, 2013

41

1   wondering for this type of collision can you draw for me the
2   approximate sort of shape of the acceleration curves that
3   occurs with a collision like this?
4   A   I don't claim to be an artist, but what you're going to have
5   is something in the shape of a haversine or half sine wave,
6   basically kind of like a bell curve.
7   Q   And as I understand it, you use a duration of collision of
8   .15 seconds or a 150 milliseconds; is that correct?
9   A   In this particular case we did.
10  Q   So could you show me to this graph with a line that you just
11  drew, where would the 150 milliseconds be?
12  A   It would start at the beginning of the graph and time would
13  end basically at this point at 150 milliseconds.
14  Q   And the acceleration when it goes up, that means it's
15  basically a positive acceleration; correct?
16  A   Correct.
17  Q   Is there a portion of the curve that goes sort of below the
18  line and becomes negative acceleration in a collision like
19  this?
20  A   It depends on what the other vehicle is doing.  Obviously at
21  some point it decelerates and can just roll to a stop and go
22  to zero.  If the brakes are applied, or something like that,
23  certainly you have a negative acceleration, or if it
24  contacts another vehicle, some other object, it's certainly
25  possible to have some negative acceleration.

42

1   Q   So, in other words, down the towards the 150 millisecond end
2   of the graph the line may actually go negative?
3   A   Again depending upon what event you're discussing.  It could
4   go back up, it could go back down, it could just stay at
5   zero.  Very opened-ended question.
6   Q   Can you draw a horizontal dashed line that represents sort
7   of the average acceleration in this acceleration curve.
8   Okay.  And then, I guess, the last piece of art that I'm
9   going to ask of you is if you could draw on the bottom chart
10  sort of the velocity versus time.  Could you draw the
11  approximate shape of that curve if you plotted it out?
12  A   It's a nonlinear curve.  And so what happens is you have an
13  increase in velocity, and then as the velocity or the
14  acceleration decreases it becomes more asymptotic.  So I
15  guess the easiest way to say it is it's asymptotic from
16  below approach from the velocity of zero up to our max
17  change in velocity.
18  Q   Let me further clarify that you calculated in the context of
19  this collision involving Laura Wolf and her Subaru Outback
20  that based on a five-mile-per-hour speed change that the
21  average acceleration was 1.5g's; is that correct?
22  A   I'm just seeing it now and looking at it now that we do have
23  a typo on page five.  Let me just re-read this.
24  At a bottom of page five in the paragraph beginning with
25  Review, we note that using an accelerate pulse with a

43

1   haversine, an impact duration of 150 milliseconds, the
2   average acceleration associated with a five-mile-per-hour
3   impact is 1.5g's.
4   I guess I can clarify the next sentence.  It appears
5   we're saying there's peak acceleration, but it should be
6   that the most acceleration that would be experienced by Ms.
7   Wolf is that 1.5g's, not necessarily meaning the difference
8   between a peak and an average acceleration.  So in this
9   particular case, yes, we determined an average acceleration.
10  Q   So the dotted line that you drew for Laura Wolf's collision
11  is at 1.5g's; is that correct?
12  A   Correct.
13  Q   And could you write on there 1.5g's then?
14  And when you're talking about 1.5g's, you're talking
15  about the Subaru Outback; correct?
16  A   Correct.
17  Q   You're not talking about Laura Wolf particularly.  You're
18  talking about the vehicle, not the occupant; correct?
19  A   Well, as you're noting, that's the maximum the vehicle can
20  experience.  Therefore, even if all the energy that the
21  vehicle has experienced has been transferred to Ms. Wolf,
22  which is theoretically impossible, we would say the maximum
23  she can receive would be 1.5g's.  However, obviously, some
24  of that energy or acceleration is lost as it travels through
25  the vehicle, if you will.  Various portions of the vehicle

44

1   absorb some of the impact or the energy and some is
2   converted to sound, heat, various things like that.  So
3   again, the maximum would be 1.5g's if everything was capable
4   of going from the vehicle to Ms. Wolf.
5   Q   Let me ask you a couple more clarifying questions because I
6   want to break this down.
7   You found that the average acceleration of the Subaru
8   Outback was 1.5g's over the 150 milliseconds; correct?
9   A   Correct.
10  Q   What happens is if you apply a constant acceleration of
11  1.5g's to an object over 150 milliseconds, at the conclusion
12  of that 150 milliseconds the object is going five miles per
13  hour?
14  A   If you have a crush pulse in the shape of a haversine and
15  the average acceleration of that haversine is 1.5g's and the
16  pulse lasts a duration of 150 milliseconds, then yes, you
17  have a five-mile-per-hour change in velocity.
18  Q   So on the little graph that you drew on the bottom, the end
19  point of the velocity after 150 milliseconds, that ends up
20  at five miles per hour; correct?
21  A   Correct.
22  Q   Could you write that on there?
23  Did you make any attempt to determine the peak
24  acceleration level that Ms. Wolf's Subaru Outback
25  experienced in this collision?

Bradley Probst, Volume I - August 8, 2013

45

1   A   Just as part of the spreadsheet it reports the, I think,
2       peak and average, and then for other shapes if we're looking
3       at a different type of event as well.
4   Q   Did you make an attempt to determine what the peak
5       acceleration level of the Subaru Outback was?
6   A   As I said, it was determined, yes.
7   Q   And what is it?
8   A   I believe in this particular case it should have been 3.0g.
9   Q   Could you write on there 3.0g?
10      Now, I've read through your report.  You didn't mention
11      3.0g anyplace in this, did you?
12  A   I don't know.  I'd have to go through it word by word, but I
13      don't recall that I did.
14  Q   And, in fact, isn't your report wrong when it says the peak
15      acceleration experienced by the Subaru in which Ms. Wolf was
16      seated was comparable to 1.5g's?
17  A   I think I just clarified that, that the maximum average
18      acceleration -- so we didn't quite write it as clearly as
19      possible in English.  English is not my field of study.
20      Engineering is.  So we quite clearly note prior to that that
21      the average acceleration was 1.5g.  And then as I stated
22      previously, because we're trying to give the benefit of
23      doubt to Ms. Wolf that all the damage that, in fact, is
24      noted to her car did come from this event, the maximum
25      acceleration in terms of average acceleration that would be

46

1       experienced by her vehicle is 1.5g.  As you can see, that's
2       a very lengthy and wordy and awkward sentence, and therefore
3       we wrote it in a much more simplistic fashion, but obviously
4       it confused you.
5   Q   Thanks for clarifying my confusion on this.  Let's be clear.
6       There's a difference between average and peak; isn't that
7       true?
8   A   Certainly.
9   Q   Yeah.  Average is when you take the mean of all of the
10      values and figure out that's how you get to the average;
11      correct?
12  A   You take the numbers, add them up, divide by the number of
13      points, yeah.
14  Q   And on this, we'll get this marked as Exhibit 3, it's the
15      dotted line that's the average acceleration?
16  A   Correct.
17  Q   Peak has a very specific meaning in physics.  And when
18      you're talking about a peak acceleration, that's talking
19      about the 3.0g's, the top of the curve; correct?
20  A   If you take just the word peak and average without any other
21      context, certainly one means summing up numbers and the
22      other one is a maximum.  However, this work peak was not
23      used without any other context.  It was used with context
24      and it's, as I note it right before, we quite clearly note
25      it's the average acceleration, and I clarified for you what

47

1       we mean by that.
2   Q   The peak acceleration that Ms. Wolf's Subaru Outback
3       experienced, you calculated at 3.0g's; correct?
4   A   If we're looking at the difference between an average and a
5       peak.  In the context of this sentence, this is the maximum
6       average acceleration that she would have noted.
7   Q   How did you calculate that the peak acceleration of the
8       Subaru Outback was 3.0g's?
9   A   Again, utilizing an Excel spreadsheet, looking at a
10      haversine wave shape and a crash pulse of 150 milliseconds.
11  Q   Did you bring that Excel spreadsheet with you?
12  A   I did.
13  Q   You did?
14  A   I did.
15  Q   Wonderful.  I assume it's in there.
16              (Exhibit 3 marked for identification.)
17  Q   Let me ask you about one of your conclusions that you make.
18      You make the conclusion that the acceleration experienced by
19      Ms. Wolf was within the limits of human tolerance and
20      comparable to that experienced during various daily
21      activities; is that correct?
22  A   That's correct.
23  Q   Is that really two different opinions?  One is that it's
24      within the limits of human tolerance, and the second one is
25      that it's within the types of accelerations that Ms. Wolf

48

1       experiences in her activities of daily living?
2   A   Again I apologize.  English was not my field of study.  But
3       what I'm simply trying to say is that the accelerations were
4       comparable to that of daily activities, and certainly those
5       are within the limits of human tolerance.  So it's simply
6       one opinion that these are within the -- comparable to that
7       experienced by daily activities.  But again to be more
8       specific, noting that, yes, daily activities are within the
9       limits of human tolerance.
10  Q   And is that a conclusion based on the fact that you found
11      that the average acceleration for the Subaru Outback was
12      1.5g's?
13  A   Either the 1.5g acceleration -- I think we note, and there's
14      several references in my report where we note various test
15      subjects experienced peak and average accelerations that
16      were in excess of this amount of acceleration here, and then
17      it's certainly well noted in the references that we've
18      cited.
19  Q   So is your conclusion that the acceleration experienced by
20      Ms. Wolf was within the limits of human tolerance and
21      comparable to that experienced during various daily
22      activities based on the fact that you found the Subaru
23      Outback average acceleration was 1.5g's?
24  A   It's not as simplistic as you're making it sound.  We don't
25      just say 1.5g's, therefore it is what it is.  We actually do

49

1    connect all the dots.  And so if you read the report, we
2    note that here is the acceleration experienced in this
3    vehicle, here is all the research that has been performed
4    showing other impacts and other events at above that
5    acceleration as well, and then we also look at Ms. Wolf
6    herself, various activities she's performed, noting what the
7    accelerations are.  And then based upon her reported
8    activities, research of others, known human tolerances, we
9    can make this comparison and show that, yes, 1.5g's is well
10   within the limits of human tolerance.
11   Q    So is the answer to my question yes or no?
12   A    I was just being specific.  You left out quite a few steps
13   in the manner in which I performed this analysis.  I don't
14   just say 1.5g's, therefore this is my opinion.  So again, if
15   you read through the entire report, we go through all these
16   various steps and citations and references to show how we go
17   from 1.5g's to that opinion.
18   Q    So was the answer to the question yes or no?
19   A    The answer is what I've answered.  I can't be any more
20   specific.  Again, I'd have to read the entire report to show
21   you here is everything we did and all the steps we did.  We
22   don't just go from A to Z.  We go from A to B to C to D and
23   go through step by step by step.
24   Q    Let's try and break this into little tiny bite-sized pieces.
25   Your conclusion includes the phrase, The acceleration

50

1    experienced by Ms. Wolf.  Is that the 1.5g's that you're
2    talking about or is it something else?
3    A    Again, if you back up, I think it's purely clearly noted in
4    conclusion number two that we've determined what the
5    acceleration on the vehicle was, and the maximum average
6    acceleration experienced by the Subaru Outback was 1.5g.
7    Ms. Wolf was seated inside that vehicle.  As I stated
8    earlier, the vehicle was experiencing 1.5g.  A theoretical
9    maximum transfer of energy from the vehicle to her would be
10   1.5g's.  However, there is energy lost.  So again, being
11   generous, giving the benefit of the doubt to Ms. Wolf saying
12   all this energy from the vehicle is transferred to her, the
13   maximum would be 1.5g.
14        So in conclusion number three it's quite obvious that
15   we're building upon conclusion number two, that the
16   acceleration experienced by the vehicle was 1.5g.  The
17   maximum that could possibly be transferred to her would also
18   be 1.5g.  We cannot create energy.
19   Q    Let me be very specific.  If you put an accelerometer at her
20   temple and measured the lateral acceleration of her head,
21   are you saying that the maximum possible head acceleration
22   that she could experience when the vehicle experiences an
23   acceleration of 1.5g's is 1.5?
24   A    Due to inertial loading, correct, yes.
25   Q    And you've never seen any study that finds that head

51

1    accelerations of the occupant exceed the vehicle
2    acceleration?
3    A    Not inertial loading to the head, not inertial accelerations
4    to the head, no.
5    Q    I'm going to eliminate all the qualifiers.  If you have peak
6    vehicle acceleration of 1.5g's, can you have a peak
7    acceleration of the occupant's head greater than 1.5g's or
8    does that violate the laws of physics?
9    A    You're looking at two different things.  You're looking at
10   inertial forces and contact forces.  In this particular case
11   we're not dealing with direct impact injuries.  So certainly
12   even if I just slap the table, I can have very high
13   accelerations, but it's of no consequence.  So what we're
14   actually looking at is the actual pertinent accelerations,
15   not only to the vehicle, but to the occupant.  And in this
16   particular case the maximum acceleration that is of concern
17   cannot be of any value higher than 1.5g's.
18        MR. ELDER:  Can we have the last question read
19   back?
20        (Pending question read back.)
21   Q    What's your answer to that question?
22   A    I've answered that question.  I could ask the court reporter
23   to read it back.  My previous response is long.
24   Q    You qualified this, sir, with a bunch of different things
25   like the ones that we're concerned about.  I'm not asking

52

1    about that.  I'm just asking if you put an accelerometer on
2    Laura Wolf's head and the vehicle experiences a peak
3    acceleration of 1.5g's, can she have head acceleration of
4    greater than 1.5g's or not?
5    A    It's possible she has the exact same, less, or more.  The
6    maximum inertial, again, what we're looking at is what is of
7    any interest in this incident would be a maximum of 1.5g's.
8    Q    What do you mean by inertial acceleration?
9    A    Non-contact acceleration.
10   Q    What about contact acceleration then, can that be greater
11   than 1.5g's?
12   A    Certainly.  As I explained in my previous answer I can
13   contact this table lightly with my hand and have multiple
14   g's, but there's no contact-related injuries or
15   biomechanical failures in this incident, so why anybody
16   would look at contact accelerations, there's no reason to do
17   that.
18   Q    Let me ask you a different question now.  I'm looking at
19   conclusions number two and number three on pages 12 and 13
20   of your report, and in number two you say, The severity of
21   the subject incident was consistent with the Delta-V
22   comparable to five miles per hour with an average
23   acceleration comparable to 1.5g for the subject 2000 Subaru
24   Outback in which Ms. Wolf was seated.
25        Conclusion number three you state, The acceleration

Bradley Probst, Volume I - August 8, 2013

53

1    experienced by Ms. Wolf was within the limits of human
2    tolerance and comparable to that experienced during various
3    daily activities.
4         My question for you is:  How much higher would the
5    1.5g's in conclusion number two have to be before you would
6    no longer feel comfortable writing in your report conclusion
7    number three that you reached?
8    A    I think there's a significant disconnect between
9    engineering, law, and what we're dealing with here.  If we
10   were dealing with a direct contact failure, then we'd be
11   concerned about direct -- or accelerations associated with
12   direct contact.  There's nothing in any of the records to
13   suggest there's any direct contact failure associated with
14   this event to any part of her body.  So to obtain that
15   value, to look at that value, utilize that value in any
16   fashion is meaningless.
17        It's certainly possible to make a determination of what
18   that is, but there's no purpose in doing that because,
19   again, there was no failures associated with direct contact
20   accelerations.
21   Q    Let me try again because I'm going to ask this question all
22   day long until we get an answer, okay?
23        You found 1.5g's of average acceleration of this
24   vehicle.  You're writing this report and you're either going
25   to write for conclusion number three that the acceleration

54

1    experienced is within the limits of human tolerance and
2    comparable to that experienced during daily activities or
3    you're going to write that it's not within the limits of
4    human tolerance and comparable to those experienced in daily
5    activities.
6         At 1.5g's you write that it's within.  What would that
7    1.5 have to change to before you would no longer issue
8    opinion number three and you would change opinion number
9    three to read the acceleration that she experienced was not
10   within limits of human tolerance?  What do you have to
11   change?  What do you change it to before you don't reach
12   conclusion three?
13        MR. NYE:  Object to the form.
14   A    Again, unfortunately there's a disconnect between
15   engineering and my background and your -- you have an
16   incomplete predicate.  You're just simply saying, What has
17   to change?  What has occurred to her?  And once I know
18   what's occurred to her, then I can tell you what the force
19   must be.  You're simply saying, What changes?  That's
20   incomplete.  You haven't asked anything -- you haven't
21   provided me enough information.
22   Q    I'm going to run through a series of examples and you tell
23   me.  If you changed your calculations so that you arrived at
24   an average acceleration of 2.5g's for the subject 2000
25   Subaru Outback, would you still write conclusion number

55

1    three, that the acceleration is within the limits of human
2    tolerance and comparable to those experienced with various
3    daily activities?
4    A    You basically just reasked the same question.  I apologize.
5    My report goes through quite clearly what it takes to
6    receive the failures she experienced, that these would be
7    resulting from inertial loading, not direct contact forces.
8    And are you asking -- we still dealing with inertial
9    forces, direct contact forces, different injuries, same
10   injuries?  You haven't provided any information.  You've
11   only changed the acceleration, but what else is changing?
12   Because you're saying what's now changing, but you have to
13   provide information.  I don't know what you're asking.  You
14   have to be specific.
15   Q    Well, I'm being super specific.  You authored these reports,
16   sir, and I want to know -- okay, let's break it down in a
17   series of steps.  First of all, isn't it true that your
18   conclusion number two and conclusion number three are
19   related?
20   A    Certainly.  The whole report is related to everything in the
21   report.
22   Q    So you're taking what you calculate in terms of the
23   acceleration of the vehicle and you're applying it to
24   determine whether or not the forces are within those of
25   human tolerance and daily activities or not; right?

56

1    A    As we stated earlier, there's all the steps in between, and
2    what we reached as a conclusion that 1.5g's is well, in
3    fact, within the limits of human tolerance, and well within
4    the limits of Ms. Wolf's personal tolerance.
5         Again you're taking something out of context if you're
6    now trying to say it's something that's inertial loading and
7    a direct contact force.  Two different things.
8         I apologize if you are not familiar with biomechanics.
9    I am.  I understand that your question is incomplete.
10   Whether you realize it or not, it's simply incomplete and
11   cannot be answered in the fashion in which you asked it.
12   Q    Let me ask you this.  I'm going to read you your sentence:
13   The acceleration experienced by Ms. Wolf was within the
14   limits of human tolerance and comparable to that experienced
15   during daily activities.
16        What would it take for you to write the opposite of that
17   in a report?
18   A    This is the part where there's the disconnect.  What else
19   has changed?  Because we could have high accelerations and
20   still not see certain types of injuries.  Again there's an
21   endless possibility of what might or might not happen at a
22   variety of accelerations with a variety of outcomes.  I
23   don't know what you're saying.  If we increase the
24   acceleration at some point, if we apply enough acceleration
25   to this vehicle, you're going to crush it such that you now

14 (Pages 53 to 56)

Bradley Probst, Volume I - August 8, 2013

---

57

1  are invading the occupant space and part of the vehicle is
2  contacting her. That's vastly different than what we have
3  here. You haven't specified what is or is not occurring.
4  Q   Let me ask you this. Have you ever written a report where
5      you found that the acceleration experienced by the occupant
6      was not within the limits of human tolerance and comparable
7      to those experienced during various daily activities?
8  A   I certainly would believe so. I'm not sure if we noted it
9      in that same terms, but I've certainly authored reports
10     where we said a person was injured either in an automotive
11     accident or some other event.
12 Q   Are you making some comparison in reaching your conclusion
13     that the experience -- that the acceleration experienced by
14     Ms. Wolf was within the limits of human tolerance and
15     comparable to that experienced during daily activities? Are
16     you making a comparison, sir?
17 A   Certainly for validation purposes throughout the report we
18     note that here are a quite number of studies where they look
19     at an input acceleration to a vehicle and note that this --
20     a variety of people, a variety of ages, both male, female,
21     with pre-existing conditions, various things like that have
22     withstood this event. So from an automotive point of view
23     it's within limits of human tolerance. There's other
24     references, I believe, in here that talk about just overall
25     body accelerations, it also notes that that is well within

---

58

1  the limits of human tolerance. And then we note other tasks
2  that Ms. Wolf could perform without injury and we can
3  determine those accelerations and say that this is within
4  her personal tolerance level.
5  Q   Aren't you comparing the acceleration that she experienced
6      in this collision with what you believe to be the limits of
7      human tolerance and her activities of daily living? You're
8      comparing those two things?
9  A   We're noting that here is an input acceleration, others have
10     studied this, it's well within the limits of human
11     tolerance. If you want to say it's a comparison -- we are
12     looking at the difference between an applied force and a
13     resultant. But it's not just the acceleration. Again,
14     we're looking at what is occurring to this occupant, their
15     movement, their restraint capabilities, various things like
16     that, as well as what does occur to individual anatomic
17     regions as these forces are applied.
18 Q   Are you comparing 1.5g's to something else in reaching
19     conclusion number three? Are you saying whether 1.5g's is
20     less than some other number?
21         MR. NYE: Object to the form.
22 A   Well, certainly we note that at some points, yes. I mean,
23     math being what it is, 1.5g's is less than some of the other
24     numbers we mention, like 17g's. We can't avoid that. There
25     has to be some comparison. Math is math. So 1.5 is, yes,

---

59

1  in fact, less than 17.
2  Q   Did you mention 17g's somewhere? Did you make that
3      comparison in authoring your report?
4  A   Page eight.
5  Q   Are you, in fact, making a comparison between the 1.5g's
6      that you calculated Ms. Wolf's Subaru experienced and 17g's
7      in reaching your conclusion number three?
8  A   Again, if you would like to call it a comparison, you are
9      welcome to. But we're quite clear in the report what we've
10     done is determine the acceleration and various things that
11     you haven't bothered to discuss yet, but when we look at
12     1.5g's and we look at the published literature as to input,
13     response, and outcome of the various events, that there are
14     other events of greater magnitude in which no biomechanical
15     failures have occurred.
16 Q   If Ms. Wolf had 18g's of acceleration in this collision,
17     would you have still written that the acceleration
18     experienced by Ms. Wolf was within the limits of human tolerance
19     and comparable to that experienced during various daily
20     activities?
21 A   I doubt I would say it's comparable to various daily
22     activities. But depending upon, again, a specific set of
23     circumstances for various portions of her body, that still
24     could be well within the limits of human tolerance, 17g's.
25 Q   What about 25g's?

---

60

1  A   What about 25g's?
2  Q   I just used the example of if she had accelerations of 18.
3      What if you changed that question to 25g's? Would you still
4      be writing conclusion number three?
5  A   Again, it depends on what information is provided, how we
6      analyze it. But, again, some of these various citations, I
7      don't think we note it in the report, but various portions
8      of the body can well withstand input accelerations in excess
9      of 40g's. It depends upon what you're asking, what kind of
10     -- what portion of her body, how she's restrained, what the
11     actual test case scenarios are to actually be able to fully
12     answer that question. Simply giving an acceleration doesn't
13     cover any other variable. You're simply looking at one
14     variable.
15 Q   No, I understand. Okay. So if the acceleration experienced
16     by Ms. Wolf was 41g's, would you be comfortable writing your
17     conclusion number three, quote, The acceleration experienced
18     by Ms. Wolf was within the limits of human tolerance and
19     comparable to that experienced during various daily
20     activities?
21 A   At that point, 40g's, because it's again
22     body-part-dependent, actual event-scenario-dependent, it's
23     possible at that point, yes, now we're starting to get into
24     the range where we're exceeding various tolerances and
25     various body parts and different orientations, different

---

15 (Pages 57 to 60)

Bradley Probst, Volume I - August 8, 2013

61

1    applied vectors.  Without knowing any of that information, I
2    can't say, but, yeah, certainly we're getting into that
3    realm where many things can occur.
4  Q    That's where you would start to become uncomfortable with
5    writing conclusion number three?
6  A    Again your question, sir, is grossly incomplete because, as
7    I stated before, once you're getting up to accelerations
8    such as that, depending upon the type of vehicle as it's
9    applied to the vehicle, now we have a completely different
10   scenario because we can have intrusion into the vehicle
11   where objects of the vehicle are contacting her, the seat
12   could collapse, you can have an unrestrained occupant, a variety
13   of other things could be occurring to drastically change
14   that.  We might not get to 40g's before all those things
15   occur.  So without actually analyzing that and having a
16   complete set of data or a complete -- formulate a question
17   from you, I can't say.  But I can certainly say that yes,
18   now we're starting to get to the level where we're at or
19   beyond tolerance levels for various body parts, various
20   orientations, and various scenarios.
21  Q    Let me ask you this.  The duration of the collision that you
22   used, 150 milliseconds, is that a relatively standard time
23   duration to be using for rear-end collisions?
24  A    It's actually a little bit low based upon the published
25   literature and testing that I've performed.  I've seen crash

62

1    pulses up to roughly 400 milliseconds.  But again, to give
2    Ms. Wolf the benefit of the doubt to make it the most severe
3    event possible, I chose 150 milliseconds.
4  Q    Have you seen any published reports that talk about crash
5    impulses down in the range of like .09 to .124 seconds per
6    the crash pulse?
7  A    Generally for a higher speed events.  When we're talking
8    something more comparable to what you would see in a FMVSS
9    testing, 25 plus miles per hour, I've certainly seen that
10   noted.
11  Q    Let me ask you this.  As the speed increases, like the speed
12   at which the bullet vehicle hits the target vehicle, as it
13   increases, do you have to adjust the duration of the
14   collision?  So, for example, in this case for a
15   five-mile-an-hour speed change you used a duration of 150
16   milliseconds or .15 seconds.  If you increased that to, say,
17   like 30-miles-an-hour speed change, would you have to adjust
18   the duration of collision?
19  A    Again, depending upon the type of 30-mile-per-hour
20   collision, I would generally use something probably in the
21   70 to 120 millisecond range for a higher speed event, so
22   yes, there is some adjustment.  But a 5 and a 30 are vastly
23   different events.  The energy's related to the square of the
24   velocity.  So if you squared 5 and squared 30, you can see
25   it's orders of magnitude different in energy where you now

63

1    make a change in the pulse duration.
2  Q    And just so that I'm clear, at a five-mile-an-hour speed
3    change you're going 150 milliseconds.  If you increase that
4    speed change, then you're going to decrease the duration of
5    the collision?
6  A    Again, potentially, based upon the type of event, type of
7    collision, and how much greater the actual impact speed is.
8  Q    Have you ever tried to calculate what kind of speed change
9    would be necessary, speed change of a vehicle would be
10   necessary to generate a peak acceleration --
11       Let me start all that over.
12       Have you ever tried to calculate what kind of speed
13   change would be necessary to create an average vehicle
14   acceleration of 40g's?
15  A    I don't think I've sat down and just said if I have a 40g
16   impact what type of Delta-V are we looking at.  I don't
17   think I've -- I don't believe I would have performed that
18   analysis, no.
19  Q    Because I sat down and did it, and for 150 millisecond
20   duration collision it would take 132 miles an hour of speed
21   change to get a 40g average acceleration.  Does that seem
22   right to you?
23  A    I don't know.  As I said, I haven't performed that analysis,
24   so I can't say.  Again, unfortunately automotive events are
25   highly nonlinear, and so as damage is occurring, various

64

1    other things are occurring.  So once you get up into higher
2    speeds, again because it's nonlinear, we're not having that
3    same stiffness coefficient, and so things can change to
4    affect that calculation.
5  Q    To generate 40g's of acceleration, if you're starting at
6    zero and the duration of the collision is 150 milliseconds,
7    at 40g's at the end of 150 milliseconds you'd be going 132
8    miles an hour.  Do you have any reason to disagree with
9    that?
10  A    I haven't run any of those numbers and I don't have your
11   calculation, so I can't say one or the other.
12       (Discussion off the record.)
13  Q    So, Mr. Probst, I did a Google search on acceleration
14   calculator and I got a website that has flexible units and I
15   put in there that a starting speed of zero and an ending
16   speed of 132 miles per hour and a duration of .15 seconds.
17   and that produces g force of about 40g's; correct?
18  A    That's what this website says, correct.
19  Q    And do you have any reason to disagree that this website --
20   does that seem wrong to you?
21  A    Again, math being what it is, it's most likely correct, yes.
22  Q    Let me ask you.  You cited to a number of different articles
23   in your report about crash tests involving human subjects;
24   isn't that true?
25  A    Correct.

16 (Pages 61 to 64)

Bradley Probst, Volume I - August 8, 2013

65

1 Q   And the point of these studies is to try and understand
2     motor vehicle collisions better?
3 A   Various ones are looking at various aspects.  Some of them
4     are looking at the role of head restraints, some of them are
5     looking at the role of the seat as your primary means of
6     restraint.  They're looking at a variety of different
7     things.
8 Q   And they're generally trying to understand the forces
9     involved in vehicle collisions?
10 A   Again, some are, some aren't.  They're all looking at
11    different things.
12 Q   They're generally trying to understand the bodily movements
13    of occupants during motor vehicle collisions?
14 A   Again, certainly in some, yes, they are, in other ones it's
15    just a by-product of the testing that's being performed.
16 Q   And ultimately this is all being done to hopefully design
17    safer vehicles and keep occupants safe; isn't that true?
18 A   Well, that's ultimately one goal of biomechanics.  If we
19    know what's occurring, we know how to mitigate or prevent
20    various things.  So certainly this information could be
21    utilized in designing better and safer cars.
22 Q   And the point of doing crash tests on human beings is not to
23    torture test them to see what levels of forces will injure
24    people?
25 A   Well, certainly you don't want to create an injury during

66

1     testing, no.
2 Q   And, in fact, the studies' principals, the designers of the
3     studies, they try to predict human safety and not
4     purposefully cause injury to people?
5 A   Correct.
6 Q   And they control the speeds involved in human crash tests so
7     that they can get data that's useful to them, but hopefully
8     not injure the people that are participating?
9 A   Well, you could look at it a different way that we've known
10    for quite an extremely long amount of time the tolerance of
11    the human body, and so we can apply that knowledge and
12    generate a test or protocol that we know is well within
13    human tolerance, and so we're not really doing anything new
14    or unique by picking various speeds of the input velocities
15    for these tests.
16 Q   So before doing tests, generally the principals control the
17    speeds to levels that they believe are not going to hurt the
18    people that are participating?
19 A   Control the speeds, acceleration, force.  Depending on
20    what's being tested, how the test is being performed.
21 Q   And they also try to control the environment the best that
22    they can to mimic real world conditions of motor vehicle
23    collisions.
24 A   Again, it depends on what they're looking at.  Sometimes
25    they want the occupant in position, other times out of

67

1     position, sometimes with a head restraint, sometimes without
2     a head restraint.  They look at a large range of various
3     aspects of motor vehicle scenarios.
4 Q   Isn't it true that one of the standard techniques that they
5     use is that they generally put blinders on people and then
6     they put headphones with loud music on there so people can't
7     tell exactly when the collision's going to occur to try to
8     mask the visual and auditory cues that would cause a test
9     subject to anticipate the collision and tense up?
10 A   Certainly they've conducted tests like that.  I don't know
11    if you would say that's a standard for all live human
12    testing because sometimes they do want to know the effect of
13    awareness of an impending impact.  Other times they could
14    certainly change the manner in which they perceive things.
15    Other times, I don't think we cite it in here, but they've
16    generated placebo rear-end collisions where there's in
17    actuality no contact between the two vehicles, but they
18    allow the occupant to be aware of it.  So they look at,
19    again, anything and everything, and they've researched this
20    quite extensively.
21 Q   Let me ask you about that one because I'm curious.  You're
22    suggesting that there's published articles on crash tests
23    where there's placebos where there is no collision, they
24    just sit in the car and there's no collision that's reported
25    scientifically?

68

1 A   Correct.
2 Q   Can you give me an example of a specific article where
3     there's tests involving no collision?
4 A   There is a test by a gentleman named Castro, and it's
5     actually -- no, we have him cited for a separate article.
6     But there is one that he authored where actually in the
7     title of it is Placebo Rear-End Collisions.
8 Q   Now, my understanding is that you cited to a number of
9     different studies involving crash tests on human subjects
10    that involve similar speed changes and similar accelerations
11    to those that you calculated for Laura Wolf and her vehicle;
12    isn't that true?
13 A   Some are significantly higher input of velocities and some
14    are comparable and there might be some that are below.  We
15    cite a range of input velocities.
16 Q   And the general purpose or idea is that you're looking at
17    various crash tests involving human subjects and using those
18    as comparables for Laura Wolf's collision?
19 A   No.  Obviously, you've not understood what I did in my
20    report.
21 Q   Let me ask you this.  What's the purpose of citing to
22    various tests involving human subjects?
23 A   Well, what I've done is I've utilized the scientific
24    methodology to propose a hypothesis, to test that
25    hypothesis, and then in the validation phase to validate my

Bradley Probst, Volume I - August 8, 2013

69

1    results I cite various literature.  Generally what we're
2    discussing at this point in time, the various crash testing
3    with life human subjects, that's validating my own
4    independent analyses.  So you can call it a comparison, but
5    in fact, it's an actual validation of a separate analysis.
6    Q    And in that validation process you're trying to cite to
7    human test subjects that have similar ranges of speed
8    changes and accelerations to those that Ms. Wolf and her
9    vehicle would have experienced; isn't that true?
10   A    Again, there's some that, I think, are less and certainly
11   some that are more.  This is just a reasonable cross-section
12   of articles that are available.  There are certainly quite a
13   number more that we could utilize.
14   Q    Are there some tests that have been done and articles
15   published about those tests where people were involved in
16   collisions with similar levels of speed change and similar
17   accelerations to those experienced by Ms. Wolf and her
18   vehicle where people did not report any symptoms?
19   A    Let me see if I understand your question.  Are you saying
20   are there tests performed of comparable force as the one
21   we're discussing today where people have not reported
22   injuries?
23   Q    Correct.
24   A    Certainly.
25   Q    And identify for me, because I think you've got 60 different

70

1    references in your report, which ones are you talking about
2    in that regard?
3         I might be able to help you out.  I think that there's a
4    reference on page -- I think it's on page 11 of your report
5    where there's sort of a string citation of various human
6    tests, like 50 through 54.  I don't know if that helps you
7    but --
8    A    I'm just going through these from the beginning.  I believe
9    Siegmund, number two reference, I believe that has some
10   mention.  Four and five, certainly they might not be
11   discussing automotive events, but they're discussing forces
12   and tolerance levels in humans.
13   Q    I'm going to stop you just because I want to be very
14   specific in my question.  I'm not talking about general
15   articles that are just talking about forces and tolerance
16   levels and stuff like that.  I'm talking about something
17   very, very specific here.  I'm talking about articles that
18   are written about crash tests done on human subjects that
19   are designed to replicate motor vehicle collisions.  And I'm
20   not talking about a literature review or something.  I'm
21   talking about the report of the testing that was done,
22   specific testing that was done on human subjects.  So limit
23   your response to just those ones.
24   A    Without going through each article to see if it matches your
25   criteria specifically, this is my best guess, that also

71

1    number 18, Agaram.  Number 21 is not a staged collision, but
2    they are looking at collisions and the outcome of those
3    collisions on human subjects.
4    Q    So those aren't tests, that's a field study, so that
5    wouldn't respond to my question; correct?
6    A    Again, it depends upon how you are defining what a test is.
7    In the scientific method you can propose a hypothesis and
8    test it in a variety of manners, so this could be a test --
9    Q    I'm going to clarify this.  I'm not talking about where
10   people were involved in real world collisions outside of a
11   laboratory and then someone went and collected data and
12   wrote an article on it later.  I'm talking about crash tests
13   that are done as an investigation to determine the human
14   response to crash tests.
15   A    So I don't recall if 23 had live human subjects, 24 and 25
16   are obviously looking at tolerance levels in rear-end
17   collisions, number 26 by West, I don't recall these other
18   papers by Castro just because I like the placebo in my mind
19   now.  I don't know if Ito would meet your criteria because
20   it's a simulated whiplash.
21   Q    That's right.  That's using dummies.
22   A    I don't remember if that one's dummies or ligamentous
23   spines.
24   Q    It's dummies.
25   A    Vijayakumar, number 31, Szabo number 35.  Weiss has a number

72

1    of things where they're applied accelerations, it's not
2    actually crash testing, but it's applied acceleration.
3    Number 40 doesn't apply because we're not looking at crash
4    loading, but we're looking at loading from other means,
5    we're also looking at loading applied to the body and the
6    outcome.  I don't recall 41, but it's possible by Gates.
7    Nielsen, number 51, I believe.  I think 53 Braun.  I don't
8    believe number 60, Rudny, has live subjects.
9         I believe that's what generally meets your criteria.
10   Q    Let me ask you.  In those various crash tests, is it your
11   testimony that they demonstrate that people can be involved
12   in collisions at speed changes and accelerations similar to
13   what Ms. Wolf and her vehicle experienced and sustain no
14   symptoms as a result?
15   A    That's not what I've stated, no.
16   Q    I didn't ask about what you stated.  I just asked you a
17   question.
18        Is it your position that there's various scholarly
19   articles that demonstrate that in laboratory tests involving
20   motor vehicle collisions with similar speed changes and
21   similar accelerations that the subjects can experience those
22   and sustain no symptoms?
23             MR. NYE:  Objection; asked and answered.
24   A    I think you changed your question, but you're saying that
25   they can withstand this and experience no symptoms?

Bradley Probst, Volume I - August 8, 2013

73

1  Q   Correct.
2  A   I believe a number of these they note that, one, there's
3      certainly no biomechanical failure. I think in a variety of
4      them there was no reported discomfort or anything associated
5      with these. I don't recall every one specifically. Again,
6      this is just a cross-section. It's certainly not an
7      exhaustive list of all testing that's ever been performed.
8  Q   Do you believe that because there have been a number of
9      laboratory tests done at similar speed changes and similar
10     accelerations to those experienced by Ms. Wolf and her
11     vehicle where people have not had symptoms or not had
12     injuries, that that has an implication for whether or not
13     she experienced symptoms or was injured in this collision?
14 A   Well, again, I didn't do a simple analysis like that. We're
15     pretty clear in the report how we approach this and we have
16     this protocol, and also, as I explained earlier, we're
17     utilizing the scientific methodology where we propose a
18     hypothesis, test that hypothesis, and then validate our
19     results through other published literature.
20         And so what you're asking is you're kind of skipping a
21     lot of steps that I performed. Again, if you look through
22     the report there's various other things. We're not looking
23     at just solely the acceleration. It seems like you're
24     focused only on acceleration today. You haven't asked
25     anything about anything else that we've done, any other

74

1      means by which we've reached our conclusions, and so we're
2      not doing what you appear to be assuming that I performed.
3  Q   Why don't we try this? Because you've said this a couple of
4      times that either I don't understand or that I'm taking
5      things out of context or whatever. I'm going to ask you one
6      very simple question and let's see how you respond. I want
7      you to walk me through step by step what you did. Start
8      with step one and proceed forward.
9  A   Let's see. If you want to be rather specific, certainly one
10     of the first steps we perform is to review the documents
11     that we received.
12 Q   Review documents. I'm putting that down as step one.
13     What's step two?
14 A   Based upon -- depending upon what is included in those
15     documents, generally that's going to dictate how we proceed
16     to the subsequent steps. In this particular case we were
17     asked to perform a biomechanical analysis. And as we note
18     on page three, the basic outline of performing a
19     biomechanical outline, step one is to identify the
20     biomechanical failures that Ms. Wolf claims were caused by
21     the subject incident.
22 Q   I'm going to make this little bite-sized pieces, okay? So
23     let's say then one is review document. Two is identify the
24     biomechanical failures; is that fair?
25 A   Again, one, and then based upon the documents, that's going

75

1      to dictate exactly what's done, but generally then, yes, the
2      next step is to start with identifying the failures that Ms.
3      Wolf claims were caused by the subject incident.
4  Q   Give me step three, and just step three.
5  A   Well, the next step in our biomechanical analysis is to
6      quantify the nature of the subject incident in terms of the
7      forces, accelerations, and changes in velocity of the
8      vehicle Ms. Wolf was occupying.
9  Q   So as I understand step three, it involves three things that
10     you're quantifying; is that correct?
11 A   Correct.
12 Q   And the three things are the speed change, the acceleration.
13     And what's the third one?
14 A   Force. You can look at the acceleration as the force and
15     the change in velocity, in essence, is dictating the
16     acceleration which is then the same as the force. They
17     might not necessarily be three separate items. Somebody
18     might view them as three separate items, but they are all
19     interrelated.
20 Q   And so the three things that are interrelated is the speed
21     change, the acceleration, and the force?
22 A   Correct.
23 Q   That I have down as step three. What's step four?
24 A   So the next step is we would determine Ms. Wolf's kinematic
25     response within the vehicle as a result of the subject

76

1      incident. This is simply a generic term discussing what we
2      did. Later in my report we get into much more specifics as
3      to what actually is occurring and affecting her kinematic
4      response.
5  Q   By kinematic response, what you're talking about is how her
6      body moved within the vehicle; is that correct?
7  A   Correct.
8  Q   And with regard to that step, step four, determining the
9      kinematic response, that's how her body moved, and
10     essentially that's a description; right? You describe how
11     her body would have moved in the collision?
12 A   No. It's a scientific analysis based upon the laws of
13     physics and the factual information that we obtained in this
14     matter.
15 Q   And give me an idea of the output then. So I'm going to be
16     super specific here. You just said that it's determining
17     the kinematic response. What was the kinematic response for
18     Ms. Wolf?
19 A   In this particular case, due to the restraint provided by
20     the seat, seat back, and head restraint, her orientation,
21     the level of force, in essence she has no significant
22     rearward movement. Her head goes back, goes into contact
23     with the head restraint, and no other movement occurs.
24 Q   So I heard you say that she didn't have significant rearward
25     movement. What movement did she have?

Bradley Probst, Volume I - August 8, 2013

77

1  A   Simply enough to compress the seat back.  Generally seats of
2      this nature will compress about two inches or so.  There's
3      some give to the seat as well.
4  Q   And you determined that kinematic movement based on her
5      orientation and the level of force.  And the level of force
6      that you're talking about is the 1.5g's of average
7      acceleration of the vehicle; correct?
8  A   The 1.5g's is the input acceleration from the vehicle.  You
9      left out also her restraint that's provided.  That's
10     certainly going to affect her kinematic response.
11 Q   What was her orientation?
12 A   She was upright, I believe she said she had both hands on
13     the wheel, I believe foot on the brake.  And obviously if
14     her head is contacting the head restraint, she is, in
15     essence, in line with the seat and not out of position to
16     any degree.
17 Q   And are those the sort of orientation data that you use in
18     forming your opinions regarding the kinematic response?
19 A   That's noted in her records and that's what I utilized, yes.
20     Her information that she provided.
21 Q   So you utilized the orientation data that her head was
22     against the headrest?
23 A   Yes.
24 Q   How far was her head from the headrest?
25 A   That I don't know and did not need to know.  It wasn't part

78

1      of my analysis.
2  Q   Was her seat in the fully upright position or was it
3      reclined to some degree?
4  A   There's no mention of that.  Common reclination is roughly
5      21 degrees.  There's no mention that it's anything other
6      than that, so accepted protocol would be that it's at
7      roughly 21 degrees.  And I don't think there's anything in
8      the photographs or anywhere else to suggest that it was
9      anything but that.
10 Q   For purposes of determining the kinematic response did you
11     assume that her seat was at a 21-degree angle?
12 A   Correct.  There's nothing to suggest otherwise.
13 Q   Was her seat in the fully forward position, fully back
14     position, or somewhere in between?
15 A   I did not seek that information because it doesn't affect
16     the manner in which I perform my analysis, so I don't know
17     if it's fully forward or fully back.  It does not matter in
18     this analysis.
19 Q   Did she have both hands on the steering wheel or just one?
20 A   I believe it was noted both hands.  Again, not going to
21     change my ultimate conclusions, but I believe it was noted
22     both hands.
23 Q   Where were they located on the steering wheel?
24 A   Again, I don't know if was ten or two, nine and three.
25     Again, it doesn't matter, but both hands were on the

79

1      steering wheel with at least one document noted.
2  Q   What about the seats on the Subaru, were they the factory
3      seats that came with the Subaru or were they after-market
4      seats?
5  A   Again, there's nothing in the repair estimates or anything
6      else that suggests that they were after-market, so protocol
7      would dictate that you use factory seats.  To assume
8      anything else would be unacceptable protocol.  There's no
9      information to suggest anything other than factory seats.
10 Q   You assumed that they were factory seats?
11 A   Again, there's nothing to suggest they're anything else.  If
12     I were to assume anything, I would be assuming that they're
13     non-factory seats.  This is a vehicle sold, it comes with
14     factory seats.  Anything else is an assumption.
15 Q   Would that make any difference in your analysis if they were
16     factory seats or non-factory seats, could that change
17     anything?
18 A   Overall I would say potentially no.  It depends upon the
19     type of seat, because now you're asking a hypothetical that
20     you're not providing significant information on again, what
21     type of seat, its strength, its characteristics, its height,
22     all those things.  But in general, this level acceleration
23     is very minimal and it's well below any established
24     tolerance levels.  Certainly you might be able to have some
25     seat that something else extraordinary occurs and it might

80

1      produce an injury, but if it's a typical seat, we would not
2      expect anything.
3  Q   Would anything change in your report based on Ms. Wolf's
4      height or weight?
5  A   I'm not sure what you're asking.  Are you saying what's been
6      provided by her medical professionals is not accurate?
7  Q   No.  I'm just asking whether it changes anything in your
8      report.  In other words, is that a factor that somehow
9      calculates into your findings and conclusions whether the
10     person is tall, short, heavy, fat, light, slight?  Any of
11     that matter at all?
12 A   Well, as quite clearly noted on page eight, we do use the
13     age, height and weight of Ms. Wolf that was obtained from
14     her provided documents to determine her seated height and do
15     a comparison to the height of the Subaru and determine what
16     level of restraint is provided based upon her age, height
17     and weight, and the height of the seat.
18 Q   So you're factoring in the level of restraint that the
19     vehicle is providing her?
20 A   In a rear-end collision your primary means of restraint is
21     the seat and seat back, so we're looking specifically at the
22     seat, seat back, head restraint, which most people commonly
23     call a headrest, but it's factually a restraint.
24 Q   What position was her headrest in?  Was it in the fully down
25     position, fully up, somewhere in the middle?

Bradley Probst, Volume I - August 8, 2013

81

1  A   That I don't know, so we assumed a fully down position. And
2     even in the fully down position, again as noted in my
3     report, that it was more than adequate to provide restraint
4     from hyperextension.
5  Q   Did you find for her height and weight that she was getting
6     adequate restraint from the safety systems on the Subaru?
7  A   Correct.
8  Q   How tall would she have to be before she would no longer be
9     getting adequate restraint from the safety devices on the
10    Subaru?
11  A   I don't know.  I haven't run those numbers, but generally I
12    would say for a seat of this height of 30-and-a-half inches
13    with the head restraint in the full down position, we're
14    talking somebody significantly above six feet tall.  Now, I
15    don't know how much additional space there is between the
16    top of the head restraint and the roof of the vehicle, if
17    you can actually position somebody in there such that you
18    still could have enough space to fit a head.  There are
19    certainly vehicles like the Mini Cooper where basically the
20    head restraint is almost in contact with the roof of the
21    vehicle, so in that sense height wouldn't matter.  And I
22    would have to go back and look at this vehicle again and
23    increasing her height to see how that might change the
24    outcome.
25  Q   Step four was determine the kinematic response.  What's step

82

1     five?
2  A   So to define the biomechanical failure mechanisms known to
3    cause the reported biomechanical failures and determine
4    whether the defined biomechanical failure mechanisms were
5    created during Ms. Wolf's response to the subject incident.
6  Q   So kind of in laymen's terms, are you looking for the
7    occupant having some kind of movement or motion that is
8    known to cause injury?
9  A   Again, in my report it's quite clear that we note when we're
10    looking at a biomechanical failure mechanism we're looking
11    at both the magnitude of the applied force and the direction
12    of the applied force and then what that response is.
13      So in the case of -- and we note it pretty clearly again
14    in the report about sprains and strains, that you have to
15    have some type of excessive movement.  Depending upon the
16    body part, that's going to dictate how that part moves,
17    whether it's a torsion or a bending, extension,
18    hyperextension, flexion, hyperflexion, various things like
19    that.
20  Q   So as I understand it, you're looking at the magnitude of
21    the force, the direction of the force, and you're looking
22    specifically for whether that caused excessive movement?
23  A   You're mischaracterizing my answer.
24  Q   So you characterize it correctly.  What are you looking for
25    when you're trying to define the biomechanical mechanism of

83

1     failure?
2      Let me back up because I don't want to get your words
3    wrong.  What was step five?  Say it again.
4  A   Well, now you're asking multiple different questions at
5    different times, so let's go way back and ask what question
6    specifically do want to start with?  Because you've asked
7    three completely different questions and backed up and
8    started and backed up, so I'm at a loss as to where you are
9    right now.
10  Q   Let me be very clear.  Step number four you said was
11    determine the kinematic response.  Tell me again what step
12    number five is.
13  A   Define the biomechanical failure mechanisms known to cause
14    the reported biomechanical failures and determine whether
15    the defined biomechanical failure mechanisms were created
16    during Ms. Wolf's response to the subject incident.
17  Q   And with respect to Ms. Wolf, what did you find in that
18    regard?
19  A   So for the type of cervical spine, thoracic spine, lumbar
20    spine sprain and strain, to produce some type of sprain or
21    strain we still have to have excessive movement.  Because
22    the spine can have three dimensional movement, any excessive
23    beyond physiological range of movement could produce a
24    sprain or strain.
25      However, because we're dealing with a specific event

84

1     that's only producing specific kinematics, what we'd be
2    looking for in this type of event would be hyperextension of
3    the cervical spine, thoracic spine or lumbar spine.
4  Q   And so is that another way of saying what you're looking for
5    is whether there was either hyperextension or hyperflexion
6    occurring, and if there is no hyperextension or hyperflexion
7    then you would find that there is no biomechanical failure
8    mechanism?
9  A   Again, if we're looking specifically at hyperextension which
10    is going to occur or has the potential to occur in a
11    rear-end collision.  If it cannot occur, you cannot have any
12    biomechanical failures associated with hyperextension,
13    therefore it cannot occur.
14  Q   Let me ask you this.  Do you look for biomechanical failures
15    other than hyperextension and hyperflexion when it comes to
16    cervical spine injuries?
17  A   Again another general question.  What event are we talking
18    about, what person?  It depends upon what we're looking at
19    and what we might be doing.
20  Q   I'm talking about your investigation.  When you're on step
21    number five and you're looking for whether there's been a
22    biomechanical failure mechanism, you described a couple of
23    them that you're looking for.  You're looking for
24    hyperextension, you're looking for hyperflexion.  I want a
25    complete list.  Are there more than just those two for

Bradley Probst, Volume I - August 8, 2013

85

```
 1      cervical spine?
 2   A  Well, this is why I was trying to explain all the steps of
 3      what I did.  And so if you remember, if we back up, we
 4      reviewed these documents and we reviewed the event,
 5      scenario, and various things like that, the amount of force
 6      applied to the vehicle, the direction of the forces applied.
 7      Because with my knowledge of biomechanics I can eliminate
 8      various things.  If we're talking about a rear-end
 9      collision, obviously there's no force in a lateral
10      direction.  It's not present.  So I would not look at that
11      because there's no purpose in that.  The way you asked the
12      question you're saying again a generic question of in an
13      event what do you do?
14          I'm talking about this specific event.  We knew at the
15      time we were analyzing her kinematics that her movement
16      would be rearward based upon the contact between the two
17      vehicles.  And if we're looking at an injury mechanism due
18      to rearward contact on the vehicle, we would look at
19      hyperextension movements or kinematics.  That's what we were
20      looking at.
21   Q  So I think I understand your response, which is if you were
22      looking at a different type of an incident, for example,
23      where someone's head got twisted really hard, in that type
24      of an incident you might look for a hyper-rotation type of
25      injury, but in a rear-end collision you don't look for that,
```

86

```
 1      you only look for certain things.  Am I correct in
 2      describing why you couldn't really answer the prior
 3      question?
 4   A  In a roundabout way you're getting closer to it, yes.
 5   Q  Let me be more specific then.  When you're dealing with a
 6      rear-end motor vehicle collision and you're looking at the
 7      occupant of the vehicle that got rear-ended, you're looking
 8      to see whether a biomechanical failure mechanism of
 9      hyperextension and hyperflexion.  Are looking for other
10      types of biomechanical failure mechanisms?
11   A  Again, maybe we should back up, because when we're
12      identifying in the first step of the biomechanical analysis,
13      we're identifying the biomechanical failure Ms. Wolf claims
14      were caused by the subject incident.  So if we know you have
15      a cervical sprain or strain and it's a rear-end collision,
16      that's dictating that it has to be some type of
17      hyperflexion.  They're saying they were injured in this
18      event in this manner.  That's limiting to what we're dealing
19      with.
20          If at some point in time somebody starts to claim a
21      different event, this event occurs in a different fashion,
22      there's some type of different injury or biomechanical
23      failure or that it was created in something other than her
24      inertial loading which is not noted anywhere, I would be
25      happy to readdress that.  But in this particular case based
```

87

```
 1      upon the facts that we have at this time, we're simply
 2      looking at some type of hyperextensive movement and we
 3      wouldn't look at anything else.
 4   Q  And I'm going to ask a clarifying question on hyperextension
 5      and hyperflexion.  Are you talking about hyperflexion for
 6      the cervical spine, the entire cervical spine, or do you
 7      look at each inter-segmental level to see whether there's
 8      hyperextension, for example, between C6 and C7 as
 9      opposed to like C2 and C3?  Are you looking at the overall
10      spine or are you looking at individual segments with regard
11      to hyperextension or hyperflexion?
12   A  In this specific case with Ms. Wolf at her stated age,
13      height and weight in this vehicle, there simply cannot be
14      any hyperextension of either the overall spine or individual
15      components.  Again, there's a restraint behind her, so I
16      wouldn't look at it any more than that.  There's restraint,
17      there's no hyperextension, therefore we're not going to look
18      at individual components to see what level extension they
19      had.
20   Q  Going back to the kinematic response for a minute, are you
21      familiar with the four phases of whiplash motion?
22   A  Correct.
23   Q  What are the four phases?
24   A  If I remember, I don't know if I remember them specifically
25      because it's not any manner in which I produce these
```

88

```
 1      analyses, but you have the lower cervical spine tends to
 2      move forward, you get kind of an S-bend, then you have some
 3      extensive movement, and then generally you're going to have
 4      flexion back to the starting position.
 5   Q  Is there a certain sort of threshold of forces that are
 6      necessary to create the motions that you just described,
 7      sort of the four phases of whiplash?
 8   A  Certainly.  Again, as we note in the report, you have to
 9      have forces that rise above the level of muscle response.
10      So you have a normal tension due to just active muscles.
11      They keep us upright, keep us in a normal posture.  So you
12      have to have a force that goes beyond that and beyond just
13      inertial properties, so force necessary to create movement
14      of a specific mass.  So there certainly are levels.  For her
15      I didn't calculate that.  Again, there was no reason to
16      that.
17   Q  So what kind of levels does it take in terms of forces
18      before people go through the four phases of whiplash?
19   A  I don't know if I've analyzed that to see the whole four
20      phases, so I don't know.
21   Q  Let me ask you this.  Does it apply to Laura Wolf or were
22      the levels of forces involved in her collision, whether you
23      calculated a five-mile-an-hour speed change and an average
24      acceleration of 1.5g's, is that sufficiently low that the
25      four phases of whiplash don't even apply?
```

Bradley Probst, Volume I - August 8, 2013

89

1  A   Well, again, unfortunately when I hear the term whiplash,
2      that's already stating that there's hyperextension.  This
3      case doesn't have hyperextension, therefore we don't have
4      those same four phases of whiplash as you're describing or
5      you asked me to describe.  Again, whiplash implies that
6      there's some type of hyperextension.  We don't have that.
7      This whole phase analogy doesn't apply to Ms. Wolf.
8  Q   Let me ask you about this.  There was some research done by
9      a researcher name Ono in Japan who did sled tests and he
10     used video fluoroscopy and he took essentially motion x-rays
11     of people experiencing deceleration and looked to see when
12     that transient S-shape in the cervical spine was present.
13     Are you familiar with that research?
14 A   I have reviewed it, yes.
15 Q   Do you think it's good research?  Do you have some reason to
16     believe that his findings are flawed or that the research
17     that Ono did is not reliable research?
18 A   I don't believe so.  I mean, he documented what he
19     performed.  How you utilize the information he presented,
20     certainly it can be misused.  But from what he presented, I
21     don't believe there's anything that would make me say that
22     it's flawed to any degree.
23 Q   And isn't it true that at speeds at about -- speed changes
24     of about four kilometers per hour, that he was seeing this
25     transient S-shape created in people's cervical spines?

90

1  A   I don't recall the specific number, but certainly that's
2      something that is occurring.
3  Q   So something in the range of about two-and-a-half miles an
4      hour?
5  A   Let's see.  Five kilometers is 3.1.  Somewhere in that
6      two-mile-per-hour range, yeah.
7  Q   And Ono found that these were non-physiological movements,
8      that transient S-shape is non-physiological?
9  A   Correct.
10 Q   Did you look to see whether Laura Wolf experienced sort of a
11     transient S-shape in her cervical spine as a result of this
12     collision?
13 A   I did not analyze that.  She would experience it.  Any time
14     you have a rear-end impact, if you will, a motor vehicle
15     event, you're going to experience it.  It might be
16     non-physiological, but again it doesn't produce a failure
17     mechanism and, again, it's well within the limits of human
18     tolerance.  It might be non-physiological, but it does not
19     mean it's creating any type of failure mechanisms.
20 Q   When does that transient S-shape start to create failure
21     mechanisms?
22 A   Again, what failure are we talking about?  Bone, soft
23     tissue, which ligaments?
24 Q   Any of the above.  When do you start seeing biomechanical
25     failure due to a transient S-shape in the cervical spine?

91

1  A   Well, again, we have to talk about restraint.  And in a
2      particular case like this there's adequate restraint to
3      prevent they hyperflexion.  I don't know of anything.
4      Again, there's certainly tests that have been conducted
5      upwards of 40g's of acceleration, and certainly that's going
6      to produce a transient non-physiological S-shape to the
7      cervical spine, and there's not been any reported failures,
8      biomechanical failures due to that non-physiological
9      S-shape.
10 Q   So you've mentioned a couple times about studies involving
11     40g's.  Is 40g's kind of a lot?
12 A   It depends upon what you're looking at, but in the world of
13     automotive of collision, certainly again you could smack a
14     table and produce 40g's quite easily.
15 Q   And the studies that you're talking about, the 40g citation,
16     that's done by the Navy; right?  That's that study where
17     they're looking at ejection seats on fighter aircraft and
18     they found it tolerable for people in the pilot seat that
19     are hitting the eject button to experience 40g's during the
20     ejection phase?  Is that the study that you're talking
21     about?
22 A   No, not specifically to ejection seats.
23 Q   What are you referencing then?
24 A   So, again, if you look at studies by Weiss.  Certainly there
25     was quite a bit of research performed at the Naval

92

1      Biodynamics Lab, which is now the National Biodynamics Lab,
2      a lot of research by Colonel John Paul Stapp at Holloman Air
3      Force Base.  So a variety of people have looked at the
4      accelerations in the negative X or the rear direction.
5          MR. MAXWELL:  So I need to leave.  I want to tell
6      you gentleman that I took some screen shots from my computer
7      where you were during that acceleration calculator thing.
8      I've e-mailed several screen shots to you, Mr. Elder.  What
9      I propose you do is e-mail them to Mr. Nye or choose the one
10     you think best represents the screen shot, e-mail it to Mr.
11     Nye, and if he agrees that it accurately represents the
12     screen as it was when Mr. Probst looked at, then you can
13     e-mail it to Elaine and she could include that as an exhibit
14     to Mr. Probst's deposition.
15         MR. ELDER:  Is that fair enough, Chris?
16         MR. NYE:  Yeah, but you're going to ask me to
17     compare it something I looked at an hour and a half ago?
18         MR. ELDER:  Well, the other nice thing is do a
19     Google search on acceleration calculation and then put it in
20     there yourself and you'll be able to help verify whether it
21     is accurate or not.
22         MR. NYE:  You can send it to me and I'll take a
23     look and I'll run it by the expert.
24         MR. MAXWELL:  You can ask Mr. Probst whether it
25     accurately represents what he saw.  But the thing is I'm

Bradley Probst, Volume I - August 8, 2013

93

1    representing to you that I just figured out how to do it
2    with a screen shot off my own computer and I'll represent to
3    you that I e-mailed it to Mr. Elder.
4         MR. NYE:  The purpose being you want to use that
5    screen as an exhibit?
6         MR. ELDER:  Yeah, sure.
7    Q   So on page ten of your report, up at the top there's a
8    reference up there to live human subject torsos were being
9    exposed to rear g levels up to 40g's with no acute trauma,
10   only transient, short-term soreness.  Is that what you're
11   talking about with the human tolerance being able to
12   withstand 40g's?
13   A   Certainly again that's one reference.  This is the one I've
14   mentioned multiple times by Weiss from the Naval Biodynamics
15   Laboratory.
16   Q   And that's the experiment where they're hitting the ejection
17   button and they're trying to figure out what it's safe to
18   expose pilots to when they're ejecting from aircraft; is
19   that right?
20   A   Again not necessarily.  The direction of force applied
21   during an ejection seat is different than the force being
22   applied in this particular test.  They were looking at --
23   again, the title of the paper, Guidelines For Safe Human
24   Experimental Exposure to Impact Acceleration.  They're
25   talking accelerations in generalized 3D orientation, not

94

1    just the unique direction as a comparable to an ejection
2    seat.
3         MR. NYE:  Let's take a break.
4         (Exhibits 4 - 12 marked for identification.)
5         (Recessed 12:32 p.m. to 1:30 p.m.)
6    Q   Before we took a break, this morning you had identified that
7    you e-mailed your reports to an editor.  Do you know her
8    e-mail address?
9    A   I don't.
10   Q   Is it some combination of her name and the letters in her
11   name?
12   A   Generally that's the company's policy, but I just type her
13   actual name, and that's the way Outlook works, and it
14   converts it into her e-mail address.  I could probably check
15   and see if I can find it from somebody if you really need
16   it.
17   Q   Yeah, I would like you to do that.  What's your e-mail
18   address at ARCCA?
19   A   First initial, last name.  So bprobst@ARCCA.com.
20   Q   Which is ARCCA is A-R-R-C-A?
21   A   A-R-C-C-A.
22   Q   And then if you use the same naming convention for your
23   editor, what would that be?
24   A   L. Renner.  I think it's R-e-n-n-e-r.
25   Q   And how long has she been your editor?

95

1    A   Five to seven years or so.  I don't honestly know, but it's
2    been a while.
3    Q   And do you e-mail all your forensic reports to her?
4    A   Not always.  I think for a period of time she was moved to a
5    different position, and then obviously if she's not in the
6    office or not able to handle that amount of workload, I
7    would send them to her and it might go to somebody else.
8    Q   But you sent them all to her, it sounds like?
9    A   I believe I would have.  Again, aside from those times where
10   I know she's out for an extended period of time and I've
11   been told not to send them so they don't get lost in the
12   Internet or when she was not actually in that position.  I
13   think there was a time where she was doing some other type
14   of work at the company.
15   Q   When you e-mail the reports to her, do you e-mail them like
16   in a Word format?
17   A   Generally it's a Word format, yes, so she can edit them.
18   Q   Do you normally delete the e-mails that you send to her
19   after you send them?
20   A   I don't know.  There are times where I will just because we
21   have a limit on mailbox size, and so, obviously, if I'm
22   sending a report and it has photographs and then it becomes
23   a large file and it takes up space in what I'm allotted in
24   my e-mail.  So it's certainly possible that there's times
25   where various things like that are deleted.  I don't have

96

1    any set protocol.
2    Q   You don't have a protocol where as soon as you send it you
3    delete it.  It sounds to me like that when you delete your
4    e-mails is when your box is becoming too full and then you
5    just delete everything before a certain date, something like
6    that?
7    A   Correct.
8    Q   Okay.  I wanted to talk about a few of the reports that you
9    cited in your paper.  I'm going to show you Exhibit Number
10   4.  This is the Szabo study.  First of all, isn't it true
11   that this involved five test subjects?  And if you need some
12   help identifying it, I think if you turn to page 26 you can
13   see that they're lettered A through E.
14   A   I'm pretty sure this is the one.  I think it's brought up
15   quite often that there's five test subjects in this
16   particular study.
17   Q   And for this particular study that Szabo did, he was using
18   changes in velocity of the target vehicle of approximately
19   eight kilometers per hour; correct?  And if you want to find
20   that, it's on page 27 under results.
21   A   I'm looking at the methodology.
22   Q   Look under vehicle response right here.
23   A   I'm looking under methodology.  So this is how they were
24   performing the tests, that's why it's entitled methodology,
25   and it states right under methodology that six

Bradley Probst, Volume I - August 8, 2013

97

1    16-kilometer-per-hour or 10-mile-per-hour car-to-car impact
2    tests were conducted.
3  Q   They're answering a different question. That's how fast the
4    bullet vehicle was going. I asked you about the target
5    vehicle. And the change in velocity of the target vehicle
6    was approximately eight kilometers per hour, isn't that
7    true? You can find on that page 27 under results, vehicle
8    response.
9  A   There's a difference between the input and the result, and
10   what they were doing was trying to use an input of ten miles
11   per hour. So yes, the results that you're stating that it
12   resulted in approximately that Delta-V is correct, but
13   that's not what their intention was. Their intention was to
14   do a 16-kilometer, 10-mile-per-hour car-to-car impact.
15 Q   Let me be clear. I'm going to ask you a yes or no question.
16   Is it true that the Szabo article specifically states that
17   the change in velocity for the target vehicle was
18   approximately eight kilometers per hour, yes or no?
19 A   That's correct.
20 Q   Eight kilometers per hour is approximately five miles per
21   hour; right?
22 A   Correct.
23 Q   And that would be the same speed change that you found for
24   Laura Wolf's vehicle?
25 A   Correct.

98

1  Q   Isn't it true that the test subjects were instructed to
2    relax in this experiment, but they did not have headphones
3    with loud music or blinders to defeat either visual or
4    auditory cues?
5  A   Correct.
6  Q   And that four out of the five test subjects reported
7    transient headaches immediately post impact? You can find
8    that on page 28.
9  A   So it states, Volunteers A, B, C, and E described a
10   transient headache immediately post impact, which resolved
11   spontaneously prior to exiting the target vehicle.
12   Volunteer A, who underwent two rear-end impacts, reported
13   transient minor neck stiffness the morning following the
14   first test. No other symptoms whatsoever were reported by
15   any of the subjects in the one-year period following the
16   test.
17 Q   So would you agree that four out of five had a transient
18   headache immediately post impact which resolved
19   spontaneously?
20 A   Prior to exiting the vehicle, correct. That's exactly what
21   it states.
22 Q   And one out of five reported transient minor neck stiffness
23   the following morning?
24 A   Correct. This was the Volunteer A who underwent two
25   rear-end impacts.

99

1  Q   I'm going to show you what's marked as Exhibit 5. So
2    Exhibit 5 is the Castro article that you cited in your
3    report; correct?
4  A   Correct.
5  Q   And this involved 19 test subjects, 14 males and five
6    females; is that correct?
7  A   Correct, 14 men between the ages of 28 and 47, five women
8    between the ages of 26 and 37.
9  Q   And the speed changes that were observed for the target
10   vehicle were in the range of 8.7 to 14.2 kilometers per hour
11   with an average of 11.4 kilometers per hour; isn't that
12   true?
13     You can find that on the first page right there.
14 A   The results showed that the range of velocity change,
15   vehicle collisions, was 8.7 to 14.2 kilometers per hour,
16   average 11.4 kilometers per hour, correct.
17 Q   So that's a range of speed changes for the target vehicle
18   between 5.5 and 8.8 miles per hour, with an average of about
19   7 miles per hour; correct?
20 A   I haven't run the numbers to do the conversion, but I'll
21   take your word for it, correct.
22 Q   And in this laboratory test study one of the male subjects
23   experienced a reduction in left cervical rotation for a
24   period of ten weeks. You can find that at the very, very
25   top of the second page.

100

1  A   I'm trying to see -- they don't state in there specifically
2    -- because you left out the fact that aside from just
3    vehicle-to-vehicle collision, they also conducted bumper car
4    collisions, and I don't know -- I'm just trying to be
5    specific if this male volunteer noted that after the
6    vehicle-to-vehicle collision or a bumper car collision, and
7    what the actual test parameters were for that individual.
8  Q   So you point out that most of the collisions involved in the
9    Castro study were vehicle-to-vehicle collisions, but they
10   did three bumper car collisions as well involving lower
11   speeds, isn't that true, and lower accelerations?
12 A   Correct.
13 Q   So you're not sure whether that male volunteer that suffered
14   a reduction in rotation of the cervical spine to the left of
15   ten degrees for ten weeks, whether he was involved in the
16   bumper car with smaller forces or the auto-to-auto
17   collisions with the higher forces, but there was such a
18   subject, correct, who reported that?
19 A   I'm just trying to see if they note somewhere specifically
20   which -- because there was no head restraint in the bumper
21   car collisions, and therefore it's a different type of event
22   than what we're dealing with with Ms. Wolf or what would
23   necessarily be occurring in a car-to-car test. So without
24   going through this page by page, I don't see it quickly and
25   easily as to what they say if it was car-to-car or bumper

Bradley Probst, Volume I - August 8, 2013

1    car. I guess without going through it again, it says that
2    they were available for seventeen car-to-car impacts and for
3    three bumper car collisions. I don't know if they go into
4    more detail than that.
5 Q   Would you agree that one of the male volunteers suffered a
6    reduction of left cervical rotation of ten degrees and that
7    lasted for ten weeks in this Castro study?
8 A   Correct. Test Subject 2 was noted to have a restriction of
9    rotation of about ten degrees, but clinical examination
10   revealed no pathologic findings in comparison to the
11   clinical examination before the crash.
12 Q  So in other words, people can have a limited range of motion
13   without having anything that's going to show up on an MRI?
14 A   Well, it certainly shows that there is no anatomic change,
15   so there's no mechanical failure associated with this event.
16   So certainly you could have some type of reduction in
17   movement, but it's certainly not due to any type of
18   mechanical failure.
19 Q  So you're not suggesting that the person did not sustain an
20   injury and didn't have a limited range of motion and neck
21   stiffness, you're just saying that there's no biomechanical
22   failure?
23 A   They're not saying anybody was injured in here. They're
24   simply saying he noted a reduction in motion, and again that
25   there was no change from his pre-impact status to his

102

1    post-impact status from a pathologic point of view.
2 Q   And that's because you don't consider someone who gets into
3    a car accident and has a limited range of motion to be an
4    injury?
5 A   Well, again, what I'm discussing is biomechanical failure.
6    So as it quite cleanly notes in this article that there was
7    no failure, there was no change in anatomic structures to
8    him, therefore there was no biomechanical failure to his
9    body.
10 Q  That's really what you would need to see in order to find
11   that there was a biomechanical failure is you would have
12   needed to have seen something on the MRI, something more
13   than just the fact that the person can't move their head all
14   the way?
15 A   That would be an objective finding. Whether or not he can
16   or cannot move is still, truly from a scientific point of
17   view, subjective. So if we did have an MRI and he had some
18   change, certainly that would be an objective finding.
19 Q  But you don't disagree that there was an individual involved
20   in these Castro tests at these types of speed changes that
21   reported a limitation of left cervical rotation of ten
22   degrees and it lasted for ten weeks? That's what he found.
23 A   Correct. Again, I'm not -- if this gentleman did not have
24   any type of restraint, again a different scenario than what
25   we're dealing with with Ms. Wolf. Unfortunately, this

103

1    paper, I don't think it goes into enough detail to state
2    that. So the only thing we can say is that, yes, they
3    report that one individual self-reported a limitation of
4    cervical range of movement.
5 Q   And out of these 19 people that underwent these tests with
6    speed changes in the range of 5.5. to 8.8 miles per hour,
7    one female and four male test subjects reported symptoms
8    afterwards? See page 373.
9 A   I don't see where they go in to any more detail, but then
10   they note that for some people they did report some
11   different symptomatology. One person who had been taking
12   malaria prophylaxis, they attribute some conditions to that.
13   But again, overall they note no injury, no pathologic
14   findings comparing pre-impact conditions to post-impact
15   conditions, including people with degenerative changes. So
16   some people noted muscle soreness or some type of transient
17   change, but again no injuries or mechanical failures.
18 Q  You're using both terms injuries and mechanical failures
19   here. So again I just want to clarify. So when people were
20   reporting that they have limited range of motion and they
21   can't move their head in left rotation, they've lost ten
22   degrees of range of motion, you don't consider that to be
23   either a biomechanical failure or an injury?
24 A   In the context of this paper, and if you read the paper, it
25   states quite clearly out of all these people, people with

104

1    and without degenerative changes, with and without head
2    restraints, impacts of greater than we have, nobody had any
3    type of mechanical failure, there was no change in any of
4    the objective studies pre-impact to post-impact, so there
5    were no biomechanical failures. That's what I'm stating is
6    reported in this paper.
7 Q   Didn't you say that that's not an injury? There's a
8    transcript, so we'll be able to see. Correct me if I'm
9    wrong. You said that that's not an injury?
10 A   If you can maybe refresh my memory what you're meaning by
11   that's not an injury? That's quite an incomplete question
12   again.
13 Q  We'll see the transcript.
14    Let me ask you this. Tell me if I read this correctly.
15   Here's where I'm going to reading from, page 373 right down
16   at the bottom: Evaluation of the physical examinations at
17   time 2, i.e., 18 to 24 hours after crashes, revealed that
18   one female and four male test subjects reported symptoms.
19   Did I read that much correctly out of the Castro
20   article?
21 A   No.
22 Q   What did I read incorrectly?
23 A   It's 18 to 25 hours, not 24.
24 Q   Oh, I'm sorry, 18 to 25 hours, not 24. I'm going to try it
25   again because we're going to get a clean transcript out of

Bradley Probst, Volume I - August 8, 2013

105

1   this.
2       Tell me if I read this quote correctly:  Evaluation of
3   the physical examinations at time 2, i.e., 18 to 25 hours
4   after the crashes, revealed that one female and four male
5   test subjects reported symptoms.
6       Did I read that correctly?
7   A   You did.
8   Q   And tell me if I read this correctly:  Test subject number
9   1, a female age 37, with a change in velocity of 13.6
10  kilometers, had sensation of muscle soreness in the cervical
11  spine for three days.
12      Did I read that correctly?
13  A   Correct.
14  Q   Test subject number 2 had sensations of muscle soreness in
15  the cervical spine and lumbar spine complaints.
16  A   That's correct.
17  Q   Test subject number 3 had headache persisting for 13 hours
18  after the crash and sensations of muscle soreness in the
19  cervical spine persisting until the seventh day; is that
20  correct?
21  A   Correct.
22  Q   Test subject number four, a male 30 years old with a change
23  in velocity of 14.2 kilometers per hour had nausea and
24  vomiting a half hour after the crash, this test subject had
25  received malaria prophylaxis shortly before the experiment.

106

1   and sensation of muscle soreness in the cervical spine.
2       Did I read that correctly?
3   A   Correct.
4   Q   So out of nineteen people, at least five of them reported
5   some level of symptoms after these crash tests that are
6   reported on by Castro; isn't that correct?
7   A   Correct, they reported symptoms.  Again, as we stated
8   before, subjective findings, but no objective findings.  Had
9   you continued to read through the paper, most of them still
10  say clinical examination revealed no pathologic findings in
11  comparison to the clinical examination before the crash.
12  Q   I'm showing you what's been marked as Exhibit 6.  This is a
13  report by Nielsen that is referenced in your report on Laura
14  Wolf; is that correct?
15  A   Correct.
16  Q   On page 194, Table Number 2, you can see that there were
17  seven subjects in this study; correct?
18  A   Correct.
19  Q   They were all male; correct?  Page 190.
20  A   Correct.
21  Q   All of the people taking part in this study were members of
22  the engineering team that was the author of the paper, plus
23  a physician that assisted with the study; isn't that true?
24  It's on page 190.
25  A   The test volunteers were all males, one was a

107

1   physician/kinesiologist, the remainder were members of our
2   engineering staff.
3   Q   And by "our", that's the authors of the paper; correct?
4   A   Correct.
5   Q   And the speed changes involved in this study were in the
6   change of 1.1 to 5 miles per hour; isn't that true?  You can
7   find that starting at page 202.
8   A   So Delta-V for the struck vehicle at lowest 1.7 kilometers
9   per hour and a maximum of 9 kilometers per hour.
10  Q   So we're talking -- oh, there's a 9 in there?  Okay.  So
11  they did 25 tests.  There's one at 9, which the 9 would be
12  up in the range of about 7 miles per hour, actually a little
13  less.
14  A   So 10 kilometers is 6.2, 5 is 3.1.  So somewhere less than
15  6.2 miles per hour.
16  Q   One was up that high, but all the rest of them are in the
17  range of 1.1 to 5 miles per hour; correct?
18  A   Again it varies from 1.7 to 9, and there's various ones,
19  yeah, 5, 7, 8 kilometers per hour.  So approaching, if not
20  at, 5 miles per hour.
21  Q   And of the seven test subjects, two reported symptoms.  One
22  reported headache and one reported cervical spine ache;
23  isn't that true?  Page 196.
24  A   So this was also following both the frontal and rear-end
25  impacts, two volunteers, both involved in multiple test

108

1   series on the same day, reported symptoms.
2   Q   And am I correct in believing that one test subject reported
3   headache and the second one reported cervical ache?
4   A   Correct, following both frontal and rear and multiple
5   impacts all within a day's time.
6   Q   I'm going to show you Exhibit 7.  This is the Braun study
7   that you cited in your report, correct, on your report on
8   Laura Wolf?
9   A   Correct.
10  Q   That involved seven test subjects?
11  A   Correct.
12  Q   The largest speed change for any of the collisions was 4.8
13  kilometers per hour, which is about 3 miles per hour;
14  correct?
15  A   The range for the target vehicle was 1.5 to 4.5 miles per
16  hour.
17  Q   Speeds below the speed change -- or speed changes below the
18  speed change that you found for Laura Wolf; correct?
19  A   Correct.
20  Q   And three out of the seven subjects reported minor neck
21  stiffness the day after the test was concluded?
22  A   Three of the participants that had multiple exposures had
23  minor neck stiffness, but not pain that resolved without
24  treatment in one day, correct.
25  Q   The duration of the collision was measured by Braun; isn't

27 (Pages 105 to 108)

Bradley Probst, Volume I - August 8, 2013

109

1    that true?
2  A    Correct.
3  Q    And he found that the range of durations of collision was
4       .09 to .124 seconds?
5  A    Correct.
6  Q    It wasn't the purpose of this test to reach or exceed any
7       injury threshold, was it?  That's a direct quote from the
8       first page of the full article.
9  A    In the introduction it says, Accident reconstructionists and
10       biomechanical or biomedical engineers are frequently called
11       upon to analyze low speed rear-end automobile impacts and
12       assess the potential for any injury to have occurred to the
13       occupants of the vehicles  The key issues in these types of
14       accidents are typically the speeds and forces involved in
15       the impact, and whether or not these speeds and forces were
16       sufficient to cause injury.  Several studies done in the
17       1990s have attempted to address these issues, citations 1
18       through 8.  The database of human exposures and our
19       understanding of human tolerance to rear-end impacts
20       continues to grow as additional work is published.  Our
21       testing is intended to add to the growing body of research
22       related to occupant kinematic response to low speed rear-end
23       impacts and to further quantify the vehicle dynamic response
24       that would be typical of the bumper systems in use in modern
25       passenger vehicles.

110

1         And then they list three separate objectives.  The first
2       one, to add to the human exposure database by testing human
3       volunteers in low speed rear-end impacts at a level that was
4       at or below the level currently associated with no
5       significant risk of injury.
6         The second objective was to subjectively describe and
7       characterize the severity of the impact that was experienced
8       by the occupants.
9         And the third objective was to evaluate the vehicle
10       dynamic response to low speed rear-end impacts.
11  Q    Is it true, and is this a direct quote, sir, that the
12       paper's authors said, and I'm going to quote, quote, It was
13       not our intent to reach or exceed an injury threshold?  Did
14       I read that correctly?
15  A    Correct.
16  Q    Handing you Exhibit Number 8, this is the West article that
17       you cited in your report related to Laura Wolf; correct?
18  A    Correct.
19  Q    This test involved five test subjects?
20  A    Correct.
21  Q    The peak acceleration of the target vehicle was 3.1g's;
22       correct?  You can find that on the table at the bottom of
23       the right column of the first page.
24  A    In Series A the peak vehicle acceleration varied from 0.9g's
25       to 3.1g's.

111

1  Q    And so going back to that, when they had a peak acceleration
2       of the vehicle of 3.1g's, the occupant of the vehicle
3       experienced head peak acceleration of 3.0g's in the X axis
4       direction 3.4 g's of head acceleration in the Y axis
5       direction, and 2.8g's of head acceleration in the Z axis;
6       isn't that correct?
7  A    Correct.  That's not simply noting the inertial loading,
8       that's inertial and contact acceleration of the head.
9  Q    Understood.  And the orientation, just so the record is
10       clear, the X is in the longitudinal direction, which would
11       be sort of forward and back; correct?
12  A    Correct.
13  Q    The Y is in a lateral direction, which is basically side to
14       side; correct?
15  A    Correct.
16  Q    And the Z axis is in the vertical direction, which is up and
17       down?
18  A    Correct.
19  Q    Isn't it true that West found that there was significant
20       rebound of the subject's head from the head support that was
21       occurring when the striking speed was 8.7 kilometers per
22       hour or higher, so basically a little over 5 miles per hour
23       or higher speed change?
24  A    That full paragraph reads, For the first three impacts the
25       displacement of the test subject's head was insufficient to

112

1       cause his head to contact the head support.  Significant
2       rebound of the subject's head from the head support did not
3       occur until the striking speed was 8.7 kilometers per hour,
4       5.4 miles per hour or greater.
5         And I'm trying to see if they later describe what they
6       mean by significant rebound of the head.  That's, again,
7       simply a descriptive term and not a quantitative term.
8  Q    But they did find that there was significant rebound of the
9       subject's head once the striking speed was 5.4 miles per
10       hour or greater; correct?
11  A    Well, taken in full context, they're saying at speeds below
12       that there's no head contact, therefore there can be no
13       rebound.  And then at some point, obviously, you do have
14       some rebound, meaning you go from none to something that's
15       measurable, meaning significant, and that did occur at this
16       level of 5.4 miles per hour or greater.
17  Q    Okay.  And if you go back to the first page, you can
18       actually find the specific test where they started to
19       observe that, the line and the table where it's got a
20       striking speed of 8.7, that involved a peak vehicle
21       acceleration of 2.8g's and peak head accelerations of the
22       occupant of 7.5g's, 3.3g's and 2.9g's in the X, Y and Z axes
23       respectively; correct?
24  A    At 8.7 kilometers per hour, that's 5.4, and that is correct,
25       that is what that table does read.

Bradley Probst, Volume I - August 8, 2013

113

1   Q   So in a situation where you had a peak vehicle acceleration
2       of 2.8g's, that's when they started to see the significant
3       head rebound, as they describe it; correct?
4   A   Again, anything below this, and as it notes for the first
5       three tests, there's actually no head contact, so there
6       can't be any rebound, everything else in between there's
7       contact but no rebound, and until you get to a level 5.4,
8       that's the only time where any significant rebound was
9       observed.
10   Q   The 5.4 that you're talking about, that's the striking
11       speed; right? That's not the speed change of the target
12       vehicle. They're using the term striking speed?
13   A   I apologize. I stand corrected. I'm looking at the peak
14       vehicle acceleration. It's roughly 3, so it's fairly
15       comparable again to the case we're dealing with here today.
16   Q   Just so we're comparing apples to apples, they started
17       saying rebound in the example where the peak vehicle
18       acceleration was 2.8g's. In Laura Wolf you calculated
19       3.0g's for the peak vehicle acceleration; correct?
20   A   Correct. Again, assuming that all the damage noted did, in
21       fact, come from this event. So that's a maximum that it
22       could possibly be.
23   Q   In this West study, out of the five test subjects, two of
24       them reported minor neck pains lasting for one to two days;
25       correct?

114

1   A   I think I even note that in my report, but correct.
2   Q   And the tests were being performed with the head rest in the
3       retracted position, so all-the-way-down position, and at 5.9
4       miles per hour of impact speed the test subject said that he
5       would no longer continue with the testing unless the
6       headrest was raised; correct?
7       You can find that on page three up at the top where
8       there's a description of that.
9   A   Correct, at any speed additional to that he requested that
10       the head support or head restraint be extended to allow for
11       higher impact magnitudes.
12   Q   Showing you Exhibit Number 9, this is the Mertz paper that
13       you cited in your report on Laura Wolf; correct?
14   A   Correct.
15   Q   This test involved just a single human test subject;
16       correct?
17   A   Correct.
18   Q   And just tell me if I read this correctly. I'm starting at
19       the beginning of the article. It says: The so-called
20       whiplash syndrome constitutes the most prevalent trauma to
21       occupants of automobiles struck from the rear. It is
22       particularly insidious with subtle pathology that often does
23       not show up radiographical or other quantitative
24       diagnostic techniques. The acute or chronic symptoms
25       sometimes persist for years, and in the case where there is

115

1       no immediate obvious morbidity, injuries attributed to the
2       accident show up months later.
3       Did I read that correctly?
4   A   You added an extra word, but in essence you read it
5       correctly.
6   Q   Do you generally agree with that assessment by Mertz in the
7       article that you cited?
8   A   If you simply go by numbers, there are more claims of
9       whiplash generally than any other type of injury in rear-end
10       collisions. However, this is a difference between a claimed
11       injury and an actual investigation. Basically if you look
12       at the purpose of this paper, they're noting that, yes,
13       quite a number of people claim to have been injured, we're
14       going to see if that is, in fact, an actuality when we look
15       at these events. And if you look at the conclusions, what
16       they determine is that we don't see mechanisms in a typical
17       collision of the forces we're discussing to actually produce
18       mechanical failure.
19   Q   I'm going to show you Exhibit Number 10. Earlier in your
20       testimony you referenced that you calculated the peak
21       acceleration of the Subaru in which Ms. Wolf was driving at
22       3.0g's, and you indicated that there was a spreadsheet where
23       you derived that. Is Exhibit 10 the spreadsheets that
24       you're referencing?
25   A   Correct.

116

1   Q   When I look at that, it looks like when you printed that out
2       it just captured the formulas that are present in each of
3       the Excel spreadsheet cells, it doesn't actually show you
4       the values of those formulas being run; is that correct?
5   A   Correct. If somebody wants to recreate the work I did, this
6       is certainly what they would need. It actually shows the
7       formulas, the algorithm that was employed.
8   Q   And that's where you derived that, even though the peak
9       acceleration of the Subaru --
10       Let's try that again.
11       That's where you derived that, even though the average
12       acceleration of the Subaru in this collision is 1.5g's, the
13       peak acceleration of the Subaru is 3.0g's?
14   A   Correct.
15   Q   And where did you get the formula or algorithm that you're
16       using in order to make that calculation?
17   A   I did not create this spreadsheet. I believe it was by a
18       physicist in our office. I could be mistaken, but I'm
19       pretty sure this was done by a physicist.
20   Q   Now, it turns out in the context of Laura Wolf's case that
21       there's a 2-to-1 ratio between the peak acceleration and the
22       average acceleration. Does this formula always produce that
23       same 2-to-1 ratio or is sometimes that ratio different?
24   A   I haven't investigated that, so I honestly don't know. I'd
25       have to play with some numbers to see if that's actually the

29 (Pages 113 to 116)

Bradley Probst, Volume I - August 8, 2013

117

```
 1      case.
 2    Q  Now, one thing that I note is in the Laura Wolf report you
 3       never say that the peak acceleration of the Subaru is
 4       3.0g's; correct?
 5    A  I don't believe that I do, no.  There was no reason to.
 6    Q  You only cited the average acceleration of 1.5g's?
 7    A  I believe so, correct.
 8    Q  You actually reference it two different ways.  Once you
 9       reference it as the average acceleration associated with a
10       5-mile-per-hour impact as 1.5g's, and the other time you
11       reference it as the peak acceleration experienced by the
12       subject Subaru in which Ms. Wolf was seated was comparable
13       to 1.5g's.  So you reference the 1.5g's using two different
14       terminologies; correct?
15    A  Well, to be fair, we do note that it's 5 mile per hour, the
16       average acceleration is 1.5g.  That's on page five.  And
17       then I think we note a couple other areas that same value.
18       Under findings on page seven, change in velocity was
19       comparable to 5 miles per hour with average accelerations
20       comparable to 1.5g's.  Then on page nine we say the subject
21       incident had an average acceleration comparable to 1.5g's.
22       Then on page ten we say the subject incident had an average
23       acceleration comparable to 1.5g's.  Then on page 11 we say
24       the subject incident had an average acceleration level that
25       was comparable to 1.5g's.  Then on page 12 under conclusions
```

118

```
 1       we note that the incident was comparable to -- well, had an
 2       average acceleration comparable to 1.5g's.
 3         The one incident where it's noted that it says peak
 4       acceleration, we've discussed before that unfortunately my
 5       writing style might lead to some confusion by people such as
 6       you, but meaning while we've stated quite clearly multiple
 7       times we're discussing the average acceleration, I was
 8       trying to be more clear in that we've looked at a worst case
 9       scenario saying this would be the highest average
10       acceleration that we could possibly produce.  So that one
11       sentence you've the cited is simply trying to clarify
12       something.
13    Q  Is it your normal practice to only reference the average
14       acceleration, in this case the 1.5g's, and not reference the
15       peak acceleration, which in this case was 3.0g's, when you
16       write your reports?
17    A  Sometimes I do peak, sometimes I do average.  There's no
18       real reason why I might do one or the other.  Sometimes it's
19       easier for people to understand that, obviously, this is a
20       very short duration event, and so instead of looking at a
21       momentary point in time of the acceleration, we're looking
22       at basically what's occurring over the entire length of this
23       event.  Sometimes it just depends on what we think might be
24       easier for somebody to understand in reading this report.
25    Q  Well, comparing apples to apples, and I'm going to use the
```

119

```
 1       West report which has a listing of various peak vehicle
 2       accelerations, and comparing that to Wolf's vehicle's peak
 3       acceleration which was 3, as you calculated it, there's a
 4       number of these that are right in the neighborhood in West's
 5       report.  Here we've got 3, 2.8, 2.9, 3.1 for vehicle
 6       acceleration.  So you would consider those to be pretty
 7       similar, wouldn't you?
 8    A  Math being what it is, those numbers are all fairly close to
 9       3, correct.
10    Q  And then when you look at the occupant's head acceleration
11       in the X, Y and Z planes for those involving the similar
12       vehicle accelerations, you're looking at things in the X
13       plane in the range of 4.8 to 8.3g's; correct?
14    A  We explained this, I guess, at length that that's a contact
15       acceleration.  Again, that's why if you note in that paper
16       they say the first three tests there was no head contact to
17       the head restraint, and if you compare the vehicle
18       acceleration roughly to that head acceleration, they're
19       comparable.  There's no amplification like there is when you
20       actually have head contact.  So that's an artifact of head
21       contact to the head restraint.  It's not inertial
22       acceleration, it's not acceleration that produces a
23       mechanism for hyperextension failure.
24    Q  But again you're looking at accelerations of the head in the
25       X direction, the longitudinal direction of between 4.8 and
```

120

```
 1       8.3g's in a collision like this one with Laura Wolf?
 2    A  Correct.
 3    Q  And you're looking at accelerations of the head in the Y
 4       direction, in other words, the side-to-side lateral
 5       direction, in the range of about 3.0 to 3.4g's?
 6    A  Correct.
 7    Q  And you're looking at accelerations in the Z direction,
 8       basically the up-and-down plane, in the range of about 2.8
 9       to 2.9g's?
10    A  Correct.
11    Q  And those are all happening simultaneously.  So the person's
12       experience of their head moving feels like it's moving in
13       three different directions, you have to do the math of all
14       of those, but it's going to be something greater than any of
15       those numbers; correct?
16    A  Just to be clear, you're saying these are all happening
17       simultaneously.  Yes, the head, because it's in
18       three-dimensional space, it is experiencing
19       three-dimensional acceleration.  However, these peak head
20       accelerations are not necessarily all happening at the same
21       time temporally.  So you might have little-to-no
22       acceleration in one direction, while you have more in the
23       other.  And, unfortunately, this paper did not include any
24       figures or timing that I can see readily as to when those
25       peaks occurred.  And so without knowing when those peaks are
```

Bradley Probst, Volume I - August 8, 2013

121

1    occurring, you can't do super-position to actually combine
2    the three directions to determine an overall peak head
3    acceleration.
4  Q    So it may not be the worst case scenario. In fact, it
5    probably isn't the worst case scenario where you would
6    literally take all three of those maximums at the same time?
7  A    That would be the worst case scenario where you're taking
8    all three peak head accelerations, assuming they're all
9    occurring at the same time, would give you a worst case
10   scenario.
11 Q    It's been a while since I've been in math, but working out
12   the formula for this is you'd take the X acceleration,
13   square it, the Y acceleration, square it, the Z acceleration
14   square it, and take the square root of the whole thing, and
15   that would give you pretty close to the peak acceleration
16   worst case scenario; correct?
17 A    Correct.
18 Q    So is there any reason to believe that Laura Wolf's head did
19   not have the kind of head accelerations consistent with what
20   we're seeing in West's report for when he's got vehicle
21   accelerations in the range of 2.8 to 3.1g's for peak
22   acceleration?
23 A    It's possible they are head contact accelerations. I know
24   of no reports of any type of head mechanical failure
25   associated with any direct contact, but certainly it's

122

1    possible that you could have some contact accelerations that
2    are comparable to those.
3  Q    So did you write anything up in your report suggesting that
4    she might have had head accelerations in the range of
5    4.8 to 8.3g's in the lateral direction? Did you think to
6    comment on something like that in your report?
7  A    Again, there would be no purpose in doing that. I could
8    report on a lot of things. I don't think I mentioned the
9    color of the car. It has no bearing in my analysis, and so
10   many things like that are simply not reported.
11 Q    Let me ask you this. You're saying that there was a peak
12   vehicle acceleration of about 3.0g's and now you're
13   acknowledging that her peak head acceleration may have been
14   something in excess of 8.0g's, and then you're making a
15   comparison between g-forces involved with activities of
16   daily life and the g-forces people experience in daily life.
17   Wouldn't it be more fair to compare head accelerations with
18   activities of a daily life than car accelerations with
19   activities of daily life?
20 A    Again, I think you're kind of confused. What we're looking
21   at when we're comparing any type of vehicle-and-vehicle,
22   we're looking at input accelerations versus response
23   accelerations. And certainly in certain cases we do look at
24   -- again, we're looking at inertial responses, not contact
25   acceleration responses. Unfortunately, I don't know if

123

1    you're confused in looking at a variety of different things,
2    but we're looking at a valid fair comparison between input
3    acceleration from one test vehicle to another test vehicle
4    and then relating that to other daily activities as well.
5  Q    Before we took a break this morning we were going through
6    the various steps that you go through in your analysis and
7    we only got part way through when we took a break. I'm
8    going to get us back on that subject, so I'm going to review
9    one through five as I have them written down.
10       Number one, review documents. Number two, depending on
11   what is included in those documents it will make some
12   difference as to how you proceed, but in this case your
13   second step was to identify biomechanical failures. Number
14   three, you quantified the nature of the collision. There
15   you're looking for the speed change, the acceleration and
16   the force. Number four, you determine the kinematic
17   response, in other words, how the body moved. Number five,
18   you're going to define the biomechanical failure mechanisms
19   known to be involved. And I think that's where we left off.
20       So can you give me number six for where you go next in
21   your analysis?
22 A    To evaluate Ms. Wolf's personal tolerance in the context of
23   her pre-incident condition to determine to a reasonable
24   degree of scientific certainty whether a causal
25   relationships exists between the subject incident and her

124

1    reported biomechanics.
2  Q    So in other words, you're looking at the types of activities
3    that she's involved in historically, and then you're looking
4    at the kinds of forces that would be involved in those types
5    of activities?
6  A    Correct.
7  Q    And why do you look at that?
8  A    This is for her personally. So we're not generalizing this
9    to, again, the general population. This is we're looking at
10   this unique event with this unique individual with her
11   unique personal tolerant values given whatever her
12   pre-existing conditions might or might not have been. That
13   tells us, again, specifically something about her.
14 Q    Let me ask you this. Let's assume the lowest possible
15   movement that you could have for a person and that the
16   person is just a total couch potato, they don't do anything
17   but sedentary, and compare and contrast that with a
18   situation where the person is kind of like Ms. Wolf where
19   she's pretty active and plays dodgeball and does rock
20   climbing and goes running and stuff like that. Does that
21   difference make a difference with regard to your opinions
22   when you're finding that the speed change is about 5 miles
23   per hour and the acceleration from the collision has a peak
24   acceleration for the vehicle of about 3.0g's?
25       In other words, if you're finding -- maybe I should have

31 (Pages 121 to 124)

Bradley Probst, Volume I - August 8, 2013

125

1    asked it that way first.  If you're finding 5 miles per hour
2    of speed change and 3.0g's of peak acceleration for the
3    vehicle, is it going to make a difference whether the person
4    is a couch potato or out doing rock climbing in terms of
5    your conclusions?
6  A   Potentially.  It depends on what the injury mechanism is or
7    their pre-existing condition.  Because certainly if somebody
8    is fully sedentary, that means they're only -- the most
9    precise I can be in their personal tolerance level, if I
10    only know that this person is sedentary and I know nothing
11    else, I can say they can withstand 1.0g.  Now, if they just
12    move their body, any movement whatsoever, it certainly rises
13    above that 1.0g.  But, obviously, unless somebody -- I think
14    they had article the other day, somebody who was bedridden
15    for 47 years with polio, he would be somebody who does not
16    move whatsoever and only experiences 1.0g of force.  But
17    certainly once we're looking at things beyond that, it does
18    allow us to look at events like this and say here is an
19    event of comparable, greater, or less magnitude, whatever it
20    happens to be, and here's the forces associated and here's
21    the outcome to this individual such as Ms. Wolf.
22  Q   Let me ask you this.  You're sort of looking at the severity
23    of the forces in the collision versus the severity of what
24    they're engaged in the rest of their life.  And doesn't it
25    make a difference that when she's out rock climbing she

126

1    knows she's rock climbing and she's expecting to be climbing
2    rocks, whereas when she gets into a car accident it's kind
3    of one of those things where you just get hit out of the
4    blue?  Is that significant in any way or not really?
5  A   Not really.  Again, you asked about automotive accidents
6    where they put blinders on people and headphones so they're
7    not aware.  In just some of the papers we went through
8    people were aware.  So they've looked at that difference and
9    there's no significant difference between the two.
10      And if you look at it actually on a structural point of
11    view, her cervical spine has no cognitive awareness.  Her
12    cervical spine doesn't know what will or will not occur,
13    what is occurring.  It only can respond to an input per laws
14    of physics and engineering science.  So regardless of
15    whether she's aware or not, if there's a force applied to
16    that structure, that force must obey the basic laws of
17    physics and respond always the same based upon an input
18    force.
19  Q   Well, it's not that her cervical spine has a consciousness
20    or expects anything or doesn't, but isn't there a factor
21    associated with muscle tension that it can either sort of
22    increase or decrease the amount of kinematic movement that
23    occurs based on whether people tense up their muscles before
24    a collision or not?
25  A   Again, in my report, and as we said earlier, if it is enough

127

1    force to overcome muscle reaction force.  So certainly you
2    have a basic level of muscle force just due to posture.  If
3    you are tensing up, certainly you are a little bit stiffer,
4    but then that places you -- if you're not moving, and
5    studies have shown when there's increased muscle stiffness
6    you actually have less movement and less muscle reaction
7    force.  And so if you have less movement, you have less
8    potential for any type of hyperextension, hyperflexion, any
9    hyper movement or sprain or strain injury.  And certainly
10    less force in the muscles is less than anything.  So in
11    examining any of that like this, I assume there's no
12    awareness, no pre-tensing or anything.  And again this is a
13    worst case scenario that might have happened.  If she had
14    any awareness of this, then it just simply means there's
15    even less likelihood of any type of mechanical failure.
16  Q   You said step six was evaluate her personal tolerance.
17    What's step seven?
18  A   Well, it's not noted in here necessarily, but again we
19    discussed this earlier, that basically what we're doing is
20    this -- instead of going through and saying we're applying a
21    scientific methodology, this is our hypothesis, this is our
22    test, in essence these last five steps I gave you are, in
23    essence, our testing phase of that methodology, and then the
24    next phase of using the scientific methodology is
25    validation, external validations from some other source, and

128

1    that's where we have quite a number of these references
2    cited.  I say when many other people have looked at many
3    other impacts with many other subjects with and without
4    pre-existing conditions and at levels comparable to this and
5    greater, there's been no type of mechanical failure.  So my
6    independent analysis is validated by others in the
7    scientific community.
8  Q   So step seven is your validation step?
9  A   Correct.
10  Q   And when you're doing validation, do you look for only
11    articles that confirm your data or do you look for articles
12    that would contradict your data?
13  A   I look for any and all articles, and to date I haven't found
14    any tests that have been staged or conducted that show
15    there's some type of mechanical failure such as she reported
16    to have in an event like this under similar conditions of
17    restraint, force levels, things of that nature.
18  Q   Have you found any articles where people are sustaining
19    injuries in motor vehicle collisions with speed changes and
20    acceleration, peak acceleration of a vehicle similar to what
21    you found in Ms. Wolf's case?
22  A   Are we limiting this to just a pure rear-end collision with
23    no --
24  Q   We're talking about rear-end collisions, someone seated in
25    an automobile, wearing their seat belt, they get into a

Bradley Probst, Volume I - August 8, 2013

129

1    collision with similar forces.  In other words, studies that
2    are comparable to this incident involving Laura Wolf where
3    the study supports that people do get injured in these
4    collisions.
5  A    I've never seen anything that supports that you would
6    receive mechanical failure in an event of this nature with a
7    vehicle of this design, restraint of this design.  The only
8    article I'm really aware of is where they took a ligamentous
9    spine, so they removed all the skin, all the musculature,
10    all the flesh, basically, and only left the bones, if you
11    will, and some attached ligaments to the spine, and then
12    subjected that to significant loading where some type of
13    failure occurred.  But, obviously, Ms. Wolf was not in this
14    vehicle with purely a ligamentous spine.  So I'm unaware of
15    anything, any peer-reviewed published literature that shows
16    in an event like this under similar circumstances some type
17    of mechanical failure would occur.
18  Q    What about any articles that are specifically looking at and
19    studying tow hitches, tow bars, and whether that increases
20    either the severity of the collision when they're involved
21    or the likelihood or severity of injuries, have you come
22    across any such scientific articles?
23  A    No scientific articles.  Certainly you run across lots of
24    anecdotal information of a wide variety of things.  I don't
25    know if there are any mention of tow hitches specifically,

130

1    but again not something that's scientific that says if you
2    have a tow hitch in an event like this you will receive
3    these specific failures.
4  Q    Now, do you have any opinion as to whether Laura Wolf was
5    injured in this collision or not?
6  A    Again, my report's quite clear.  What we're looking at is
7    mechanical failure.  There's not a mechanism for any
8    mechanical failure.  So it's up to everybody else to say,
9    okay, if there's no mechanical failure, you can't go beyond
10    this step.  So if there's an injury, or whatever happens to
11    be associated with some mechanical failure, that mechanical
12    failure can't occur, no sequelae, nothing else can come from
13    this event.
14  Q    So I understand that you're going to be saying that there's
15    no biomechanical failure.  I'm asking you a different
16    question.  Are you going to be testifying on a more probable
17    than not basis that either Laura Wolf was injured in this
18    collision, was not injured in that collision, or do you
19    simply have no opinion on the injury question?
20  A    I'm simply looking at it from a biomechanical point of view
21    and strictly discussing biomechanical failure.
22  Q    Will you been expressing an opinion that Laura Wolf was not
23    injured in this collision?
24  A    As I said multiple times, I'm simply discussing
25    biomechanics, biomechanical failure, and that in this event

131

1    there was no biomechanical failure mechanisms.
2  Q    So is your answer no?
3  A    I'm very specific in the answer, and I'm discussing
4    biomechanics and biomechanical failure.
5  Q    Sometimes I think no and yes aren't in your vocabulary
6    because I ask you yes/no questions and you won't answer yes
7    or no.  I need to know.  If you're going to say that she was
8    injured or uninjured in this collision, I need to know.  I
9    know you're going to say some other things.  I didn't ask
10    you those questions.  I asked you:  Will you be expressing
11    an opinion as to whether or not she was injured in this
12    collision?
13  A    Again, I'm just trying to be very specific.  As I've stated
14    before, there's a wide variety of people who confuse quite a
15    number of terms, failure, biomechanics, injury, anything
16    like that.  I don't want to have somebody misunderstand what
17    I will and will not been doing, so to be specific I always
18    say that I'm simply discussing biomechanics and
19    biomechanical failure mechanisms.
20  Q    You reviewed a number of medical records in this case; is
21    that true?
22  A    True.
23  Q    Did Mr. Nye provide those records to you?
24  A    Correct.
25  Q    Did Mr. Nye provide you with the medical report from Dr.

132

1    Battaglia, who was the doctor hired by the defendant to
2    interview Ms. Wolf, examine Ms. Wolf, review all of her
3    medical records, and express opinions, did you review that
4    report from Dr. Battaglia?
5  A    I have not reviewed that record, no.
6  Q    Did Mr. Nye share you with the declaration from Dr. Koo
7    which states that Ms. Wolf sustained injuries in this motor
8    vehicle collision including a torn rotator cuff?
9  A    I don't believe that I've seen that, no.
10  Q    Did Mr. Nye supply you with the declaration from Dr.
11    Katherine Ellison, a chiropractor, who expresses opinions
12    that Ms. Wolf was injured in this motor vehicle collision
13    from June 15th of 2009, and that she sustained various
14    injuries, including cervical strain, thoracic strain, lumbar
15    strain, and a shoulder injury?
16  A    Well, I might save us some time.  I don't think I have any
17    declarations, so I don't have any declarations from any
18    other experts.
19  Q    How about the opinion from Dr. Peterson who signed a sworn
20    statement that Ms. Wolf was injured in this motor vehicle
21    collision, did you get that from Mr. Nye?
22  A    I do not have any record of receiving that, no.
23  Q    Does it make a difference to you that those four physicians,
24    Dr. Battaglia, Dr. Koo, Dr. Ellison, Dr. Peterson, all come
25    to the unanimous conclusion that Ms. Wolf was, in fact,

Bradley Probst, Volume I - August 8, 2013

133

1     injured in this motor vehicle collision?
2   A   First off, I don't know what they did or did not do, what
3       materials they reviewed, what methodology they employed, I
4       have no way of saying anything to the validity of their
5       results.  And simply because they have numbers, it's kind of
6       meaningless.  I think we've all heard the old adage that two
7       wrongs don't make a right.  So four wrongs don't necessarily
8       make a right, either.  So it has no bearing whatsoever on me
9       whatever they have said.  I've done my own independent
10      analyses.
11  Q   Let me ask you this.  Do you think that there's any kind of
12      conflict between the fact that you've got four doctors, some
13      are treating physicians for Ms. Wolf, one of them is hired
14      by the person who caused this motor vehicle collision to
15      investigate the nature and extent of injuries, and all four
16      of those doctors are concluding that she was hurt in the
17      motor vehicle collision, do you see any conflict between
18      their opinions and your opinion?
19  A   Again, I don't know what work they have performed, what they
20      did or did not do.  If they know anything about the incident
21      kinematics, what actually did or did not occur, so I don't
22      know what basis they have for reaching the conclusions that
23      they do have, so I can't answer that question without
24      knowing what they did and how they did it and how they
25      arrived at the results and what the basis is.

134

1   Q   You were on step seven, which was validation from other
2       sources.  What's step eight?
3   A   Basically write the report.  I mean, we've finished
4       everything there.
5   Q   Let me ask you.  In your report on Laura Wolf you reached a
6       conclusion number -- I guess it's not actually listed under
7       conclusions one, two, three or four, but just after number
8       four in your report you state, A causal relationship between
9       the subject incident and the shoulder biomechanical failure
10      cannot be made.
11      So you're basically, as I understand it, you're saying
12      that there is no causal link; is that right?
13  A   Correct.  Just to clarify.  I'm not sure -- it appears that
14      there is a formatting error there, that maybe that paragraph
15      should be a number five.  It doesn't make any sense that it
16      would be separated out like that as a paragraph after the
17      conclusions, so it should be number five.
18  Q   So it is number five.  And you're finding that there's no
19      causal relationship between the collision and biomechanical
20      failures; is that right?
21  A   We say that there's no biomechanical failure in this
22      incident, and therefore you can't have a causal relationship
23      between a claimed failure and the subject incident.
24  Q   Now, I'm trying to figure out if that means something
25      different than that there's no causal relationship between

135

1       the collision and her injuries.
2   A   We've kind of been through this discussion of biomechanics
3       quite extensively, and again I'm simply stating whether or
4       not there's biomechanical failures.
5   Q   I still have a hard time figuring out whether you mean
6       something different by a biomechanical failure than injury
7       or whether those terms are synonymous.  Can you help me out
8       here?
9   A   I can't.  That's your knowledge, your background.  I know my
10      point of view is coming strictly from biomechanics.  That's
11      my education, experience, background.  That's what I'm
12      discussing.  I don't know what your background is or your
13      knowledge of any this.  I can't explain it any differently.
14  Q   Let me add one more layer onto this and ask you about
15      another thing.  Did you review the stipulation that was
16      signed by Mr. Nye on behalf of his client, and I signed it
17      on behalf of my client, Laura Wolf, that specifically
18      stipulates that Ms. Wolf was injured in this motor vehicle
19      collision?
20      I'll read it to you here.  Paragraph three, Ms. Wolf
21      sustained cervical, dorsal sprain/strain injuries in the
22      July 15th, 2009 motor vehicle collision.
23      That's already been stipulated to by the counsel of
24      record for the parties.  Was that shared with you?
25  A   I don't believe so, no.

136

1   Q   I'm trying to figure out how your testimony can be useful or
2       helpful when we've already stipulated that Ms. Wolf was
3       injured in the collision.  Can you help us out?  Can you
4       explain from an engineering point of view how testimony
5       regarding biomechanical failure might be helpful to a finder
6       of fact in a case where there's already been a stipulation
7       that Ms. Wolf was already -- that she was, in fact, injured
8       in this motor vehicle collision?
9   A   I don't know --
10          MR. NYE:  Object to the form of that question.  Go
11      ahead.
12  A   I don't know what, if anything, Mr. Nye was doing with that
13      information, if he decided just from a legal tactical point
14      of view to concede something whether it's factual or not.
15      It might just be a means by which for him to move the case
16      forward to meet a mutual resolution.  I have no idea why he
17      did what he did.  Again, it has no bearing upon the actual
18      facts and scientific analysis of this event.  Again, as I
19      said, I present information.  What somebody chooses to do
20      with it, that's up to them.
21  Q   Well, let me put it this way.  Ms. Wolf, she will testify
22      that she was injured in this motor vehicle collision, so
23      will all of her treating physicians, so will the defense
24      doctor, everyone is going to get up on the stand and say
25      that she was hurt in this motor vehicle collision.  Do you

Bradley Probst, Volume I - August 8, 2013

137

1  think your testimony that there was no biomechanical
2  failures adds something relevant to the discussion at that
3  point?
4  A   Certainly.
5        MR. NYE:  Object to the form.
6  A   Certainly.  Nobody -- as far as I understand, Ms. Wolf is
7  not a biomechanist, she has performed no type of accident
8  reconstruction, force analysis, kinematic analysis,
9  biomechanical failure analysis.  I'm unaware of anybody else
10  performing anything like this.  So if you're simply looking
11  at a difference between a lay person's point of view, a
12  medical physician who's simply using differential
13  diagnostics, and somebody applying scientific and
14  engineering principles, they are three separate things and
15  each adds something different.
16        I'm looking at pure physics, engineering science.  It's
17  something different than Ms. Wolf's perspective.  And it's
18  vastly different than a treating physician's point of view,
19  as their primary concern is treating her, not what caused
20  this event, so I don't know why any of her treating
21  physicians would look at anything involved in this to
22  determine what actually happened.  It's of no concern to
23  them.
24  Q   Let me be clear.  The doctors aren't just unanimous that
25  she's hurt.  They're unanimous that she was hurt in the

138

1  motor vehicle accident as a result of the motor vehicle
2  accident.  Does that make any difference in terms of your
3  opinions as a biomechanical engineer?
4        MR. NYE:  Objection; asked and answered.
5  A   Again, mine is an objective, factual, scientific analysis.
6  Strength in numbers, again as I pointed out, is meaningless.
7  You can have quite a number of people who all believe -- let
8  me go back to Flat Earth Society.  Obviously quite a number
9  of people believed that.  They were wrong.  Strength in
10  numbers when it's not supported by facts is meaningless.
11  Q   Let me ask you this.  Because Ms. Wolf and all of the
12  doctors in the case are testifying that she was hurt and
13  hurt in this motor vehicle collision, are you suggesting
14  that they're all wrong?
15  A   I'm suggesting if you provide me documents that shows on a
16  factual scientific basis how they reached their conclusions
17  that's not relying upon subjective information, I'll look at
18  that and I'll answer your questions based upon their
19  research and their work.
20        MR. ELDER:  I've referenced both the Battaglia
21  report and the stipulation, so I'm going to get both of
22  those marked as exhibits.
23        (Exhibits 13 and 14 marked for
24            identification.)
25  Q   Maybe we can move all those exhibits to the side for a

139

1  minute, and I've got a bunch of reports that I'm going to
2  have marked, and then I'm going to ask you the same
3  questions about all of them.  And the reason that I'm
4  explaining this is I'm thinking to save some time as I'm
5  having them marked and you get handed them.  Keep on looking
6  up the same thing, because the question that I want to find
7  -- these are a bunch of reports that you've authored and I
8  want to find out whether in any of them you ever found that
9  there was a biomechanical failure or injury that resulted
10  from the motor vehicle collision, okay?
11  A   Sure.
12        (Discussion off the record.)
13  Q   Off the record we discussed this.  We're going to mark a
14  bunch of reports all as one exhibit number and then I'm just
15  going to ask you to verify that none of these reports found
16  any biomechanical failures, okay?
17  A   Okay.
18  Q   So the reports that I'm referencing is we've got a report
19  for Khan, Le is two, Osborne is three, Bushdorf is four,
20  LeBaron is five, Jiminez-Garcia is six, Nguyen is seven,
21  Zenner is eight, Fox is nine, Leon-Jenkins is ten, Smart is
22  eleven, Nettles is twelve, Nock is thirteen, Jones is
23  fourteen, Brumfeld is fifteen, Vogel is sixteen, Ehringer is
24  seventeen, Ripley is eighteen, Parkhotyuk is nineteen,
25  Tucker is twenty, Corner is twenty-one, Hughes is

140

1  twenty-two, Hazard is twenty-three.
2        (Exhibit 15 marked for identification.)
3  Q   So, Mr. Probst, I've attached 23 different reports as an
4  exhibit, and all of these are instances where you've done a
5  biomechanical investigation and found that there were no
6  biomechanical failures; is that correct?
7  A   Correct.
8  Q   And in all of these cases you found that there was no causal
9  link between the motor vehicle collision and the claimed
10  biomechanical failure, as you deem it?
11  A   Correct.
12  Q   And in each of these you specifically detail which
13  biomechanical failures you're looking at?
14  A   Generally that's something I would normally do in a report,
15  correct.
16  Q   So I guess my next question is 23 out of 23 of those things
17  are all coming out no causal link.  Did you ever find that
18  there is a causal link between the motor vehicle collision
19  and the claimed injuries or does it just always come out
20  with this result?
21  A   No, it doesn't always come out with this result.  I'm
22  looking -- I haven't looked at all 23, but it certainly
23  appears a fair number of these is a Delta-V of 5 miles per
24  hour or less.  If we're talking about a rear-end collision
25  with proper restraint and a force of less than that, you

35 (Pages 137 to 140)

141

should expect similar results every time. If I'm getting different results for a similar event, I would be concerned. but if I'm having consistent results for consistent events, that's how it should be. Physics is physics. We can't alter or deny the laws of physics, so we should always have the same type of analyses, same type of results if we're looking at similar events. I haven't looked through all of these to look at the details, but sure, if they're similar events, we should have similar analyses. That's how physics works.
Q Let me ask you this. When you're working -- I should ask this first.
Do you always work for the defense or sometimes do you work for the plaintiff, are you hired by the plaintiff?
A I'm hired by the plaintiff. Just prior to showing up today I was called by a plaintiff's attorney and asked to look at an automotive accident and look at biomechanical failures.
Q What's the approximate ratio of how much time you're hired by the defendant in the case versus the person who's claiming the injury?
A I've been asked this numerous times. I don't keep track of it. It has no bearing on how I do my work. Some time ago somebody told me, I think, roughly it's 70 percent plaintiff, 30 percent defendant. That's all I know.
Q How many current cases are you working on for plaintiffs?

142

You mentioned you got hired on, apparently, just recently?
A Correct. Again, it has no bearing on how I perform my analysis. I just look at it scientifically, factually, and whether it's a plaintiff or a defendant, it really has no bearing on how I approach the work, so I don't know.
Q And when you write a report and you're representing the plaintiff, is the format of the report that you write the same as the format of the report that you write when you're working for the defense?
A It depends upon what I've been asked to do. Certainly it's going to follow a similar approach of looking at the forces, kinematics, mechanisms. That's biomechanics. So in that sense, there's definitely going to be a fair bit of similarity.
Q Now, it looks to me from these 23 reports that you have sort of a template that you generally use when you're writing reports for the defense; is that fair to say?
A There's just not much different you can say. A rear-end collision produces the same type of motion, a five-mile-per-hour impact produces the same amount of force, so in some sense, yes, there's going to be a lot of similarities because, again, that's just physics and basic science. There's not a lot that changes in some of these.
Q Perhaps you misunderstood. I asked whether there was a template for your report.

143

A For some things, I think. Obviously my education, background, some of those things are the same.
Q If you look at the first two reports in this exhibit, I'm going to set them side by side, and it looks to me that the first page looks exactly the same, only the names of the people up at the top has changed; isn't that true?
A Well, again this is saying thank you for working with us or us working with you, here's who I am, here's my background. So no, that doesn't change from report to report because who I am doesn't change from report to report. I am who I am, as Popeye would say.
Q I'm asking you questions really about your report and the template. So you started with the same Word file when you wrote both of those, is that fair? I mean, you didn't retype the exact same stuff word for word, punctuation by punctuation in those two reports, did you? You used a template; right?
A Correct, or just a report that, I guess -- it's not a template, but it might just be a blank report like this that it has this background and various things.
Q And in looking at these first two reports, you go through the same order in term of your headings, Incident Description, followed by Information Received, followed by Biomechanical Analysis, followed by Injury Summary, followed by Damage and Incident Severity, followed by Kinematic

144

Analysis, followed by Findings, followed by Evaluation and Injury Mechanism, followed by Conclusion.
A Correct. It basically follows what we said previously, our steps -- I don't know how many we enumerated, but one through seven, one through eight.
Q So you're either working from the same Word file or a template in Word or something when you go and write these reports?
A We follow the same format, correct.
Q Do you use that same format when you represent plaintiffs and when you represent defendants?
A Again, it basically should be the same. Sometimes we are looking at different things from the plaintiff's point of view, but generally if we're asked is there a causal relationship between a claimed biomechanical failure and this event, because the protocol is the same, we would go through a similar approach.
Q Let me ask you. When you're hired by the defense, do you ever reach the conclusion that the forces were in excess of human tolerance or that the biomechanical failure did occur when you represent the defendant?
A Yes.
Q And when you reach those conclusions, do you still express your conclusions in the same format, a templated report, it's the opposite, instead of saying it didn't occur, you

Bradley Probst, Volume I - August 8, 2013

145

1  say it did occur?
2  A   No.  Again, just to be specific, the way this methodology
3      works is if there is no mechanism, then we can rule out a
4      causal relationship.  If there is a mechanism, all that we
5      can say, and this is pure science, is that we cannot rule
6      out the potential or possibility that this event did produce
7      a causal relationship.  We can't say anything more than that
8      because we can show that it produced an injury, but that doesn't
9      mean that it did happen.  So from a pure scientific view, we
10     just simply say that it cannot be ruled out, just to be
11     scientifically accurate.
12  Q   I think I understand.  When you're saying, for example, we
13     cannot establish the causal link, that's meaning no, this
14     did not cause it.  But if you're finding the opposite of
15     that, you're not finding that there is a causal link, you're
16     saying a causal link cannot be ruled out?
17  A   We're saying a causal link exists.  Whether this event did
18     produce this injury or not, we can't say anything to that
19     effect.  We can simply say that the mechanism is possible
20     and that's all we can say.  Again, that's pure science.
21     That's all that science allows us to do.
22  Q   So basically what you're saying is that it's impossible to
23     say on a more probable than not basis that a causal link
24     does exist in fact.  You can only say on a more probable
25     than not basis that you can't rule it out or that it doesn't

146

1  exist.
2          THE WITNESS:  Can you repeat the question?  I just
3      want to make sure I understand it.
4          (Pending question read back.)
5  A   Just to be clear, this is the means by which I produce the
6      reports.  If we're simply looking at pure biomechanics and
7      just biomechanics and saying can biomechanics alone without
8      any other subjective information, circumstantial
9      information, anything else, what does it allow you to do?
10     And it certainly says whether there is or is not a
11     mechanism.  And what you can factually do with that is if
12     there's not a mechanism, then you can say something could
13     not have occurred.  If there's a mechanism, then something
14     might have occurred.  And if we have in some other
15     information that suggests a broken bone, say, that's an easy
16     example, this bone wasn't broken because we're not driving
17     with an open leg fracture in a vehicle, therefore we know it
18     must have occurred in this event and we can show that
19     there's a mechanism and, therefore, we say yes, definitely
20     there is a mechanism and, in fact, this injury or this
21     failure did come from this event.
22  Q   So that makes it sound like for a broken leg you could say
23     on a more probable than not basis that there is a causal
24     link between a collision and a broken leg; right?
25  A   Again, I'm just being clear.  If we're looking at just

147

1  biomechanics, and normally that's when I'm writing a report
2      from that point of view here is what biomechanics tells us.
3      That's ignoring any other subjective information or any
4      other potentially objective information as to the occurrence
5      of the events.  We're simply saying from, again, as we
6      enumerated, a force, kinematic, mechanical failure
7      perspective.  That's what it allows us to do.
8          Then if you have additional information, then you can
9      state within a reasonable degree of certainty that, in fact,
10     this did or did not occur in this event.
11  Q   You mentioned with a leg fracture that you could verify it.
12     Is there something different about a leg fracture versus
13     like whiplash symptoms, neck strain or something from a
14     biomechanical perspective?
15  A   Well, there's certainly -- I see a wide range of events and
16     failures.  Certainly somebody who is a quadriplegic was not
17     driving a vehicle while they're a quadriplegic, so it's very
18     factual that that quadriplegia occurred at that time, not
19     while they were driving or anything else.  So, yes, there
20     are different degrees that can be seen during these events.
21  Q   So can you think of a single instance where you were hired
22     by the defendant in a case and you found that basically
23     there was a mechanism for biomechanical failure and that you
24     could not rule out a causal link to the motor vehicle
25     collision?

148

1  A   Certainly.
2  Q   What case?
3  A   I don't know the case name.  I know there was one where it
4      was, in essence, what would be for the plaintiff a frontal
5      impact to their vehicle and they had a rotator cuff tear,
6      and so the mechanism did exist for mechanical failure, so it
7      was not possible to rule it out.  I think I've had others
8      where people have had some different type of congenital
9      conditions or malformations or non-unions of bones or a
10     surgical procedure sometimes, even, I think, that day of the
11     event, and it doesn't allow us to say there's not this
12     failure mechanism or causal relationship.
13  Q   The one that you're thinking of where it was a front-end
14     collision and the person had a rotator cuff injury, do you
15     remember what kind of vehicle acceleration and speed change
16     you were finding in that case?
17  A   Not as I sit here today, but it was significantly above
18     this.  There was significant crush to the vehicle, but I
19     don't -- again, I don't recall a specific number.  I just
20     know that we said that there's a mechanism in this event.
21  Q   When you're saying that you found pretty significant crush,
22     are you talking about like the speed change was ten miles an
23     hour and the forces are up around 6.0g's or are you talking
24     about something higher than that?
25  A   Again, I don't recall.  I know it was well in excess of what

37 (Pages 145 to 148)

Bradley Probst, Volume I - August 8, 2013

149

1    we're discussing here today with Ms. Wolf.  And certainly
2    just on a big guess basis, I would say it's in excess of 10
3    miles per hour.  It's been a long day, so my memory might be
4    a little faulty at this point in the day.
5  Q   Part of the reason that I subpoenaed your records, your
6    reports from January 1st, 2011 to present is that I wanted
7    to see whether you've been hired by the defendant in some
8    instances and written a report that reaches a different
9    conclusion than these 23 reports that are marked as Exhibit
10   15.  So can you go back and try and find one for me?
11  A   I can try.  I know in that particular case the client did
12   not request a report, so it's possible.  Sometimes they just
13   simply don't want a report.  So I'll look if I can and I can
14   do the best I can.
15  Q   How many reports like this do you write in a given week,
16   month, year, whatever?
17  A   I don't know.  Again, it's not something that I keep track
18   of and I don't know if there's anything that is a given day
19   or week that's normal.  I think -- I know this week, I
20   think, I've done one or two reports just because a few
21   people had some rushes on things.  I don't know if that's
22   normal or abnormal.
23  Q   Isn't that pretty typical that you're doing one or two a
24   week?
25  A   I mean, if I'm given an assignment and it roughly takes,

150

1    depending upon how long, a couple of days' worth of research
2    and analysis, and some do require inspections, we could
3    certainly do one or two a week just on a given time basis,
4    but that's not counting if we're doing any other type of
5    work aside from just this forensics.
6  Q   For how long has that been true?
7  A   I don't know.  Again, I would like to say in the last year
8    or two things have been fairly typical.  I'd have to go back
9    and actually look to see if that's -- if I had, in essence,
10   a more regular schedule.
11  Q   And even though you don't keep track of it, you could
12   probably recreate it by looking at the e-mails that you sent
13   to your editor, looking at the files that are available on
14   the ARCCA server, and looking at your billing records to see
15   who you have been billing for; is that fair?
16  A   Again, I don't know what our billing records are capable of
17   or anything else.  So it's certainly possible to look into
18   those things, but I don't know what the results would be.
19  Q   I'm trying to get an idea here.  I've got 23 of your reports
20   that are Exhibit 15.  Can you give any estimate as to how
21   many of these reports that look like this involving motor
22   vehicle collisions there are?  I've got 23.  Are there only
23   50 that exist in the world or are we talking 500-plus?  If
24   you are doing 50 to 100 a year, and think you've been doing
25   this for quite some time because I see these reports,

151

1    there's not many, but I've got some going back to the early
2    2000s, I'm thinking they are probably in excess of 500.
3  A   Again, yeah, I've been doing this for about 16 years now, so
4    it doesn't take that many per year to add up.
5  Q   This could easily be a universe of maybe 1,500, maybe 2,000?
6  A   I have no way of knowing.  Again, I don't honestly keep
7    track of it.
8  Q   Is there anybody else that keeps track of this kind of stuff
9    for ARCCA?  Is there anyone that kind of monitors your work,
10   sees how productive you are, sees how many litigation cases
11   you're working on, things like that?
12  A   Not that I know of.
13  Q   Do you have a supervisor, a manager, someone in your office
14   that's sort of your boss?
15  A   No.  In my office, no.
16  Q   How about back in Pennsylvania?
17  A   Well, obviously there's the owner of the company, but I
18   don't report directly to anybody.
19  Q   How much of your time do you spend working on forensic legal
20   matters as opposed to doing other things?
21  A   Again, that's not something I keep track of, but again I've
22   been told in the past it's 60 percent litigation, 40 percent
23   nonlitigation, but I have no way of verifying that because,
24   obviously, some of the work that would be nonlitigation or
25   nonbillable work wouldn't be reflected in any billing

152

1    records.  If it's nonbillable, I would have no records of
2    that in any billing software, so I don't know of any way to
3    go back and research it, validate it or anything.  I don't
4    keep track of it.
5  Q   When you say litigation versus nonlitigation, sometimes
6    you're preparing reports where there's no lawsuit filed and
7    you're just like, for example, making a report to the
8    insurance company; correct?
9  A   Correct.  That's certainly something that's not
10   litigation-related.
11  Q   So if you were to break out sort of how much of your time do
12   you think you spend on doing sort of litigation and
13   nonlitigation matters involving car accidents, analyzing
14   biomechanical failures, stuff like that for either a claim
15   or a litigation type context, how much of your time do you
16   spend doing that?
17  A   I have no way of knowing.
18  Q   You must have some -- let me put it this way.  I think
19   you've got a better idea than I do because you are you and
20   I'm not.  So give me a better idea than what I have
21   currently of, which is no idea.  Does it seem to you like
22   you spend all day doing these things or do you just do it
23   once in a while?  You can give some idea better than "I
24   don't know."
25  A   Again, some days I'm getting presentations together.  I

38 (Pages 149 to 152)

Bradley Probst, Volume I - August 8, 2013

153

1    haven't been doing as much article writing as I've done
2    previously, but we still do nonlitigation research for
3    private entities, things of that nature, so I don't have a
4    typical day where every day I go in and -- it's not an
5    assembly line.  It depends upon what is needed when, what
6    has a deadline when as to what I'm working on, so I don't
7    have a typical day or week.
8    Q   Let me ask you this.  In the last week have you done
9        anything other than these sort of forensic analysis of car
10       accident cases for either litigation or pre-litigation
11       matters?
12   A   Well, this week was a little shorter week for me just
13       because my wife had a surgical procedure, so I wasn't in the
14       office quite as much, so I think the majority of this week
15       was doing litigation work.
16   Q   The majority or all of it?
17   A   I'd have to go back and look, but I think it would be the
18       majority, but not all of it.
19   Q   So what else are you working on that's not a litigation or
20       pre-litigation matter involving like a car accident or a
21       slip and fall or something?
22   A   Well, we have some ongoing research with the National Hockey
23       League.
24   Q   Have you worked on that in the last week?
25   A   We're not working on the actual testing.  We're moving

154

1    towards a larger project, so it requires some background,
2    some --
3    Q   Have you done any of that in the last week?
4    A   Certainly.
5            MR. NYE:  Let him finish his answers.
6    Q   So aside from the National Hockey League, over the last week
7        what other non-car accident, non-slip and fall,
8        nonlitigation, non-pre-litigation type stuff have you been
9        working on?
10   A   Well, obviously, just around the office, I'm, in essence,
11       the senior member of the office, so there are certainly just
12       other office managerial things to deal with that are
13       nonlitigation, just discussing things with employees and
14       various things like that.  I don't keep track of that time,
15       but it certainly is a percentage of my time.  I'm trying to
16       think.  We had some -- the business development person and I
17       were discussing -- they're planning some seminars or various
18       things like that, so we discussed that.  So there's a
19       variety of things that are nonlitigation that are going on,
20       but again I don't have any purpose of noting what percentage
21       is done with the other, so I don't --
22   Q   But I'm trying to figure out.  The things that you just
23       described, that just sounds to me like Mr. Nye's in an
24       office, he probably spends some time going and getting lunch
25       or talking to the receptionist or whatever.  He doesn't bill

155

1    every minute that he's here, but he's doing legal work when
2    he's here.  It sounds to me like you're saying, well, I
3    don't spend every minute that I'm in the office working on
4    this forensic stuff, sometimes I'm like talking to the guy
5    in the office next me or doing something.  But are you
6    actually working on anything, like billing for anything
7    other than doing these car accidents or is this like
8    completely your livelihood right now, you're just doing the
9    litigation and pre-litigation reports and depositions and
10   trial testimony and stuff?  Is this basically all that
11   you're doing that's like bringing money into ARCCA?
12   A   Well, we were just talking about this past week and the work
13       that I was doing that was nonlitigation and was
14       non-billable.  That's why I prefaced it by non-billable work
15       I don't keep track of, so I don't know how to split it up
16       into --
17   Q   Then let me ask you this one.  When's the last time you
18       worked on something billable to a client that had nothing to
19       do with litigation, one of these templated reports, a
20       pre-litigation insurance claim file, a car accident, a slip
21       and fall, some kind of biomechanical failure analysis like
22       this?
23   A   I would have to see if I could do a search like that.
24       Again, I don't split things up to litigation, nonlitigation,
25       forensic, nonforensic.  So as I sit here today I have no way

156

1    of knowing.  That's not how it enters into me in my brain
2    and how it comes back out.  I just look at this as
3    biomechanics.  I do biomechanics.
4    Q   I'll tell you how it looks to me and you tell me if this is
5        wrong.  It looks to my like what you do is you work for
6        defendants in cases and you come in and write reports for
7        defendants and insurance companies in cases, and that's all
8        you do.
9            MR. NYE:  Object to the form; argumentative.  Sam,
10       where are we going?
11   Q   I'm trying to figure out -- am I wrong?  Is that all that
12       you do productive for ARCCA is you're the person who writes
13       these litigation reports and shows up and testifies in court
14       and shows up and testifies in deposition and that's what you
15       do?
16           MR. NYE:  And he prepares presentations, he's
17       working on things for the NHL.  Why aren't you listening to
18       the parts that you don't want to hear?
19   A   That question has been asked and answered.  I've told you
20       things that I do that are nonlitigation, nonforensic.  I
21       apologize.  I don't keep track of things in the manner in
22       which you do.  We work differently.  I can't explain things
23       differently.  While we have different approaches, that's
24       common, that's normal, but...
25   Q   Who are the defense counsel that you work with regularly?

Bradley Probst, Volume I - August 8, 2013

---

157

1  A   I guess I've worked with pretty much everybody in Seattle, a
2      lot of people down in Portland, Oregon.  Most of my -- just
3      because I don't care to travel, I have four children, I try
4      to travel less, I try to keep things more in the Northwest,
5      so there's only so many defense attorneys in the Pacific
6      Northwest, but I've worked with quite a variety of them.
7  Q   Because I've got a lot of these reports.  A lot of them are
8      either Law Office of Kelley Sweeney or Reed McClure or
9      Allstate In-House Counsel.  Are those the offices that
10     you're used to going to and visiting and working with the
11     attorneys at?
12 A   Certainly.  Liberty Mutual, Safeco, Liberty Mutual
13     Northwest, State Farm, Allstate, Progressive, PEMCO.  I
14     don't discriminate.  If somebody calls me and asks me are
15     you physically capable of doing this work, yes.  And so if
16     somebody asks me to do some work that I'm capable of doing,
17     I will accept it.
18 Q   Who are the plaintiff lawyers that you normally work with?
19 A   I would have to -- there's not quite as many again, so I'd
20     have to look those names up.
21 Q   Can you name any of them?
22 A   Traynor.  I don't think you know him because that was in
23     North Dakota.
24 Q   Can you name me a single plaintiff lawyer in the state of
25     Washington that you've worked with?

---

158

1  A   Not as I sit here today.  My mind is starting to turn to
2      mush after being here for this extended time, but I can
3      certainly look up names in the state of Washington at a
4      later time.
5          MR. ELDER:  Let's go off the record.
6          (Recessed 3:23 p.m. to 3:25 p.m.)
7          (Exhibits 16 - 24 marked for identification.)
8  Q   So, Mr. Probst, I'm going to hand you a number of exhibits
9      here, these go all the way from 16 up through 24, and I'll
10     tell you what we've got here.  We've got 16 and 17 are your
11     report in the Green case and a doctor hired by the defendant
12     in Green who verifies that Green was hurt in the vehicle
13     collision.  The next two exhibits, what are 18 and 19,
14     that's your report in LeBlanc and a doctor hired by the
15     defendant in that case who says that LeBlanc was hurt in the
16     motor vehicle collision.  Then the next exhibit is your
17     report in Shim and a doctor hired by the defendant in the
18     Shim case who says that Shim was hurt in the motor vehicle
19     collision.  And then finally the last three here are your
20     report in Baccay, a doctor hired by the defendant in the
21     Baccay case saying that Baccay was hurt in the motor vehicle
22     collision, and then some photos that you reviewed in the
23     Baccay case.
24         First of all, are those your reports in those cases?
25 A   They certainly appear to be, yes.

---

159

1  Q   And in each of these situations you've got the defendant
2      hiring a doctor, and the doctor concludes that the person
3      was hurt in a motor vehicle collision when your opinion is
4      that there was no mechanism for biomechanical failure.
5          And I guess my question is:  Do you see any problem with
6      that or does it affect your opinions in any way when the
7      doctors are saying that the person was hurt?
8          MR. NYE:  Objection.  We've gone through this, Sam.
9      You did it involving our case, which seems me to be a little
10     more pertinent than these.
11 Q   I just want to find out whether there's anything different
12     between this case and a bunch of these other ones.
13 A   I don't recall if I've seen these other IME reports or not,
14     but no, it doesn't concern me that they have a difference in
15     opinion.  My opinion is my own, my own independent analysis.
16     Somebody else's report is not going to sway my opinion
17     because my opinion again is based upon the facts, science,
18     physics, engineering.  So if somebody else says something
19     different, I can't -- that doesn't change my opinion because
20     mine, again, are simply what science is telling me.
21 Q   But let me ask a question here about validation.  At some
22     point if there's enough counter-examples out there, if
23     there's just a scientist is reaching a conclusion and other
24     people, it's not one or two instances, but over and over and
25     over again there are counter-examples where doctors are that

---

160

1      trained in doing examinations and drawing conclusions, and
2      even doctors hired by the person who's causing the injury
3      event are concluding that someone's getting hurt in a motor
4      vehicle collision, and you keep saying that there's no
5      mechanism for biomechanical failure, I guess my question is:
6      At some point does it call into question the validation that
7      you're using?
8  A   No, because this isn't validation.  I don't see in any of
9      these that they are biomechanical in nature, have conducted
10     any testing to show any kinematics, forces or anything that
11     I've done.  I'm validating my work with comparable or
12     similar work.  This is not a biomechanical analysis, any of
13     these reports you provided from anybody else.  These are
14     medical reports.  So I don't validate a biomechanical report
15     with a medical report.  That would be probably unsound
16     science to do that.  So it might be something you believe
17     because you're not as well educated and informed in the
18     field of science or biomechanics, but that's not how it's
19     done and that's not how somebody would do it.
20 Q   What I'm getting from this is I've come up now with five
21     examples, the Green case, the LeBlanc case, the Shim case,
22     the Baccay case, and the Wolf case, this case, where the
23     defense doctors are all saying that the person was hurt and
24     they were hurt in the motor vehicle collision in question.
25     But what I'm hearing from you is it wouldn't matter if

---

Bradley Probst, Volume I - August 8, 2013

161

1    there's a thousand instances where doctors are unanimously
2    agreeing that people have been hurt in a motor vehicle
3    collision.  As long as they're medical doctors that are
4    saying this and reaching that conclusion, it would never
5    affect biomechanical science in your opinion; is that fair?
6    I mean, if five isn't going to do it, a thousand isn't going
7    to do it either?
8    A    Well, I guess maybe -- I don't want to prolong this any
9    more, but if you're looking at these reports, some of these
10   say there might be some mild straining, which from medical
11   professional verbiage or language, if somebody reports some
12   type of discomfort, to give a diagnosis they will say it's a
13   sprain or strain.  In none of these do they say there's some
14   type of mechanical failure and there's an actual mechanism
15   or there is some causal linkage between the two on an
16   objective basis.  They're all saying that she says she was
17   hurt, she says it wasn't existing prior to this, it exists
18   after this.  These physicians have nothing else to go on
19   other than these individual's words.  And if they actually,
20   again, did a biomechanical analysis, they would reach a
21   different conclusion.
22        We're looking at it from two different points of view.
23   They have a grossly more limited data set than I do because,
24   in essence, they're relying upon subjective information.
25   Here is what somebody told them happened.  That's not what

162

1    I'm doing.  So you could certainly find quite a number of
2    physicians that will say anything one way or the other
3    because they're simply reiterating what has been told to
4    them.
5    Q    And so that's your opinion is that these doctors that have
6    been hired by the person who caused the motor vehicle
7    accident to investigate whether the person that they hit is
8    hurt or not, that they're just basically -- someone's
9    telling them that they got hurt in the car accident and
10   these doctors are just accepting it at face value without
11   really performing any medical analysis and they're just
12   basically writing it down that that's how it must have
13   happened?
14        MR. NYE:  Objection.
15   A    No.  I guess you asked earlier what does biomechanics bring
16   to the table, what does it add.  And this is exactly what it
17   adds.  So if you go to an IME, they look at medical records
18   and they ask what happened.  I was in a car accident.  Okay.
19   That's what they have to work with.  They're not going out
20   and performing a reconstruction, kinematic analysis,
21   biomechanical analysis.  They're relying upon what has been
22   told to them by this individual and they reach their
23   conclusions, again using a differential diagnostic technique
24   that's relying upon subjective information.  I'm relying on
25   objective information.  I'm using factual information,

163

1    engineering science and physics to add additional
2    information as to what factually did occur.
3    Q    Let me ask you specifically regarding Exhibit Number 24, and
4    those are the photos that you reviewed of the Baccay
5    vehicle; isn't that true?
6    A    Correct, I guess.  Without having to go back through my
7    file, I will assume that what you're saying is correct.
8    Q    And, actually, if you take a look at the injury description
9    in your report, which is Exhibit Number 22, that might help
10   you verify that this was, in fact, the Baccay vehicle that
11   was involved in a T-bone collision.  The defendant pulled
12   out in front of the Baccay vehicle and Baccay was driving
13   this vehicle and ran into the side of the defendants
14   vehicle, and these are the photos that you reviewed; is that
15   fair?
16   A    Again, I'm assuming this is the vehicle.  It appears to be a
17   Honda Civic.  I don't have a vehicle ID number or anything
18   else to say specifically.  Again, I'll take your word for
19   it.
20   Q    And the air bags went off during this collision?
21   A    That's what is noted in my report, correct.
22   Q    And describe for me the severity of the property damage in
23   Exhibit 24.  How does it look to you?
24   A    Well, I prefer to use what's in my report, which is
25   objective and, again, it's quantitative and not qualitative

164

1    of just describing what's shown in the photographs.  We
2    performed an energy-based crush analysis and there was
3    significant override/underride due to bumper mismatch, and
4    what we found is that this incident is consistent with a
5    ten-mile-per-hour Delta-V for this vehicle.
6    Q    Was the collision in this Baccay case severe enough that
7    some of the material components of the Baccay Honda Civic
8    failed?
9    A    Certainly, yes, there is some type of mechanical failure to
10   this vehicle.
11   Q    Does this appear to be a collision that's severe enough that
12   the air bags went off as a result of the collision?
13   A    Correct, air bags generally will deploy in the 8- to
14   14-mile-per-hour range.  I think, again, just looking at my
15   report in a very brief fashion, we note a 10-mile-per-hour
16   Delta-V, so that's certainly within that 8- to
17   14-mile-per-hour range, so it would not be unexpected.
18   Q    And what was the average acceleration of the vehicle that
19   you found?
20   A    Well, we noted it in a peak acceleration, so we have, I
21   think, a peak acceleration of 6.0g's for this incident.
22   Q    I've got to ask you because you called it peak acceleration
23   of 1.5 in this case.  So when you're talking about peak
24   acceleration of 6.0 in that case, do you mean that the 6.0
25   is analogous to the 1.5 or analogous to the 3.0g's of

Bradley Probst, Volume I - August 8, 2013

165

1      acceleration?
2   A   I made myself extremely clear on all these accelerations. I
3       apologize if you're incapable of understanding it, but it's
4       quite clear that this is a 6.0g peak acceleration.
5   Q   So is it comparable to the 1.5 or the 4.0 in the Wolf case?
6   A   You can compare anything. I mean, numerically 1.5 is less
7       than 6.0. That's a comparison. What do you mean
8       comparison?
9   Q   Well, if you're comparing apples to apples, if you're
10      comparing whatever calculation you made, you call it peak
11      here, you called it peak 1.5 in Wolf, so I need to know. If
12      you're comparing apples and apples, if you're comparing the
13      6.0g's of vehicle acceleration that you found in the Baccay
14      case, is that comparable to the 1.5g's that you wrote in
15      your report in the Wolf case or comparable to the 3.0g's
16      that you've identified in Exhibit 3?
17  A   This is a 6.0g peak acceleration. In Wolf we said 3.0g peak
18      acceleration. Those are the peak accelerations. I've made
19      myself painfully clear. I apologize if you simply cannot
20      grasp these basic concepts.
21  Q   And despite the fact that the vehicle got pretty smashed up
22      and the air bags went off, you still found that there was no
23      mechanism for biomechanical failure in the Baccay case;
24      isn't that true?
25  A   If you read my report, we go into great detail as to why

166

1       that occurs and doesn't occur. If you have anything in my
2       report that you disagree with other than results or
3       conclusions, I'm happy to address them. But it's all laid
4       out there in a scientific basis. If you have something to
5       say that it's scientifically invalid, I'm happy to discuss
6       it.
7   Q   I just want to make sure that I'm understanding. The
8       conclusion that you did reach in the Baccay case was that
9       there was no biomechanical failure that resulted from this
10      collision.
11  A   The actual conclusions, if you'd like me to read all of
12      them, is that on August 27, 2008, Ms. Cayetana Baccay was
13      the belted right front seat passenger of a 1992 Honda Civic
14      that was contacted in the front. The severity of the
15      subject incident was consistent with a Delta-V comparable to
16      10 miles per hour with peak acceleration comparable to 6.0g
17      for the subject 1992 Honda Civic in which Ms. Baccay was
18      seated. Three, the acceleration experienced by Ms. Baccay
19      was within the limits of human tolerance and comparable to
20      that experienced during various daily activities. Four, the
21      forces applied to the subject vehicle during the subject
22      incident would tend to move the occupant's body forward
23      relative to the vehicle's interior. These motions would
24      have been limited and well controlled by the three-point
25      restraint and seat bottom friction. All motions would be

167

1       well within normal movement limits. And five, there is no
2       causal link between the reported lumbar injuries of the
3       occupant and this reported collision. Ms. Baccay
4       experiences loading on a daily basis greater than that
5       experienced in this incident. An injury mechanism for the
6       claimed thoracic and lumbar injury was not present in the
7       subject incident. There would be no motion of the thoracic
8       and lumbar -- and I think we're missing a word -- spine
9       outside of the normal physiologic range of motion.
10  Q   Is there something in the property damage -- in the Baccay
11      case, is there some property damage that you would expect to
12      see if that collision was bad enough that Baccay actually
13      sustained a biomechanical failure in that collision that
14      we're not seeing in Exhibit 24?
15  A   I'm not sure if you simply are failing to understand how a
16      biomechanical analysis is performed, but we're not simply
17      looking at severity alone. If you read any of these reports
18      you would quite plainly understand that. Certainly if you
19      do increase the severity, as I said, these are nonlinear
20      events, something else could occur. What I analyzed was
21      that specific event. I wasn't ask to analyze some other
22      hypothetical event, so I can't say what we might or might
23      not expect without given specifics to analyze your
24      hypothetical.
25  Q   Are you familiar with the four tendons that converge to form

168

1       the rotator cuff tendon?
2   A   Yes.
3   Q   What are they?
4   A   We have the supraspinatus, the subscapularis, teres minor
5       infraspinatus, I believe.
6   Q   Which of these tendons is most commonly associated with
7       rotator cuff tears?
8   A   I'm not an epidemiologist, I don't look at anything like
9       that, so I don't keep track of that information.
10  Q   Which tendons were involved in Ms. Wolf's rotator cuff tear?
11  A   I would have to go through my file and look at that. If
12      you'd like, I could find my file somewhere on this table and
13      let you know what it is. I didn't commit it to memory for
14      today's purposes.
15  Q   Let me ask you. As part of your analysis does it make any
16      difference which of those four tendons are involved?
17  A   It certainly can. It depends upon, again, the direction of
18      impact the type of analysis we're performing, but it's
19      certainly something that we do look at. Again, that's how
20      you do the mechanical failure. You find out what anatomic
21      structure is damaged and then that structure -- in this case
22      you have various attachment points and that's going to
23      dictate what type of movement or range of movement is
24      allowed and you certainly look at that information.
25  Q   Now, not generally, but specifically in Ms. Wolf's analysis,

## 169

1  did your work depend in any way on which of the four tendons
2  was torn in this rotator cuff tear injury?
3  A   As I said previously, it's in the file. I looked at that
4  and utilized that in determining what mechanism would be
5  required. Beyond that, I didn't commit it to memory for
6  purposes of today what specific structures were damaged.
7  Q   Let me ask you. Did you indicate in your report which of
8  the tendons were torn for her?
9  A   I don't recall. Sometimes I do note that, sometimes I
10  don't.
11  Q   Can you tell us biomechanically which shoulder positions are
12  usually associated with supraspinatus tendon rotator cuff
13  tear injuries versus infraspinatus tendon rotator cuff
14  tears?
15  A   Generally with the supraspinatus it's something that's
16  generally producing an impingement where you have the arm
17  raised overhead, something to that effect.
18  Q   And the infraspinatus?
19  A   Oh, I would have to again look at a reference. Right now as
20  I sit here today, I don't know as far as just straight
21  mechanical failure compared to normal wear and tear and
22  repetitive stress type injuries. I don't recall as I sit
23  here today and I don't commit everything to memory when I
24  have references.
25  Q   Is it anything that you noted in your report?

## 170

1  A   I don't recall that I noted anything about the difference of
2  those two mechanisms.
3  Q   How much force does it take to cause a rotator cuff tear
4  involving the infraspinatus tendon? Can you describe that
5  for me?
6  A   What kind of event are we talking about, what kind of
7  individual, what kind of pre-existing conditions, what are
8  we dealing with?
9  Q   So in order to answer the question do you need to know all
10  of those answers or do you need to know that data?
11  A   It's certainly -- you've asked a very open-ended question,
12  what does it take to damage something. That's a very
13  incomplete question.
14  Q   Well, I'm just asking you generally to describe it. Can you
15  give us any description of what that -- let me put it this
16  way. Some of the people on the jury, they may have no idea
17  that there even are tendons that make up a rotator cuff.
18  For example, describe what does the infraspinatus tendon
19  sort of look like as it goes into the rotator cuff, how big
20  around is it, what kind of material does it feel like. Can
21  you describe those kind of things?
22      MR. NYE:   Object to the form. There's about eight
23  questions in there.
24  A   Tendons are what are described as thick cartilaginous
25  structures. So for somebody on a jury, if they've --

## 171

1  they've probably seen it in chicken they're eating and
2  various things like that. I don't recall -- again, it's not
3  something I would commit to memory an exact size of each of
4  these individual tendons. It's not the manner in which
5  biomechanical failure is assessed, so I don't recall as I
6  sit here today.
7  Q   Let me ask you this. The insertion site of the rotator cuff
8  tendon at the greater tuberosity is often referred to as the
9  footprint. Have you heard it describe that way?
10  A   Possibly. I don't know.
11  Q   Do you know how big the footprint is in terms of area?
12  A   If I'm not very familiar with the term footprint, I would
13  not know what they're describing as an area of something I'm
14  not familiar with, no.
15  Q   I won't use the word footprint then. Do you know the area
16  of the insertion site of the rotator cuff tendon at the
17  greater tuberosity?
18  A   As I sit here today, no. Again, it's not something that
19  comes into any biomechanical analyses in the fashion I
20  normally analyze them. If something like that were to come
21  up, I certainly have references that I would look at. It's
22  often said that a good engineer doesn't rely upon memory
23  alone, they actually look to a reference to get an exact
24  value. And that's what I prefer to do and I don't commit a
25  lot of these things to memory because memory can be faulty.

## 172

1  Q   I'm just trying to get idea as to how familiar you are with
2  these things and whether you can just spout it off off the
3  top of your head because you know the anatomy and you know
4  these different tendons like really well and that you've
5  worked on them or whether they're the kind of things that
6  you need to go look up. It sounds like you would need to go
7  look up any of the specific data on these tendons and how
8  the rotator cuff is constructed, how it's anchored and so
9  forth.
10  A   Certainly at this point in this day, of course, it's been a
11  long day and it wasn't something I prepared for. I didn't
12  know we were going to have an anatomy quiz, so I certainly
13  wasn't prepared for that. I was prepared to discuss this
14  event with Ms. Wolf.
15  Q   How about when you authored the report that you put together
16  on Ms. Wolf, did you feel like at that time you had a really
17  good understanding of the anatomy of the shoulder, the way
18  that these tendons come together, did you look specifically
19  at things like the nature of her tear and what kind of force
20  it took in order to be able to tear the specific tissues
21  that she tore?
22  A   Again, it's kind of a compound question, but I don't know --
23  in this particular case we're looking at what her kinematics
24  are and whether those kinematics allow for any of these
25  significant loading to any of those structures. And

Bradley Probst, Volume I - August 8, 2013

173

```
 1      sometimes the nature of the tear has no -- makes no
 2      difference in the final conclusions.  I just don't recall
 3      exactly what we did and didn't look at, but we certainly
 4      were provided significant information, imaging reports that
 5      discussed exactly what the findings to her shoulder was.  So
 6      we had that information.  If it was relevant in my analysis,
 7      it was utilized.
 8  Q   What level of detail did you get into?  Did you look at the
 9      difference between sort of biomechanical failures involving
10      the supraspinatus tendon as opposed to the biomechanical
11      failures with the infraspinatus or did you just look at the
12      general level of rotator cuff injuries?
13  A   Looked at it on both levels.  One, obviously, in a rear-end
14      collision we're not going to expect just biomechanically any
15      type of rotator cuff tears until something unique is
16      occurring.  And then if we look at the specific structures
17      that are damaged, that's going to dictate exactly what kind
18      of movement.  And there's oftentimes when you look at
19      structures it would show that you would have to have two
20      separate movements and two mutually exclusive directions,
21      and it simply can't be done.  I don't always note that in my
22      report.  We simply note quite clearly that there's not a
23      mechanism.
24  Q   Is that the kind of mechanism that just wouldn't occur in a
25      rear-end collision?
```

174

```
 1  A   I hate to sound like a broken record, but a rear-end
 2      collision does not tell me anything, so I can't answer a
 3      question if you haven't given me anything specific.
 4  Q   Let me ask it this way.  Earlier you talked about the fact
 5      that there was a case where there was a front-end collision
 6      and a rotator cuff injury and that you could not rule out a
 7      rotator cuff injury; isn't that true?
 8  A   Correct.
 9  Q   And in this case you could rule out a rotator cuff injury
10      involving a rear-end collision.  And so I guess my question
11      is:  Is there something about the fact that in a front-end
12      you couldn't rule it out, but in a rear-end you could or
13      does it have -- so in other words, is the direction that's
14      important here or is it the magnitude primarily that's the
15      differentiating factor?
16  A   In that particular case, obviously the magnitude was
17      greater, but also the direction was 180 degrees different.
18      So yes, there is a significant different direction of force
19      application, movement of the occupant, and loading to the
20      shoulder.  We're talking two vastly different events.  Not
21      anything similar.  You can't compare the two.
22  Q   Well, I can compare them.  You had a front-end with higher
23      magnitude and you had a rear-end with a lower magnitude;
24      isn't that right?  Is that correct?
25  A   Correct.
```

175

```
 1  Q   And then in the front-end with the higher magnitude you
 2      found that you could not rule out a rotator cuff injury, in
 3      the lower magnitude with a rear-end you could rule it out.
 4      I've done some more comparison.  That's fair, isn't it?
 5          MR. NYE:  Object to the form.
 6  A   If you wish to make those comparisons, certainly, you can do
 7      those.
 8  Q   So let me ask you this.  If you took the higher magnitude
 9      and put that with the rear-end collision, would you not be
10      able to rule out a rotator cuff injury?
11  A   In this particular case, all things being equal, it still
12      would not produce a mechanism if we increased -- it depends
13      upon how much you increase the magnitude because -- again,
14      we've been down this road, that these events are nonlinear.
15      At some point you might expect seat failure, seat collapse,
16      unrestrained occupants, all these various things.  But if
17      the seat remains upright and you have no other change other
18      than you've increased the loading to the vehicle, you're
19      still not producing the mechanism.
20  Q   Let me ask you a question generally about rotator cuff
21      injuries and biomechanical failures.  When a person has a
22      congenital bony outcropping on the acromion surface, does
23      that increase the likelihood of biomechanical failure?
24  A   It certainly has the potential because now you're creating
25      this natural impingement.  Either you have a Type 1, Type 2,
```

176

```
 1      Type 3 acromion and you've decreased the space.  And
 2      depending on the type of work you do, the type of movements
 3      that you do, the amount that you perform these tasks, and
 4      the number of times, all those various things, it certainly
 5      can allow for more rapid degenerative changes.
 6  Q   But it's not just degenerative.  It also would lead someone
 7      to be more susceptible to a biomechanical failure from a
 8      traumatic event; isn't that true?
 9  A   Again, potentially, if you're producing a force in the
10      direction that would already be in that natural impingement
11      area.  So you've already started with an impingement, and,
12      obviously, if you have two people, all things being equal,
13      obviously if one starts with a greater impingement and you
14      add additional force, that person should end with a greater
15      impingement.
16  Q   So do you know with regard to Laura Wolf whether she had a
17      bony outcropping on the acromion surface?
18  A   As I sit here today I don't recall.  Again, it didn't affect
19      her personal tolerance level based upon the various tasks
20      she could perform and it didn't affect the potential for
21      biomechanical failure in this event.
22  Q   But it would affect her susceptibility to biomechanical
23      failure from traumatic injuries if she did have a bony
24      outcropping on the acromion surface; correct?
25  A   That's a very generic question.  Can somebody be injured,
```

44 (Pages 173 to 176)

Bradley Probst, Volume I - August 8, 2013

**177**

1  can somebody not be injured is, in essence, what you've
2  asked.
3  Q  I asked about susceptibility. And I think from your prior
4     answers you indicated this someone with a bony outcropping
5     is more susceptible to a traumatic injury?
6        MR. NYE: Object. The question mischaracterizes
7     his testimony.
8  A  You didn't ask that. From a biomechanical point of view
9     just saying somebody has a variation doesn't tell you
10    anything because you haven't said what the event is, what
11    the magnitude is, what the direction is, anything else. Is
12    it below somebody's personal tolerance level? If it's below
13    somebody's personal tolerance level, they're not going to
14    have a mechanical failure whether they have a bony
15    outcropping or not. So it's not as simple cut-and-dry,
16    black-and-white as you envision. There's more to it than
17    that.
18 Q  Let me ask it little bit differently. If someone has a bony
19    outcropping on the acromion surface and that bony
20    outcropping is creating some level of impingement of the
21    rotator cuff, already doesn't that leave the person more
22    susceptible to a traumatic injury of their rotator cuff as
23    compared to someone that's anatomically exactly the same
24    except they don't have any bony outcropping on the acromion
25    surface and they don't have any impingement?

**178**

1  A  I think we answered that question before, that if you have
2     two people and they are both -- the only difference is their
3     bony outcropping, and if you load one person below failure
4     and the other person at the level below failure but the
5     included impingement does raise that level to failure,
6     certainly there's a difference. But if you're still talking
7     we're only looking at somebody with a bony impingement and
8     we know the force level is below their tolerance level, it's
9     irrelevant whether they have that bony outcropping or not.
10       (Discussion off the record.)
11       (Deposition adjourned at 3:58 p.m.)
12       (Exhibits 1 - 14 attached.)
13       (Signature reserved.)

**179**

1                C E R T I F I C A T E
2  STATE OF WASHINGTON )
3                      ) ss.
   COUNTY OF KING     )
4     I, Elaine K. Rippen, a certified court reporter in and for
   the State of Washington, do hereby certify:
5
6     That the witness was sworn before me at the time
   and place therein set forth;
7
8     That the witness was by me first duly sworn or affirmed to
   testify to the truth, the whole truth, and nothing but the truth;
9  and that the testimony of the witness and all objections made at
10 the time of the examination were recorded stenographically by me
11 and thereafter transcribed under my direction;
12    That the foregoing transcript is a true record of the
13 testimony given by the witness and of all objections made at the
14 time of the examination, to the best of my ability.
15    I further certify that I am in no way related to any party to
16 this matter nor to any counsel, nor do I have any interest in this
17 matter.
18    Witness my hand this 19th day of August, 2013.
19
20
21    _____
22    ELAINE K. RIPPEN, CCR
      CCR License #2742
      Certified Court Reporter in and
23    for the State of Washington,
      residing at Burien.
24
25

**180**

1            DECLARATION OF WITNESS
2  STATE OF WASHINGTON)
3                     ) ss.
   COUNTY OF _____)
4  In Re: Wolf v. Stevens
   Case No. 12-2-11026-3 SEA
5  Deposition of: Bradley Probst
   Taken: August 8, 2013
6
7     Pursuant to the laws of the State of Washington, I declare
8  under penalty of perjury the following to be true:
9
10    I have read my deposition and the same is true and accurate
11 save and except for changes and/or corrections, if any, as
12 indicated by me on the CORRECTIONS or CHANGES page herein.
13
14 Signed at _____, Washington on the _____ day of
15 _____, _____.
16
17
18    _____
         BRADLEY PROBST
19
20
21
22    (Reported by: Elaine K. Rippen)
23
24
25

45 (Pages 177 to 180)

Bradley Probst, Volume I - August 8, 2013

181

NORTHWEST COURT REPORTERS        Wolf v. Stevens
1   Elaine K. Rippen        King County No. 12-2-11026-3 SEA

2   1415 Second Avenue
    Suite 1107

3   Seattle, WA  98101    Depo: Bradley Probst
    (206) 623-6136              August 8, 2013

4

5   Please make all corrections, changes or clarifications to your
    testimony on this sheet, showing page and line number and the

6   nature of the change.  If there are no changes, write "none"
    across the page.  Sign this sheet on the line provided.

7

8   Page  Line              Reason for Change
9   ____/_____/_____
10  ____/_____/_____
11  ____/_____/_____
12  ____/_____/_____
13  ____/_____/_____
14  ____/_____/_____
15  ____/_____/_____
16  ____/_____/_____
17  ____/_____/_____
18  ____/_____/_____
19  ____/_____/_____
20  ____/_____/_____
21  ____/_____/_____
22  See:  Wash. Reports 34A,
          Rule 30(b), USCA 28,
23        Rule 30(e)
24        Signature:_____
          BRADLEY PROBST
25

---

1           NORTHWEST COURT REPORTERS
            1415 Second Avenue, Suite 1107
2             Seattle, Washington  98101
                   (206) 623-6136
3

4   DATE:  August 19, 2013
5   TO:  SAMUEL ELDER
          Law Office of Sam Elder
6         12716 Northeast 106th Lane
          Kirkland, WA  98033
7

8

9

10

11             NOTICE RE FILING OF ORIGINAL DEPOSITION

12

13  RE:  Case Name:  Wolf v. Stevens
         Venue:  King County Superior Court
         Case No.:  12-2-11026-3 SEA
14       Deposition of:  Bradley Probst
         Taken:  August 8, 2013

15

16

17       Enclosed is the original sealed transcript of

18            BRADLEY PROBST.

19       The original signature page and changes, if any, received by
    this office will be forwarded to all counsel.

20

21

22

23            Elaine K. Rippen

24
    cc:  File
25       Christopher Nye

---

1            NORTHWEST COURT REPORTERS
            1415 Second Avenue, Suite 1107
2             Seattle, Washington  98101
                   (206) 623-6136
3

4              August 19, 2013

5   TO:  CHRISTOPHER J. NYE
          Reed McClure
6         1215 Fourth Avenue, Suite 1700
          Seattle, WA  98161
7

8   RE:  Wolf v. Stevens; Case No. 12-2-11026-3 SEA

9   DEPOSITION OF:  Bradley Probst
          Taken August 8, 2013
10  Dear Mr. Nye:
11      Enclosed is your copy of the above deposition, plus a
    correction sheet and a declaration.  Please have the witness read
12  the deposition, make whatever corrections and/or changes that are
    appropriate, then sign the correction sheet and the declaration.
13

14      Upon completion, please return the corrections and
    declaration to me at the above address for distribution among
15  counsel and filing.  Please be aware that the court rules provide
    that this be accomplished with 30 days of receipt of this notice,
16  or before trial, whichever occurs first.
17

        Thank you for your cooperation in this matter.
18

19

20

21

        Elaine K. Rippen, CCR
22

23

24  enc.
    cc:  Court file
25       Samuel Elder